# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CHELLINO CRANE, INC., *et al.*[1] | § | Case No. _____ |
| | § | |
| Debtors. | § | (Joint Administration Requested) |

## EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO: (A) USE CASH COLLATERAL; (B) INCUR POSTPETITION DEBT; AND (C) GRANT ADEQUATE PROTECTION AND PROVIDE SECURITY AND OTHER RELIEF TO FIRST MIDWEST BANK

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), in the above-captioned Chapter 11 Cases (the "Chapter 11 Cases"), by and through undersigned counsel, hereby file this motion (the "Motion") for entry of the interim order (attached hereto as **Exhibit A**) (the "Interim Order"), and later after notice and a hearing, a final order (the "Final Order"), authorizing the Debtors to: (a) use Cash Collateral; (b) incur Postpetition Debt, pursuant to the terms of the Postpetition Credit Agreement (as defined herein); and (c) grant adequate protection and provide security and other relief to First Midwest Bank ("First Midwest"). In support of the Motion, the Debtors state the following:

## I. JURISDICTION

1.    The United States Bankruptcy Court for the Northern District of Illinois (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Chellino Crane, Inc. (6804); Sam J. Chellino Crane Rental, Inc. (0830); G & B Equipment, LLC (0688); Chellino/Industrial Park Family Limited Partnership (1246); and Chellino Industrial Management, Inc. (0691). The address for all of the Debtors is 915 Rowell Avenue, Joliet, Illinois 60433 (the "Real Property").

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409 as the Debtors are headquartered at 915 Rowell Avenue, Joliet, Illinois 60433.

## II.  RELIEF REQUESTED

3.      The Debtors seek entry of the Interim Order and Final Order, (a) authorizing the Debtors to use "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, "Cash Collateral") pursuant to §§ 361 and 363 of title 11 of the United States Code (the "Bankruptcy Code"); (b) granting adequate protection to the Prepetition Account Lenders (as defined herein) pursuant to §§ 361, 362, and 363 of the Bankruptcy Code, solely to the extent of diminution in value of their respective interests in the Prepetition Account Collateral (as defined herein); (c) authorizing the Debtors to obtain secured postpetition financing (the "DIP Loan") from First Midwest Bank ("First Midwest" or the "DIP Lender") pursuant to §§ 364(c)(1) and 364(d) of the Bankruptcy Code, Rule 4001 of the Federal Bankruptcy Rules of Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Bankruptcy Rules for the Northern District of Illinois (the "Local Rules"); (d) vacating or modifying the automatic stay imposed by § 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms provided herein; and (e) granting related relief.   Additionally, the Debtors request that the Court schedule the Final Hearing to consider approval of this Motion on a final basis.

## III.  PRELIMINARY STATEMENT

4.      The Debtors have arranged for $7,017,903.06 in financing under the DIP Loan – financing that is critical to the continued operation and viability of the Debtors' businesses – and continued access to the use of Cash Collateral.  The Debtors seek approval of the DIP Loan for purposes of providing to their key constituents (such as vendors, employees, and professionals) with the confidence that the Debtors will have sufficient cash if the Debtors' postpetition revenues turn out to be uneven or insufficient.

SFGH:4811-7678-1640v1

5.      Certain of the Debtors' prepetition loans are in default, and multiple lawsuits have been filed across the country.  Faced with immediate prospects of losing critical equipment and falling victim to potential judgments, over the past several months Debtors engaged their prepetition secured lenders and third-party financing sources in negotiations designed to address the Debtors' over-levered balance sheet while simultaneously minimizing the adverse impact on the Debtors' businesses and preserving the Debtors' ability to continue to operate.  The proposed DIP Loan represents the Debtors' best (and only) option for survival, thereby safeguarding prospects for continued (i) employment of skilled unionized employees and (ii) performance on important contracts with sophisticated corporate counterparties.

6.      The DIP Loan, if approved by the Court, will help to fund the Debtors' operations during the Chapter 11 Cases and allow the Debtors to continue to perform under their contracts. The process for obtaining the DIP Loan yielded fair terms, adequate availability, competitive pricing, and an appropriate maturity date.

## IV.  BACKGROUND

7.      The Debtors are a leading provider and one of the largest crane companies in the Midwest, specializing in providing full service capabilities to niche markets such as refineries, power and chemical plants.  Chellino Crane, Inc. (the "Company") consists of two divisions: a Crane Division focused on providing customers with a full range of crane services and a Heavy Haul/Heavy Lift Division which specializes in transport and heavy lift/rigging services.  A more complete description of the Debtors' operations and history is set forth in the *Declaration of A. Jeffrey Zappone in Support of First Day Motions* (the "Declaration"), filed contemporaneously with this Motion.

### A.    The Debtors' Debt Structure

8.     The Debtors are parties to certain loan and security agreements (as amended, modified and/or supplemented from time to time)[2] with twenty-one (21) secured lenders (the "Prepetition Secured Lenders"), pursuant to which the Prepetition Secured Lenders made loans and other financial accommodations to or for the benefit of the Debtors.  As of the Petition Date, the Debtors owe the Prepetition Secured Lenders approximately $51,714,288.00 plus accrued interest.

9.     First Midwest has a blanket lien on all assets of the Company and Sam J. Chellino Crane Rental, Inc.  A vast majority of the Prepetition Secured Lenders provided equipment financing on heavy cranes (and/or related equipment) in exchange for a security interest thereon. Only the following five Prepetition Secured Lenders have an interest in the Debtors' accounts:

(a)     First Midwest;

(b)     The Small Business Administration ("SBA") (subordinate lien on accounts of the Company);

(c)     Rapid Advance ("Rapid") (subordinate lien on accounts of the Company);

(d)     Kalamata Capital LLC ("Kalamata") (subordinate lien on accounts of the Company);[3] and

(e)     Super G Funding LLC ("Super G") (subordinate mortgage lien on the Real Property).

10.     The Prepetition Secured Lenders' loan proceeds and advances are secured, in pertinent part, as follows:[4]

---

[2] Due to the voluminous size and scope of the various loan documents, the agreements are not attached to this Motion.  Copies of the documents will be provided to any interested party upon request to the Debtors' counsel.

[3] First Midwest, SBA, Rapid, and Kalamata are collectively referred to herein as the "Prepetition Account Lenders".

[4] An itemized collateral schedule including make, model, and serial number related to the various cranes and other equipment is attached hereto as **Exhibit C**.

SFGH:4811-7678-1640v1

| | **Prepetition Secured Lender** | **Primary Collateral** | **Approx. Loan Balance as of Petition Date** |
|---|---|---|---|
| 1. | BMO | First lien on twenty Reitnouer trailers. | $145,682.00 |
| 2. | De Lage Landen | First lien on various cranes. | $7,905,250.00 |
| 3. | Equify | First lien on various cranes, tractors, trucks, and trailers. | $5,396,204.00 |
| 4. | Everbank | First lien on four Tadano cranes. | $1,519,384.00 |
| 5. | First Midwest | First lien on various cranes and a trailer; Senior lien on the personal property of the Company and Sam J Chellino Crane Rental, Inc.; and First mortgage on 915 Rowell Avenue, Joliet, IL 60433. | $14,082,942.00 |
| 6. | Kalamata | Subordinate lien on the personal property of the Company | $132,421.00 |
| 7. | Merchant Bank | First lien on one Tadano crane. | $640,234.00 |
| 8. | Peoples Capital | First lien on one Manitowoc crane. | $546,519.00 |
| 9. | Rapid | Subordinate lien on the personal property of the Company | $267,241.00 |
| 10. | SBA | Second lien on First Midwest's equipment collateral. Subordinate floating lien on the personal property assets of the Company | $3,721,385.00 |
| 11. | Siemens | First lien on one Tadano crane. | $308,045.00 |
| 12. | Signature | First lien on various cranes and tractors. | $3,231,662.00 |
| 13. | Stearns | First lien on one Ford truck. | $61,173.00 |
| 14. | Sterling | First lien on one Grove crane. | $453,915.00 |
| 15. | Sumitomo | First lien on multiple cranes and trailers. | $6,883,747.00 |
| 16. | Super G | Second Mortgage on 915 Rowell Avenue, Joliet, IL 60433. | $165,863.00 |
| 17. | TCF | First lien on one Tadano crane and two Merlo boom trucks. | $640,234.00 |
| 18. | Triumph | First lien on two Manitex cranes and three Tadano cranes. | $2,289,466.00 |
| 19. | Wells Fargo | First lien on five Tadano cranes. | $3,322,921.00 |
| | | **Total Loan Balance**: | **$51,714,288.00** |

### B.    *Use of Cash Collateral*

11.    As of the Petition Date (as defined in the Declaration), the Debtors have approximately $258,802.29 of cash on hand.  Much of that cash constitutes the Prepetition Account Lenders' Cash Collateral.  The Debtors' ability to access Cash Collateral is critical – particularly at the outset of the Chapter 11 Cases – to maintaining ongoing operations and to ensuring the success of this restructuring.  Absent the use of Cash Collateral, the Debtors will be unable to pay immediate liabilities including wages to their employees, working capital, taxes, insurance premiums, capital expenditures, and administrative costs.

SFGH:4811-7678-1640v1

12.     In advance of the Chapter 11 Cases, the Debtors engaged in good faith negotiations with First Midwest, their largest senior secured creditor, regarding the terms of the restructuring and consensual use of Cash Collateral.  First Midwest has consented to the Debtors' use of its Cash Collateral as set forth in the proposed Interim Order.

13.     The SBA and First Midwest are party to certain intercreditor and subordination agreements whereby the SBA has agreed that its collateral position is subordinate to First Midwest's position.   Although Kalamata and Rapid did not enter into intercreditor or subordination agreements with First Midwest or the SBA, Kalamata and Rapid were on notice of their subordinate interests vis-à-vis properly filed UCC-1 financing statements with the Illinois Secretary of State's Office.  To extent that any of the Prepetition Account Lenders object to the Debtors' use of Cash Collateral, the Debtors believe that such parties' interests are adequately protected as set forth below.

14.     Based on the foregoing, and as discussed in more detail herein and in the Declaration, the Debtors respectfully request that the Court approve the use of Cash Collateral as the Prepetition Account Lenders are adequately protected as required by the Bankruptcy Code.

### C.     *The Need for Debtor-In-Possession Financing*

15.     To continue their operations in an orderly manner on a postpetition basis, the Debtors need immediate authority to borrow funds pursuant to a loan agreement negotiated with the DIP Lender.  The Debtors intend to borrow enough funds to operate in the ordinary course of business during the Chapter 11 Cases.

16.     To obtain the requested credit, the Company will execute a certain Postpetition Credit Agreement Pursuant to Sections 364(c)(1), (2) and (3) of the Bankruptcy Code in substantially the same form as attached hereto as **Exhibit B** (the "Postpetition Credit

Agreement"). Under the Postpetition Credit Agreement, the Debtors would agree (and hereby propose) to become borrowers under the following terms:

(a)    A postpetition loan not to exceed $7,017,903.06;

(b)    the outstanding loan balance shall accrue interest at Prime + 3.00% per annum as further described in the Postpetition Credit Agreement;

(c)    the loan matures on the Termination Date (as set forth in the Proposed Interim Order, the "Termination Date" is defined as, at First Midwest's election, the earlier to occur of: (a) the date on which First Midwest provides, via facsimile or overnight mail, written notice to counsel for the Debtors and counsel for any Committee of the occurrence and continuance of an Event of Default; and (b) the Final Order shall not have been issued prior to the earlier of (i) the next Business Day after the date the Final Hearing is concluded and (ii) the 21st day after the Petition Date or shall fail to approve and affirm the Interim in all material respects);

(d)    there shall be a closing fee in the amount of $138,000.00; and

(e)    the loan shall be secured by a lien on all the Debtors' assets and shall be entitled to super-priority status.

17.    In connection with the Postpetition Credit Agreement, the Debtors will execute a certain General Security Agreement (the "Security Agreement") and provide postpetition collateral, as set forth in paragraph 27(c) below, and Sam J Chellino Crane Rental, Inc.; Greg Chellino; and Frank Chellino (collectively, the "Guarantors") will execute a certain Guaranty

## V.  PROVISIONS TO BE HIGHLIGHTED PURSUANT TO LOCAL RULE 4001-2(A)(2)

18.    Local Rule 4001-2(A)(2) requires of a debtor making cash collateral and financing requests to: (a) recite whether the proposed form of order or loan agreement contains certain provision of the type enumerated within the Rule; (b) identify the location of any such provision in the proposed order or loan agreement; and (c) state the justification for the inclusion of such provision (the "Highlighted Provisions"). The below chart summarizes and provides a justification for the Interim Order's inclusion of certain Highlighted Provisions.

7

| Material Terms | Summary of Material Terms[5] | Interim Order Provision |
|---|---|---|
| **Borrower**: | Chellino Crane, Inc. | Ex. A ¶ 23 |
| **Guarantors**: | Sam J Chellino Crane Rental, Inc.; Greg Chellino; and Frank Chellino. | Ex. A ¶ 15 |
| **DIP Lender**: | First Midwest. | P. 1; Ex. A ¶ 23 |
| **Approved Budget**: | The Budget attached as Exhibit B to the Interim Order. | Ex B |
| **Interest Rate**: | Prime + 3%. | ¶ 3(b)(ii) |
| **Fees**: | $138,000 closing fee. | ¶ 3(b)(ii) |
| **Cross-Collateralization**: [Local Bankr. R. 4001-2(A)(2)(a)] | The Interim Order grants to the DIP Lender cross-collateralization protection in that all of the assets Debtors pledged to the DIP Lender to secure Prepetition Debt will act as collateral for the Postpetition Debt. | ¶ 4(a)-(b); Ex. A ¶ 20 |
| **Parties with Interest in Cash Collateral**: [Fed. R. Bankr. P. 4001(b)(1)(B)(i)] | The Prepetition Account Lenders (defined above) have an interest – each with varying contractual and statutory priorities – in Cash Collateral stemming from accounts for the Debtors' prepetition services. The DIP Lender as to Cash Collateral stemming from accounts for post-petition services. | Ex. A ¶ 7 |
| **Use of Cash Collateral**: [Fed. R. Bankr. P. 4001(b)(1)(B)(ii)] | Upon entry of the Interim Order, the Debtors are authorized to use Cash Collateral subject to and solely in accordance with the terms and conditions of the Interim Order. Cash Collateral may only be used during the term specified in the Interim Order for working capital and general corporate purposes, to pay costs associated with the Debtors' restructuring, and otherwise in accordance with the Interim Order. The Debtors will continue to operate in the ordinary course of business consistent with the cash flow forecast used to establish the Budget. | ¶ 2(a)-(d) |
| **Duration of Use**: [Fed R. Bankr. P. 4001(b)(1)(B)(iii)] | The Debtors' right to use Cash Collateral and incur postpetition debt under the Interim Order will terminate at First Midwest's election, on the earlier to occur of: (a) the date on which First Midwest provides, via facsimile or overnight mail, written notice to counsel for the Debtors and counsel for any Committee of the occurrence and continuance of an Event of Default; and | ¶ 5; Ex. A, ¶ 34 |

---

[5] Those capitalized but undefined terms herein shall have the meaning set forth in the proposed Interim Order submitted contemporaneously herewith and attached hereto as Exhibit A.

8

| | | |
|---|---|---|
| | (b) the Final Order shall not have been issued prior to the earlier of (i) the next Business Day after the date the Final Hearing is concluded and (ii) the 21st day after the Petition Date or shall fail to approve and affirm the Interim in all material respects. | |
| **Events of Default**: [Fed. R. Bankr. P. 4001(b)(1)(B)(iii)] [Local Bankr. R. 4001-2(A)(3)] | An Event of Default includes any of the following:  (a) the Company shall fail to pay (i) any interest due on the Note (as defined in the Postpetition Credit Agreement) by three (3) days after the same becomes due; (ii) any other amount due and payable under the Postpetition Credit Agreement (other than a principal payment on any Note) by three (3) days after Company receives written demand from First Midwest therefor; or (iii) any principal amount due on the Note when due; (b) the Company shall default in the performance or observance of any agreement, covenant, condition, provision or term contained in Article V or section 6.01 of the Postpetition Credit Agreement; (c) the Company or any Guarantor shall default in the performance or observance of any of the other agreements, covenants, conditions, provisions or terms in the Postpetition Credit Agreement or any of the Postpetition Collateral Documents (as defined in the Postpetition Credit Agreement) continuing for a period of thirty days after written notice thereof is given to the Company by First Midwest; (d) any representation or warranty made by the Company in the Postpetition Credit Agreement or any certificate delivered pursuant to the Postpetition Credit Agreement, or any financial statement delivered to the First Midwest under the Postpetition Credit Agreement, by the Company or any Guarantor shall prove to have been false in any material respect as of the time when made or given; (e) a final judgment which, together with other outstanding final judgments against the Company exceeds an aggregate of $10,000 shall be entered against the Company and shall remain outstanding and unsatisfied, unbonded, unstayed or uninsured after 60 days from the date of entry thereof; or any judgment which exceeds $20,000 shall be entered against the Company; (f) any lien purported to be created by any Postpetition Loan Document or the Interim Order or Final Order in any of the collateral secured by the Postpetition Collateral Documents purported to be covered thereby shall, for any reason, cease to be valid except collateral released as permitted by any Postpetition Loan Document or Interim Order or Final Order; (g) entry of an order of the Bankruptcy Court | Ex. A ¶ 11 |

SFGH:4811-7678-1640v1

converting the chapter 11 case of the Company to a case under chapter 7 of the Bankruptcy Code and such order is not reversed or vacated within thirty (30) days; (h) entry of an order of the Bankruptcy Court dismissing or suspending the chapter 11 case of the Company; (i) entry of an order of the Bankruptcy Court in the Company's chapter 11 case appointing a trustee under Section 1104 of the Bankruptcy Code which First Midwest reasonably determines may result in events which are materially injurious to the interests of First Midwest and such order is not reversed or vacated within thirty (30) days; (j) entry of an order of the Bankruptcy Court granting relief from the automatic stay to the holder of a lien on, or security interest in, any other asset the removal of which from the Company's bankruptcy estate is reasonably likely to may have a material adverse effect on the value or operation of the Company's business; (k) the Interim Order or Final Order shall terminate by its terms, shall not remain in full force and effect or shall have been stayed, vacated, reversed, modified, supplemented or amended in a manner which First Midwest reasonably believes is materially injurious to its interests, or, in the event that any such order is the subject of any pending motion or appeal, any performance of any obligation of any party hereto shall have been stayed pending such motion or appeal; (l) the Final Order shall not have been issued prior to the earlier of (i) the next Business Day after the date the Final Hearing is concluded and (ii) the 21st day  after the Petition Date or shall fail to approve and affirm the Interim Order in all material respects; (m) the aggregate principal amount outstanding by First Midwest to the Company under the Note exceeds the amount of the Postpetition Facility or the sum of the amounts outstanding under the Loans, the $600,000 Note and the Revolving Credit Agreement exceed the Borrowing Base from time to time in effect, and in either case, the Company fails to repay the amount of such excess within 5 Business Days after notice from First Midwest; or  (n) the Postpetition Credit Agreement, the Note or any Postpetition Collateral Document shall, at any time after their respective execution and delivery, and for any reason, cease to be in full force and effect or be declared null and void, or be revoked or terminated (other than by First Midwest), or the validity or enforceability thereof or hereof shall be contested in writing by the Company or any Guarantor, or the

10

| | | |
|---|---|---|
| | Company or any Guarantor shall deny in writing that it has any or further liability or obligation thereunder or under the Postpetition Credit Agreement, as the case may be. | |
| **Adequate Protection**: [Fed. R. Bankr. P. 4001(b)(1)(B)(iv)] | As adequate protection for First Midwest's interest in the Prepetition Collateral under §§ 361, 362, 363 or 364 of the Bankruptcy Code from and after the Petition Date, and to induce First Midwest to provide the Postpetition Debt: <br><br> (a) <u>Priority of Prepetition Liens/Allowance of First Midwest's Claim</u>.  Subject to the rights set forth in Paragraph 7 of the Interim Order and the Carve-Out: (1) the Prepetition Liens shall constitute Priority Liens, subject only to the Postpetition Liens and the Permitted Priority Liens; and (2) the Prepetition Debt shall constitute the legal, valid and binding obligation of each of the Debtors that are obligated on such Prepetition Debt by the terms of the documents governing such debt, by guarantees or otherwise, and their respective estates, enforceable in accordance with the terms of the applicable Prepetition Documents. <br><br> (b) <u>Replacement Liens</u>.  To the extent of any diminution in value of First Midwest's interest in the Prepetition Collateral from and after the Petition Date and subject to the Carve-Out, First Midwest will be granted the Replacement Liens as security for payment of the Prepetition Debt. The Replacement Liens: (1) are and shall be in addition to the Prepetition Liens; (2) are and shall be deemed properly perfected, valid and enforceable liens without any further action by the Debtors or First Midwest and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; and (3) shall remain in full force and effect notwithstanding any subsequent conversion to chapter 7 or dismissal of the Cases. Notwithstanding the foregoing, the Debtors authorized to and shall execute and deliver to First Midwest such financing statements, mortgages, instruments and | ¶ 4(a)-(d) |

SFGH:4811-7678-1640v1

| | | |
|---|---|---|
| | other documents as First Midwest may reasonably request from time to time in respect of the Replacement Liens.<br><br>(c) <u>Allowed Code § 507(b) Claim</u>. As additional adequate protection of the interests of First Midwest in the Prepetition Collateral, to the extent of any diminution in value of First Midwest's interest in the Prepetition Collateral from and after the Petition Date, and subject to the Carve-Out, First Midwest shall have an allowed claim under § 507(b) of the Bankruptcy Code, with priority over: (1) all costs and expenses of administration of the Cases (other than First Midwest's claims under § 364 of the Bankruptcy Code) that are incurred under any provision of the Bankruptcy Code; and (2) the claims of any other party-in-interest under § 507(b) of the Bankruptcy Code.<br><br>(d) <u>Prepetition Adequate Protection Payments</u>. As additional adequate protection, to the extent any Prepetition Debt remains outstanding, the Debtors will provide adequate protection to First Midwest, in the form of: (a) monthly payments of interest, reasonable fees and other amounts due under the Prepetition Documents; and (b) ongoing payment of First Midwest's reasonable fees, costs and expenses, including, without limitation, legal and other professionals' fees and expenses. | |
| **Priority of Adequate Protection Liens**: [Fed. R. Bankr. P. 4001(b)(1)(B)(iv)] | Subject to the Carve-Out, the Postpetition Debt will be granted superpriority administrative expense status under § 364(c)(1) of the Bankruptcy Code, with priority over all costs and expenses of administration of the Cases that are incurred under any provision of the Bankruptcy Code; and the Postpetition Debt is entitled to the protections of § 364(e) of the Bankruptcy Code.<br><br>In addition, First Midwest will be granted the Postpetition Liens to secure the Postpetition Debt. Subject to the Carve-Out, the Postpetition Liens: (1) are in addition to the Prepetition Liens; (2) pursuant to §§ 364(c)(2), (c)(3) and 364(d) of the Bankruptcy Code, are Priority Liens senior in priority to all liens on the Postpetition Collateral other than Permitted Priority | ¶ 3(c)(i);<br>¶ 3(c)(ii) |

SFGH:4811-7678-1640v1

| | | |
|---|---|---|
| | Liens, without any further action by the Debtors or First Midwest and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; (3) shall not be subject to avoidance or subordination including, without limitation, under § 510(c) of the Bankruptcy Code; and (4) shall not be subject to any security interest or lien that is avoided and preserved pursuant to § 551 of the Bankruptcy Code; and (5) shall remain in full force and effect notwithstanding any subsequent conversion of the Cases to chapter 7 or dismissal of the Cases. | |
| **Findings of Fact Binding on the Debtors and Parties in Interest**: [Fed. R. Bankr. P. 4001(b)(1)(B)(iii)] [Local Bankr. R. 4001-2(A)(2)(b); 4001-2(A)(3)] | The stipulations and admissions contained in the Interim Order, exclusive of the recitals in Paragraphs D through J of the Interim Order, shall be binding on all parties-in-interest, including, without limitation, any Committee. Further, solely to the extent that, (a) a party in interest has timely filed an adversary proceeding challenging the amount, validity, or enforceability of the Prepetition Debt, or the perfection or priority of First Midwest's liens on and security interests in the Prepetition Collateral in respect thereof, or otherwise asserting any claims or causes of action on behalf of the Debtors' estates against First Midwest relating to the Prepetition Debt, by no later than (x) with respect to the Creditors' Committee, the date that is 60 days after the date of its formation, and, with respect to any other party, the date that is 75 days from the entry of the Interim Order, and (b) the Court rules in favor of such party in interest or the Committee in any such timely and properly filed adversary proceeding, then, without further order of the Court, (i) the claims, liens and security interests of First Midwest shall be deemed to be allowed for all purposes in the Cases and shall not be subject to challenge by any party in interest as to extent, validity, priority or otherwise, and (ii) the Debtors and their estates shall be deemed to have waived, released and discharged First Midwest and its officers, directors, principals, attorneys, consultants, predecessors in interest, and successors and assigns of and from any and all claims and causes of action, indebtedness, and obligations, of every type, which occurred on or prior to the date of entry of the Interim Order with respect to or in connection with the Prepetition Debt, the Prepetition Liens, the Prepetition Documents or otherwise, and (iii) the recitals in Paragraphs D through J of the Interim Order shall be | ¶ 7 |

13

| | binding on all parties in interest, including, without limitation, the Committee. | |
|---|---|---|
| **506(c) Waiver**:<br>[Fed. R. Bankr. P. 4001(b)(1)(B)(iii)]<br>[Local Bankr. R. 4001-2(A)(2)(c); 4001-2(A)(3)] | Upon entry of the Final Order, none of the surcharge provisions of Code § 506, the enhancement of collateral provision of Code § 552 or any other legal or equitable doctrine (including, without limitation, unjust enrichment) shall, either before, on, or after the Termination Date, be imposed upon First Midwest or any of the Aggregate Collateral for the benefit of any party in interest, including, without limitation, the Committee, any of the Carveout Professionals, or the Debtor at any time during this Case unless, prior to rendering services or incurring expenses, the amount of which they may thereafter seek to recover from First Midwest or the Aggregate Collateral pursuant to such sections of the Bankruptcy Code, the Committee, any of the Carveout Professionals, or Trustee, as the case may be, first obtains First Midwest's express written consent to the rendering of such specific services or the incurring of such specific expenses.  The foregoing requirement shall be in addition to all (and not in lieu of any) of the requirements under applicable law for a recovery from First Midwest or the Aggregate Collateral pursuant to such sections of the Bankruptcy Code; provided, however, that nothing in the Interim Order shall be deemed to constitute First Midwest's consent to any claim under Code § 506(c) asserted for the benefit of any party, and First Midwest shall retain all rights to contest any such claims. | ¶ 4(e) |
| **Liens on Chapter 5 Causes of Actions**:<br>[Fed. R. Bankr. P. 4001(b)(1)(B)(iii)]<br>[Local R. Bankr. P. 4001-2(A)(2)(d); 4001-2(A)(3)] | Upon entry of the Final Order, the Debtors waive their rights: (a) to return any of the Aggregate Collateral pursuant to section 546(h) of the Bankruptcy Code; (b) to consent to any order permitting any claims pursuant to section 503(b)(9) of the Bankruptcy Code except to the extent permitted in the Budget as previously disclosed to First Midwest and the Court; and (c) to consent to setoff pursuant to section 553 of the Bankruptcy Code or recoupment. | ¶ 9 |
| **Carve Out and Committee Investigation Budget**:<br>[Fed. R. Bankr. P. 4001(b)(1)(B)(iii)] | Subject to the terms and conditions of this paragraph 6, the Postpetition Liens, the DIP Superpriority Claim, the Prepetition Liens, the Replacement Liens, Adequate Protection Superpriority Claims are subordinate to the Carveout.   The Carveout (A) with respect to each Carveout Professional: (1) shall equal an aggregate | ¶ 6;<br>Ex. A, ¶¶ 4-5 |

| | | |
|---|---|---|
| [Local Bankr. R. 4001-2(A)(2)(f); 4001-2(A)(3)] | amount not to exceed the lesser of (i) the aggregate amount provided in the Budget for such Carveout Professional for the period commencing on the Petition Date and ending on the Termination Date; and (ii) the aggregate amount of accrued and unpaid fees and expenses allowed at any time by the Court during the period commencing on the Petition Date and ending on the Termination Date; (2) shall be reduced dollar-for-dollar by any payments of fees and expenses to such Carveout Professional; and (3) shall be paid out of any prepetition retainer or property of the estate other than property subject to an unavoidable lien in favor of First Midwest before such payments are made from proceeds of the Postpetition Debt or the Aggregate Collateral and (B) from and after the Termination Date with respect to the Carveout Professionals, shall in the aggregate equal $75,000 for all such professionals.    Further, First Midwest shall have the right to reserve against the Maximum DIP Amount an amount equal to the sum of the aggregate amount of unpaid fees and expenses consistent with the Budget for the Carveout Professionals. | |
| **Roll-Up**: [Local Bankr. R. 4001-2(A)(2)(e)] | Under the terms of the Postpetition Credit Agreement, the Debtors shall comply with any recurring monthly payment obligations with respect to the DIP Lender's prepetition loans and all cash collections constituting the DIP Lender's prepetition Cash Collateral will be used to pay down any loans under the DIP Lender's prepetition loans – a "creeping roll-up", with operating expenses to be funded by borrowings under the terms of the DIP Loan in accordance with the Budget. | ¶ 3(a) |
| **Waiver/Modification of Automatic Stay**: [Fed. R. Bankr. P. 4001(b)(1)(B)(iii)] [Local Bankr. R. 4001-2(A)(2)(i); 4001-2(A)(3)] | Subject to Paragraph 5 of the Interim Order, the automatic stay of § 362 of the Bankruptcy Code will be modified solely with respect to First Midwest to the extent necessary to effectuate the provisions of the Interim Order. | ¶ 11 |
| **Adequacy of Budget**: [Local Bankr. R. 4001-2(A)(4)] | The Debtors have reason to believe that the Budget will be adequate (inclusive of professional fees and disbursements) considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Budget. | Ex. B |

## VI.  BASIS FOR RELIEF REQUESTED

**A.**      **Cash Collateral**

   *i.        The Use of Cash Collateral Should Be Approved*

19.     Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  The Debtors do not have sufficient working capital to continue their operations absent sustained use of the Prepetition Account Lenders' Cash Collateral. Without further access to the Prepetition Account Lenders' Cash Collateral, the Debtors' operations will collapse, with destructive consequences for the Debtors, their estates and all creditors.  The interests of the Prepetition Account Lenders will be protected by the adequate protection offered herein.

   *iii.       The Proposed Adequate Protection Should Be Authorized*

20.     Section 363(e) of the Bankruptcy Code provides: "on request of an entity that has an interest in property used . . . or proposed to be used . . . by [a debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  Periodic cash payments, additional liens, replacement liens, and other forms of relief are acceptable forms of adequate protection.  11 U.S.C. § 361; see also In re UAL Corp., 360 B.R. 780, 784 (Bankr. N.D. Ill. 2007) (citing In re Dairy Mart Convenience Stores, Inc., 351 F.3d 86, 90 (2d Cir. 2003)).  A determination as to adequate protection is made on a case-by-case basis.  In re EES Lambert Assocs., 62 B.R. 328, 343 (Bankr. N.D. Ill. 1986). The policy underlying adequate protection to a creditor is to ensure that the creditor receives the value for which it bargained prebankruptcy.  In re Swedeland Dev. Group, Inc., 16 F.3d 552, 554

(3d Cir. 1994).   The debtor-in-possession has the burden of proof on the issue of adequate

protection. 11 U.S.C. § 363(p).

21.     The Debtors propose to provide the following adequate protection to the

Prepetition Account Lenders:

- A superpriority administrative expense status under § 364(c)(1) of the Bankruptcy Code to the DIP Lender;

- The Debtors will continue to operate in the ordinary course of business consistent with the terms of an agreed-to cash flow budget forecast used to establish the Budget; and

- (a) a stipulation as to the amount of the Prepetition Secured Lenders' obligations, and the validity and perfection of the Prepetition Account Lenders' prepetition liens, and (b) access to the Debtors' book and records and other reporting functions.

22.     The Debtors maintain that this adequate protection package is sufficient to

adequately protect the interests of the Prepetition Secured Lenders against any diminution of

value of their Cash Collateral or heavy equipment collateral.   The proposed adequate protection

is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e).

**B.**     **Debtor-In-Possession Financing**

*i.*     ***The Proposed Debtor-In-Possession Financing Should Be Authorized***

23.     The value of the Debtors' estates is dependent primarily on the sustained

dedication of their unionized employees to operate the Debtors' cranes.   Interruption of the

Debtors' business would severely impede their ability to maintain operations and the value of

their estates for the benefit of their stakeholders.   In order to continue their operations and

preserve the value of their estates on a going-forward basis, the Debtors require the immediate

use of Cash Collateral and the postpetition financing available under the DIP Loan.

24. Access to the DIP Loan is also immediately necessary to provide comfort to third parties, such as the Debtors' contractual counterparties, vendors, employees, and professionals regarding the adequacy of the Debtors' liquidity.

### ii. The Debtors Could Not Obtain Unsecured Financing

25. To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available" without the protections of section 364(c) of the Bankruptcy Code. Bray v. Shenendoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986). Consequently, the statute imposes "no duty to seek credit from every possible lender before concluding that such credit is unavailable." Id. As set forth above and in the Declaration, the Debtors endeavored prior to commencing the Chapter 11 Cases to identify potential sources of postpetition financing. In the months leading up to the Petition Date, the Debtors and their advisors discussed alternative and debtor-in-possession financing with certain of the Debtors' existing constituents and also informally approached several third-party lenders.

26. None of the potential lenders were willing to provide the financing on an unsecured, administrative claim basis. Moreover, given the magnitude of the Debtors' financing needs, the Debtors determined that it would not be productive to solicit interest for unsecured, administrative expense financing from additional lenders.

### iii. The DIP Loan Terms Are Fair and Reasonable

27. The Debtors respectfully request authorization for the Company to enter into the Postpetition Credit Agreement with the DIP Lender on the terms summarized below:

(a)    Advances for Operations – The Prepetition Revolving Line of Credit (as defined in the Interim Order at Ex. A, ¶ 29) carries a balance as of the Petition Date in the amount of approximately $5,217,903.06. DIP Lender will agree to advance up to a maximum amount of $7,017,903.06.

18

Subsequent advances on notice may be made at the DIP Lender's discretion.

(b)   <u>Budgeted Use of Funds</u> – The Debtors will use such funds pursuant to the Budget. The Budget identifies the Debtors' proposed expenses to be incurred and paid during the Chapter 11 Cases, including payroll, landlords, inventory purchases, and the Debtor Professionals. Debtors must comply with all line-items in the Budget, within 10% of the amount set forth in the Budget, tested on a rolling two-week basis.

(c)   <u>Collateral</u> – The Postpetition Credit Agreement defines "Postpetition Collateral" to be "(a) All of the real and personal property of the Debtors that have granted a mortgage or security interest to First Midwest, or any of its subsidiaries, to secure Prepetition Debt, and their respective estates, of any description whatsoever, wherever located and whenever arising or acquired, including, without limitation all cash, accounts, receivables, inventory, equipment, fixtures, chattel paper, general intangibles all leaseholds, all commercial torts, all interests in any joint venture, all licenses and permits, all other Prepetition Collateral, and all proceeds, rents, issues, profits and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any of the foregoing; provided, however, that the Postpetition Collateral shall not include property to the extent that such property is subject to a valid and enforceable agreement with the Small Business Administration which prohibits the granting of a lien in favor of First Midwest; (b) A mortgage on the real estate and personal property owned by Chellino/ Industrial Park Family Limited Partnership and now or hereafter located at 915 Rowell Avenue, Joliet, Illinois; and (c) A pledge of notes owed by Chellino Crane, Inc. to the individual Guarantors."

(d)   <u>Priming Liens</u> – The DIP Lender's liens will be senior to any other party in interest, subject to the Permitted Priority Liens.

(e)   <u>Interest</u> – Interest will accrue at a rate of Prime + 3.00% per annum, and will be paid (pursuant to the Budget) on the first day of each month.

(f)   <u>DIP Lender's Fee</u> – A closing fee of $138,000.00 shall be due at origination.

(g)   <u>Superpriority Claim for Advances</u> – The DIP Lender will receive a superpriority claim for the advances made under the Postpetition Credit Agreement, which will be paid during the Chapter 11 Cases, with the balance due on the effective date of a plan of reorganization.

(h)   <u>Maturity Date</u> – The Debtors' obligations under the Postpetition Credit Agreement will be payable on demand of the DIP Lender, or upon the

SFGH:4811-7678-1640v1

Maturity Date, which will be August 31, 2017, unless extended in writing by the DIP Lender.

(i)    Events of Default - The list of events of default are set forth in Paragraph 11 of Exhibit A to the Interim Order.

28.    In determining whether the terms of postpetition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender.  In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003).  As set forth above and in the Declaration, the Debtors have a significant need for additional liquidity, and the DIP Lender is their senior Prepetition Secured Lender.  Under the terms of the DIP Loan, prior to the entry of a Final Order the Debtors will use all cash collections constituting Prepetition Collateral to repay any loans outstanding under the Debtors' prepetition obligations to the DIP Lender – a "creeping roll-up" – with operating expenses to be funded by borrowings under the terms of the DIP Loan in accordance with the approved Budget.  Upon entry of a Final Order, all remaining indebtedness under the DIP Lender's prepetition loans shall be fully converted into Postpetition Debt and incurred under the Postpetition Credit Agreement.

29.    Additionally, the fees and charges contained within the Postpetition Credit Agreement are customary and reasonable and the DIP Loan does not deprive the Debtors' estates or other parties in interest of rights and powers by restricting the services for which professionals may be paid in the Chapter 11 Cases.  Instead, the DIP Loan subjects the security interests and administrative expense claims granted to the DIP Lender to the Carveout for certain administrative and professional fees, including (a) fees required to be paid to the Court and to the U.S. Trustee, and (b) fees and disbursements incurred by professional persons employed by the Debtors or any statutory committee in the Chapter 11 Cases.  Carveouts for professional fees have been found to be reasonable and necessary to ensure that statutory creditors' committees

and debtors' estates are adequately assisted by counsel and other professionals. See, e.g., In re Evanston Beauty Supply, Inc., 136 B.R. 171, 177 (Bankr. N.D. Ill. 1992).

30.     The Debtors have determined that the terms of the DIP Loan are reasonable and appropriate under the circumstances.

### iv.     The DIP Loan Is Necessary to Preserve Assets of the Debtors' Estates and Is in the Best Interests of Creditors

31.     A debtor-in-possession "has the discretionary authority to exercise his business judgment in operating the debtor's business similar to the discretionary authority to exercise business judgment given to an officer or director of a corporation." In re Commercial Mortg. and Finance Co., 414 B.R. 389, 394 (Bankr. N.D. Ill. 2009) (quoting State of Ill. Dept. of Revenue v. Schechter, 195 B.R. 380, 384 (N.D. Ill. 1996)). To determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006).

32.     Here, the Debtors have determined in the exercise of their business judgment that entry into the DIP Loan is necessary to preserve the assets of their estates and is in the best interests of creditors. Without postpetition funding, the Debtors will lack the liquidity necessary to continue operating. The DIP Loan represents the Debtors' best option for survival, and is in the best interests of the Debtors, their estates, and their creditors. Accordingly, the Debtors' decision to enter into the proposed DIP Loan is a sound exercise of their judgment that warrants approval by the Court.

### v.     The DIP Lender is Entitled to Superpriority, Subject to Appropriate Carveout

33.     Section 364(c) and (d) of the Bankruptcy Code authorizes the Debtors to incur postpetition debt as requested herein. If a debtor-in-possession is unable to obtain unsecured

21

credit allowable as an administrative expense, and the Debtors demonstrate that the to-be-subordinated creditors are adequately protected, the Bankruptcy Code authorizes such debtor-in-possession to incur debt secured by priming liens.   11 U.S.C. § 364(d)(1).   Under the circumstances, the Debtors have concluded that DIP Lender is the only party willing to finance the Debtors' operations in the amounts necessary to finance their operations during the pendency of the Chapter 11 Cases.  On these facts, the relief requested is warranted.

34.     Subject to the Carveout, the Debtors propose that the DIP Loan shall be a superpriority administrative expense under section 364(c)(1) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in the Chapter 11 Cases or any successor case), and shall at all times be senior to the rights of the Debtors, any successor trustee or estate representative in the Chapter 11 Cases or any successor case (the "Superpriority Claims").  The DIP Lender has not consented, through the Budget or otherwise, to the imposition of any costs or expense of administration or other charge, fees, liens, assessment or claim (including, without limitation, any amounts set forth in the Budget) against the DIP Lender, its claims or collateral under section 506(c) of the Bankruptcy Code or otherwise, all of which rights the Debtors waive pursuant to the terms of the Interim Order granting this Motion.

35.     Subject to the Carveout, as security for the DIP Loan the Debtors propose granting the DIP Lender pursuant to section 364(d) of the Bankruptcy Code a valid, perfected, senior priming liens and security interests in all of the Aggregate Collateral, consisting of the DIP Lender's prepetition collateral and postpetition collateral.  Any security interest or lien upon the Collateral which is avoided or otherwise preserved for the benefit of the Debtors' estates

SFGH:4811-7678-1640v1

under section 551 or any other provision of the Bankruptcy Code shall be subordinate to the DIP Loan.

36.    Through this Motion, the Debtors propose that the DIP Lender's senior priming liens (subject to the Permitted Priority Liens) shall be deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; provided, however, that the automatic stay imposed pursuant to § 362 of the Bankruptcy Code shall be deemed lifted for the limited purpose of allowing the Lender, at its sole option, to file or record or cause the Debtors to obtain third party consents or execute, file or record, at the DIP Lender's expense any such UCC financing statements, notices of liens and security interests, mortgages and other similar documents as the Lender may require.

*v.*    ***The Debtors' Proposed Grant of Adequate Protection is Appropriate***

37.    While the Bankruptcy Code does not define "adequate protection," § 361 of the Bankruptcy Code contains a non-exhaustive list of acceptable forms of adequate protection including cash payments, additional liens, replacements liens, and the "indubitable equivalent of such entity's interest in such property."  11 U.S.C. § 361; see also In re UAL Corp., 360 B.R. 780, 784 (Bankr. N.D. Ill. 2007).  The "indubitable equivalent" alternative is regarded as a catch-all, "allowing courts discretion in fashioning the protection provided to a secured party." Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3d Cir. 1994).  Courts determine adequate protection for these purposes on a case-by-case basis.  In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he

determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case.")

38.     In exchange for the Debtors' use of the Prepetition Account Lenders' Cash Collateral, the Debtors are proposing to provide certain adequate protection to the extent they are secured and there is any diminution in the value of their collateral.  The Prepetition Account Lenders include the DIP Lender, the SBA, Kalamata and Rapid.  The Debtors proposed to treat the Prepetition Account Lenders as follows:

(a)     The DIP Lender: as adequate protection for the DIP Lender's interest in the Prepetition Collateral under sections 361, 362, 363 or 364 of the Bankruptcy Code from and after the Petition Date, and to induce First Midwest to provide the Postpetition Debt:

i.     Priority of Prepetition Liens/Allowance of First Midwest's Claim. Subject to the rights set forth in Paragraph 7 of the Interim Order and the Carve-Out: (1) the Prepetition Liens shall constitute Priority Liens, subject only to the Postpetition Liens and the Permitted Priority Liens; and (2) the Prepetition Debt shall constitute the legal, valid and binding obligation of each of the Debtors that are obligated on such Prepetition Debt by the terms of the documents governing such debt, by guarantees or otherwise, and their respective estates, enforceable in accordance with the terms of the applicable Prepetition Documents.

ii.     Replacement Liens.  To the extent of any diminution in value of First Midwest's interest in the Prepetition Collateral from and after the Petition Date and subject to the Carve-Out, First Midwest is hereby granted the Replacement Liens as security for payment of the Prepetition Debt.  The Replacement Liens: (1) are and shall be in addition to the Prepetition Liens; (2) are and shall be deemed properly perfected, valid and enforceable liens without any further action by the Debtors or First Midwest and without the execution, filing or

SFGH:4811-7678-1640v1

recordation of any financing statements, security agreements, mortgages or other documents or instruments; and (3) shall remain in full force and effect notwithstanding any subsequent conversion to chapter 7 or dismissal of the Cases. Notwithstanding the foregoing, the Debtors authorized to and shall execute and deliver to First Midwest such financing statements, mortgages, instruments and other documents as First Midwest may reasonably request from time to time in respect of the Replacement Liens.

        iii.    <u>Allowed Code § 507(b) Claim</u>. As additional adequate protection of the interests of First Midwest in the Prepetition Collateral, to the extent of any diminution in value of First Midwest's interest in the Prepetition Collateral from and after the Petition Date, and subject to the Carve-Out, First Midwest shall have an allowed claim under § 507(b) of the Bankruptcy Code, with priority over: (1) all costs and expenses of administration of the Cases (other than First Midwest's claims under § 364 of the Bankruptcy Code) that are incurred under any provision of the Bankruptcy Code; and (2) the claims of any other party-in-interest under § 507(b) of the Bankruptcy Code.

        iv.    <u>Prepetition Adequate Protection Payments</u>. As additional adequate protection, to the extent any Prepetition Debt remains outstanding, the Debtors will provide adequate protection to First Midwest, in the form of: (a) monthly payments of interest, reasonable fees and other amounts due under the Prepetition Documents; and (b) ongoing payment of First Midwest's reasonable fees, costs and expenses, including, without limitation, legal and other professionals' fees and expenses.

        (b)    <u>The SBA, Kalamata, and Rapid</u>: The SBA is party to intercreditor and subordination agreements with the DIP Lender and is therefore deemed to have consented to the DIP Loan. Kalamata and Rapid Advance did not enter into intercreditor or subordination

SFGH:4811-7678-1640v1

agreements with First Midwest or the SBA.  Kalamata and Rapid Advance[6] were on notice of

their subordinate interests vis-à-vis UCC-1 financing statements properly filed with the Illinois

Secretary of State's Office, and therefore are deemed to have consented to the DIP Loan.  The

Debtors propose to adequately protect the SBA, Kalamata and Rapid in compliance with section

364(d)(1) of the Bankruptcy Code by continuing to operate as a going concern.  Courts have held

that adequate protection may be demonstrated by a showing that the secured creditor's interest in

the collateral is preserved by the debtor's use of the collateral in a manner that maintains or

enhances its value.  See, e.g., In re Hubbard Power & Light, 202 B.R. 680, 684-85 (Bankr.

E.D.N.Y. 1996) (holding secured creditor adequately protected for priming loan by anticipated

increase in value of debtor's property due to use of loan proceeds); In re Aqua Assocs., 123 B.R.

192, 198 (Bankr. E.D. Pa. 1982) (holding secured creditor adequately protected for priming loan

based on increase in going concern value versus liquidation value).

39.     The balance of the Prepetition Secured Lenders have liens on particular

equipment.  These lenders are not entitled to adequate protection under the UCC and section 552

of the Bankruptcy Code because the cash received is not on account of a disposition of the

lenders' collateral.  See ¶¶ 20-22 supra.

40.     Here, the Debtors' continued utilization of Cash Collateral and equipment,

together with access to the DIP Loan proceeds, will allow for the Debtors to preserve the value

of the Prepetition Secured Lenders' collateral because liquidation will be avoided.  The Debtors

submit that their going concern value far exceeds forced liquidation value, and that the

Prepetition Secured Lenders are adequately protected by the Debtors' continued operation of

their businesses.  Moreover, the DIP Loan proceeds will create additional value by providing

---

[6] The Debtors' loan balances to Kalamata and Rapid are approximately $157,139 and $302,211, respectively.

SFGH:4811-7678-1640v1

stability to the Debtors' operations in the form of paying employees, vendors, professionals, and preserving the going concern value.

41.     Accordingly, the Debtors believe that the adequate protection proposed herein is fair and reasonable under the circumstances of the Chapter 11 Cases and is sufficient to satisfy the requirements of § 364(d) of the Bankruptcy Code.

### vi.     The Prepetition Roll-up is Necessary and Appropriate

42.     Under the terms of the Postpetition Credit Agreement, the Debtors shall comply with any recurring monthly payment obligations with respect to the DIP Lender's prepetition loans (i.e., all cash collections constituting the DIP Lender's prepetition Cash Collateral will be used to pay down any loans under the DIP Lender's prepetition loans – a "creeping roll-up"), with operating expenses to be funded by borrowings under the terms of the DIP Loan in accordance with the Budget.  The super-priority administrative expense claims and the liens granted to the DIP Lender shall be junior and subordinate to the Carve-Out.

43.     Here, the proposed roll-up of the DIP Lender's prepetition loans into the DIP Loan is a reasonable exercise of the Debtors' business judgment and appropriate under the circumstances for several reasons, including the following:

> (a)     The DIP Lender was only willing to extend to the Debtors additional financing postpetition on the non-negotiable condition that the DIP Loan be used to repay outstanding obligations under the Debtors' prepetition line of credit.

> (b)     The DIP Loan is in the best interest of the Debtors, their estates and creditors because without it the Debtors would be forced to liquidate.

> (c)     The DIP Loan is being provided by the DIP Lender, who already has a first-priority lien on substantially all of the Debtors' assets.

> (d)     The DIP Lender is providing "new money" in the approximate amount of $2.5 million.  Indeed, the DIP Loan advantages the Prepetition Secured Lenders in that their liens are not being primed and the Debtor is not being forced to liquidate.

SFGH:4811-7678-1640v1

(e)     The DIP Loan clearly benefits the Debtors' estates because the only other option is to liquidate, and the net benefit to the Debtors' estates outweighs any harm to the Debtors' creditors.

(f)     Additional funds from the DIP Lender prevents priming issues and should minimize or eliminate battles over adequate protection.

(g)     The bulk of the roll-up will occur upon entry of a Final Order, which will allow sufficient notice to all potentially impacted stakeholders and most substantive objections can be addressed prior to entry of the Final Order.

(h)     Courts in this and other districts have approved debtor-in-possession financing facilities that, like the DIP Loan, provide for the roll-up of prepetition secured debt.[7]

(i)     The ratio of rolled-up prepetition secured debt to "new money" (approximately 2.8:1.0) is within the range of market norms.[8]

(j)     A $370,000 advance on the $600,000 Note was an emergency advance provided in anticipation of the filing of these Chapter 11 Cases.  To deny a DIP Lender of a roll-up and its attendant benefits would discourage the making of loans to struggling companies.

44.     For the foregoing reasons, the Debtors submit that the proposed roll-up of the Debtors' outstanding obligations to the DIP Lender is a reasonable exercise of the Debtors' business judgment and appropriate under the circumstances.

## VII.  NOTICE

45.     Notice of this Motion has been provided to: (a) the U.S. Trustee; (b) counsel for the DIP Lender; (c) the Debtors' thirty (30) largest unsecured creditors, on a consolidated basis; (d) the Prepetition Secured Lenders; (e) those persons who have formally appeared and requested notice in this case pursuant to Bankruptcy Rule 2002; and (f) the Internal Revenue Service and

---

[7] See In re Modular Space Holdings, Inc., No. 16-12825 (KJC) (Bankr. D. Del. Jan. 18, 2017) [Docket No. 165]; In re Roadhouse Holding Inc., No. 16-11819 (BLS) (Bankr. D. Del. Sept. 28, 2016) [Docket No. 333]; In re Velo Holdings, Inc., Case No. 12-11384 (MG) (Bankr. S.D.N.Y. Apr. 2, 2012).

[8] See In re Taylor-Wharton Int'l, LLC, Case No. 15-12075 (BLS) (Bankr. D. Del. Nov. 5, 2015) (approving $1.25 million in postpetition financing in connection with a $12 million roll-up, for an approximate ratio of 9.6:1.0).

Case 17-14200   Doc 11   Filed 05/05/17   Entered 05/05/17 16:40:34   Desc Main
Document   Page 29 of 31

other governmental entities required to receive notice under the Bankruptcy Rules or the Local

Rules.  The Debtors submit that no other or further notice need be provided.

## VIII.  NO PRIOR REQUEST

46.    No prior request for the relief sought herein has been made to this Court or any

other court.

## IX.  REQUEST FOR FINAL HEARING

47.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rule 4001-

2(C), the Debtors request that the Court set a date for the Final Hearing that is as soon as

practicable, but in no event later than 25 days following the entry of the Interim Order, and fix

the time and date prior to the Final Hearing for parties to file objections to the Motion.

## X.  THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

48.    Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is

necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the

filing of the petition, grant relief regarding . . . a motion to use, sell, lease, or otherwise incur an

obligation regarding property of the estate . . . ."  Fed. R. Bankr. P. 6003(b). The Debtors submit

that, because the relief requested in this Motion is necessary to avoid immediate and irreparable

harm to the Debtors for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

## XI.  WAIVER OF BANKRUPTCY RULE 6004(a) AND 6005(h)

49.    To implement the foregoing successfully, the Debtors respectfully request a

waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14 day stay of an order

authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). Pursuant to

Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than

cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court

orders otherwise." As set forth above, the payments proposed herein are essential to prevent

SFGH:4811-7678-1640v1

potentially irreparable damage to the Debtors' operations, value, and ability to reorganize. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14 day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## XII.  WAIVER OF PAGE LIMIT RESTRICTION

50.    Given the complexity of issues addressed herein, the Debtors respectfully request that the fifteen page limit established by Rule 5005-3(D) of the Local Rules be waived for this Motion.

## XIII.  PRAYER

WHEREFORE, the Debtors respectfully request that this Court enter an Order in substantially the same form as the order attached hereto as **Exhibit A**: (i) authorizing the Debtors' use of the Prepetition Account Lenders' Cash Collateral; (ii) authorizing the Debtors to execute the Postpetition Credit Agreement and borrow and use funds from the DIP Lender on the terms set forth herein; (iii) granting to the DIP Lender liens and superpriority claims set forth herein; (iv)  granting such relief on an interim basis, and after a final hearing, on a permanent basis; and (v) granting such other and further relief as is just and proper.

SFGH:4811-7678-1640v1

Date: May 5, 2017

*Chellino Crane, Inc., et al.,*

By:   /s/ Jonathan Friedland
            One of its Attorneys

Jonathan P. Friedland, Esq. (IL No. 6257902)
Aaron L. Hammer, Esq. (IL No. 6243069)
Elizabeth B. Vandesteeg, Esq. (IL No. 6291426)
**SUGAR FELSENTHAL GRAIS & HAMMER LLP**
30 N. LaSalle St., Ste. 3000
Chicago, Illinois 60602
Telephone:  312.704.9400
Facsimile:   312.372.7951
ahammer@SFGH.com
jfriedland@SFGH.com
evandesteeg@SFGH.com

*Proposed Counsel to the Debtors*

SFGH:4811-7678-1640v1