**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CHELLINO CRANE, INC., *et al.*[1] | § | Case No. 17-14200 |
| | § | |
| Debtors. | § | (Joint Administration Requested) |

**SUPPLEMENTAL DECLARATION OF A. JEFFREY ZAPPONE IN SUPPORT OF EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO: (A) USE CASH COLLATERAL; (B) INCUR POSTPETITION DEBT; AND (C) GRANT ADEQUATE PROTECTION AND PROVIDE SECURITY AND OTHER RELIEF TO FIRST MIDWEST BANK**

I, A. JEFFREY ZAPPONE, do hereby declare, under penalty of perjury, that:

1. I am a Senior Managing Director at Conway MacKenzie, Inc. ("Conway MacKenzie"). I am above 18 years of age, and I am competent to testify.

2. On May 5, 2017 (the "Petition Date"), Chellino Crane, Inc. (the "Company") together with all of the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions (the "Petitions") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), in an effort to preserve and maximize the value of their Chapter 11 estates (the "Chapter 11 Cases," or, the "Cases"). The Debtors intend to operate their businesses and to manage their properties as debtors in possession under §§ 1107(a) and 1108 of the Bankruptcy Code.

3. Prior to the Petition Date, I oversaw preparations for the Chapter 11 Cases. I am generally familiar with the Debtors' day-to-day operations, business affairs, and books and records, as well as the Debtors' restructuring efforts.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Chellino Crane, Inc. (6804); Sam J. Chellino Crane Rental, Inc. (0830); G & B Equipment, LLC (0688); Chellino/Industrial Park Family Limited Partnership (1246); and Chellino Industrial Management, Inc. (0691). The address for all of the Debtors is 915 Rowell Avenue, Joliet, Illinois 60433 (the "Real Property").

4. Contemporaneously with the filing of the Petitions, the Debtors submitted *Declaration of A. Jeffrey Zappone in Support of Chapter 11 Petitions and First Day Motions* (Dkt. 7.) (the "First Day Declaration").

5. This Declaration is submitted as a supplement to the First Day Declaration and in further support of the *Emergency Motion for Interim and Final Orders Authorizing the Debtors To: (A) Use Cash Collateral; (B) Incur Postpetition Debt; and (C) Grant Adequate Protection and Provide Security and Other Relief to First Midwest Bank* (Dkt. 11.) (the "DIP Financing Motion").

6. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with members of the Debtors' management teams and other personnel, my knowledge and review of relevant documents including the Debtors' books and records, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

**A. The Debtors' Debt Structure**

7. The Debtors are parties to certain loan and security agreements (as amended, modified and/or supplemented from time to time)[2] with twenty-one (21) secured lenders (the "Prepetition Secured Lenders"), pursuant to which the Prepetition Secured Lenders made loans and other financial accommodations to or for the benefit of the Debtors. As of the Petition Date, the Debtors owe the Prepetition Secured Lenders approximately $51,714,288.00 plus accrued interest.

---

[2] Due to the voluminous size and scope of the various loan documents, the agreements are not attached to this Motion. Copies of the documents will be provided to any interested party upon request to the Debtors' counsel.

2

8. First Midwest Bank ("First Midwest" or "DIP Lender") has a blanket lien on all assets of the Company and Sam J. Chellino Crane Rental, Inc. A vast majority of the Prepetition Secured Lenders provided equipment financing on heavy cranes (and/or related equipment) in exchange for a security interest thereon. Only the following five Prepetition Secured Lenders have an interest in the Debtors' accounts:

(a) First Midwest;

(b) The Small Business Administration ("SBA") (subordinate lien on accounts of the Company);

(c) Rapid Advance ("Rapid") (subordinate lien on accounts of the Company);

(d) Kalamata Capital LLC ("Kalamata") (subordinate lien on accounts of the Company);[3] and

(e) Super G Funding LLC ("Super G") (subordinate mortgage lien on the Real Property).

9. The Prepetition Secured Lenders' loan proceeds and advances are secured, in pertinent part, as follows:[4]

| Prepetition Secured Lender | Primary Collateral | Approx. Loan Balance as of Petition Date |
|---|---|---|
| BMO | First lien on twenty Reitnouer trailers. | $145,682.00 |
| De Lage Landen | First lien on various cranes. | $7,905,250.00 |
| Equify | First lien on various cranes, tractors, trucks, and trailers. | $5,396,204.00 |
| Everbank | First lien on four Tadano cranes. | $1,519,384.00 |
| First Midwest | First lien on various cranes and a trailer; Senior lien on the personal property of the Company and Sam J Chellino Crane Rental, Inc.; and First mortgage on 915 Rowell Avenue, Joliet, IL 60433. | $14,082,942.00 |
| Kalamata | Subordinate lien on the personal property of the Company | $132,421.00 |
| Merchant Bank | First lien on one Tadano crane. | $640,234.00 |
| Peoples Capital | First lien on one Manitowoc crane. | $546,519.00 |
| Rapid | Subordinate lien on the personal property of the Company | $267,241.00 |

---

[3] First Midwest, SBA, Rapid, and Kalamata are collectively referred to herein as the "Prepetition Account Lenders".

[4] An itemized collateral schedule including make, model, and serial number related to the various cranes and other equipment is attached to the DIP Financing Motion as **Exhibit C**.

| | | | |
|---|---|---|---|
| | SBA | Second lien on First Midwest's equipment collateral. Subordinate floating lien on the personal property assets of the Company | $3,721,385.00 |
| | Siemens | First lien on one Tadano crane. | $308,045.00 |
| | Signature | First lien on various cranes and tractors. | $3,231,662.00 |
| | Stearns | First lien on one Ford truck. | $61,173.00 |
| | Sterling | First lien on one Grove crane. | $453,915.00 |
| | Sumitomo | First lien on multiple cranes and trailers. | $6,883,747.00 |
| | Super G | Second Mortgage on 915 Rowell Avenue, Joliet, IL 60433. | $165,863.00 |
| | TCF | First lien on one Tadano crane and two Merlo boom trucks. | $640,234.00 |
| | Triumph | First lien on two Manitex cranes and three Tadano cranes. | $2,289,466.00 |
| | Wells Fargo | First lien on five Tadano cranes. | $3,322,921.00 |
| | | **Total Loan Balance**: | **$51,714,288.00** |

### B.   Use of Cash Collateral

10. As of the Petition Date, the Debtors have approximately $258,802.29 of cash on hand. Much of that cash constitutes the Prepetition Account Lenders' Cash Collateral. The Debtors' ability to access Cash Collateral is critical – particularly at the outset of the Chapter 11 Cases – to maintaining ongoing operations and to ensuring the success of this restructuring. Absent the use of Cash Collateral, the Debtors will be unable to pay immediate liabilities including wages to their employees, working capital, taxes, insurance premiums, capital expenditures, and administrative costs.

11. In advance of the Chapter 11 Cases, the Debtors engaged in good faith negotiations with First Midwest, their largest senior secured creditor, regarding the terms of the restructuring and consensual use of Cash Collateral. First Midwest has consented to the Debtors' use of its Cash Collateral as set forth in the proposed Interim Order.

12. The SBA and First Midwest are party to certain intercreditor and subordination agreements whereby the SBA has agreed that its collateral position is subordinate to First Midwest's position. Although Kalamata and Rapid did not enter into intercreditor or subordination agreements with First Midwest or the SBA, Kalamata and Rapid were on notice of

4

their subordinate interests vis-à-vis properly filed UCC-1 financing statements with the Illinois Secretary of State's Office.  To extent that any of the Prepetition Account Lenders object to the Debtors' use of Cash Collateral, the Debtors believe that such parties' interests are adequately protected as set forth in the DIP Financing Motion.

        **C.**       **The Need for Debtor-In-Possession Financing**

        13.       As set forth in the First Day Declaration, during 2016, a decline in the Debtors' cash flow combined with expenses for continuing equipment and labor has caused a severe liquidity shortage.  Despite their best efforts, the Debtors fell further behind on their obligations to creditors in October 2016.  At that time, the Debtors decided to pursue an equity infusion from an unrelated party.  The Debtors engaged in significant discussions with a strategic financier for purposes of seeking an alternative financing solution and a buyout of the existing secured lenders.  Late in 2016, the Debtors' discussions with this third-party stalled.

        14.       The Debtors have diligently evaluated, in consultation with their professionals, a number of options to address the Debtors' current financial issues.  During the first few months of 2017, Conway MacKenzie contacted a number of potential financing parties, and engaged in extensive negotiations with at least eight interested parties.

        15.       In mid-March 2017, the Debtors received a commitment letter from strategic lender for purposes of retiring the existing secured lenders' aggregate debt at a value equal to net forced liquidation of the collateral.  Funding under the commitment was contingent upon 90% of the existing secured lenders accepting the terms.  While the proposal produced some interest, the Debtors were unable to meet the 90% threshold.

        16.       Given several unsuccessful attempts to find a financier or strategic buyer, the Debtors started exploring potential DIP financing solutions as the Debtors' liquidity significantly tightened.  Conway MacKenzie reached out to several firms regarding DIP financing.

17. Ultimately, First Midwest emerged as the only third party willing to provide DIP financing. First Midwest is familiar with the Debtors' operations and debt structure, and also is the Debtors' largest lender. Additionally, over the course of the anticipated bankruptcy period, realistic projections reveal that First Midwest's collateral position will improve and the collateral supporting the existing line of credit will significantly grow.

### D. The DIP Financing Motion

18. To continue their operations in an orderly manner on a postpetition basis, the Debtors need immediate authority to borrow funds pursuant to a loan agreement negotiated with First Midwest. The Debtors intend to borrow enough funds to operate in the ordinary course of business during the Chapter 11 Cases.

19. Accordingly, by the DIP Financing Motion, the Debtors seek the entry of the interim order (attached to the DIP Financing Order as **Exhibit A**) (the "Interim Order"), and later after notice and a hearing, a final order (the "Final Order"), authorizing the Debtors to: (a) use Cash Collateral; (b) incur Postpetition Debt, pursuant to the terms of the Postpetition Credit Agreement (defined below); and (c) grant adequate protection and provide security and other relief to First Midwest. Specifically, the Debtors seek approval of secured postpetition financing in the amount of $7,017,903.06 (the "DIP Loan"). The Debtors seek approval of the DIP Loan for purposes of providing to their key constituents (such as vendors, employees, and professionals) with the confidence that the Debtors will have sufficient cash if the Debtors' postpetition revenues turn out to be uneven or insufficient.

20. To obtain the requested credit, the Company will execute a certain Postpetition Credit Agreement Pursuant to Sections 364(c)(1), (2) and (3) of the Bankruptcy Code in substantially the same form attached to the DIP Financing Motion as **Exhibit B** (the "Postpetition Credit Agreement"). Under the Postpetition Credit Agreement, the Debtors would

6

agree (and by the DIP Financing Motion propose) to become borrowers under the following terms:

| **Material Terms** | **Summary of Material Terms**[5] | **Interim Order Provision** |
|---|---|---|
| **Borrower**: | Chellino Crane, Inc. | Ex. A ¶ 23 |
| **Guarantors**: | Sam J Chellino Crane Rental, Inc.; Greg Chellino; and Frank Chellino. | Ex. A ¶ 15 |
| **DIP Lender**: | First Midwest. | P. 1; Ex. A ¶ 23 |
| **Approved Budget**: | The Budget attached as Exhibit B to the Interim Order. | Ex B |
| **Interest Rate**: | Prime + 3%. | ¶ 3(b)(ii) |
| **Fees**: | $138,000 closing fee. | ¶ 3(b)(ii) |
| **Cross-Collateralization**: [Local Bankr. R. 4001-2(A)(2)(a)] | The Interim Order grants to the DIP Lender cross-collateralization protection in that all of the assets Debtors pledged to the DIP Lender to secure Prepetition Debt will act as collateral for the Postpetition Debt. | ¶ 4(a)-(b); Ex. A ¶ 20 |
| **Parties with Interest in Cash Collateral**: [Fed. R. Bankr. P. 4001(b)(1)(B)(i)] | The Prepetition Account Lenders (defined above) have an interest – each with varying contractual and statutory priorities – in Cash Collateral stemming from accounts for the Debtors' prepetition services. The DIP Lender as to Cash Collateral stemming from accounts for post-petition services. | Ex. A ¶ 7 |
| **Use of Cash Collateral**: [Fed. R. Bankr. P. 4001(b)(1)(B)(ii)] | Upon entry of the Interim Order, the Debtors are authorized to use Cash Collateral subject to and solely in accordance with the terms and conditions of the Interim Order. Cash Collateral may only be used during the term specified in the Interim Order for working capital and general corporate purposes, to pay costs associated with the Debtors' restructuring, and otherwise in accordance with the Interim Order. The Debtors will continue to operate in the ordinary course of business consistent with the cash flow forecast used to establish the Budget. | ¶ 2(a)-(d) |

---

[5] Those capitalized but undefined terms herein shall have the meaning set forth in the proposed Interim Order attached to the DIP Financing Motion as Exhibit A.

| | | |
|---|---|---|
| **Duration of Use**:<br>[Fed R. Bankr. P. 4001(b)(1)(B)(iii)] | The Debtors' right to use Cash Collateral and incur postpetition debt under the Interim Order will terminate at First Midwest's election, on the earlier to occur of: (a) the date on which First Midwest provides, via facsimile or overnight mail, written notice to counsel for the Debtors and counsel for any Committee of the occurrence and continuance of an Event of Default; and (b) the Final Order shall not have been issued prior to the earlier of (i) the next Business Day after the date the Final Hearing is concluded and (ii) the 21st day after the Petition Date or shall fail to approve and affirm the Interim in all material respects. | ¶ 5;<br>Ex. A, ¶ 34 |
| **Events of Default**:<br>[Fed. R. Bankr. P. 4001(b)(1)(B)(iii)]<br>[Local Bankr. R. 4001-2(A)(3)] | An Event of Default includes any of the following: (a) the Company shall fail to pay (i) any interest due on the Note (as defined in the Postpetition Credit Agreement) by three (3) days after the same becomes due; (ii) any other amount due and payable under the Postpetition Credit Agreement (other than a principal payment on any Note) by three (3) days after Company receives written demand from First Midwest therefor; or (iii) any principal amount due on the Note when due; (b) the Company shall default in the performance or observance of any agreement, covenant, condition, provision or term contained in Article V or section 6.01 of the Postpetition Credit Agreement; (c) the Company or any Guarantor shall default in the performance or observance of any of the other agreements, covenants, conditions, provisions or terms in the Postpetition Credit Agreement or any of the Postpetition Collateral Documents (as defined in the Postpetition Credit Agreement) continuing for a period of thirty days after written notice thereof is given to the Company by First Midwest; (d) any representation or warranty made by the Company in the Postpetition Credit Agreement or any certificate delivered pursuant to the Postpetition Credit Agreement, or any financial statement delivered to the First Midwest under the Postpetition Credit Agreement, by the Company or any Guarantor shall prove to have been false in any material respect as of the time when made or given; (e) a final judgment which, together with other outstanding final judgments against the Company exceeds an aggregate of $10,000 shall be entered against the Company and shall remain outstanding and unsatisfied, unbonded, unstayed or | Ex. A ¶ 11 |

uninsured after 60 days from the date of entry thereof; or any judgment which exceeds $20,000 shall be entered against the Company; (f) any lien purported to be created by any Postpetition Loan Document or the Interim Order or Final Order in any of the collateral secured by the Postpetition Collateral Documents purported to be covered thereby shall, for any reason, cease to be valid except collateral released as permitted by any Postpetition Loan Document or Interim Order or Final Order; (g) entry of an order of the Bankruptcy Court converting the chapter 11 case of the Company to a case under chapter 7 of the Bankruptcy Code and such order is not reversed or vacated within thirty (30) days; (h) entry of an order of the Bankruptcy Court dismissing or suspending the chapter 11 case of the Company; (i) entry of an order of the Bankruptcy Court in the Company's chapter 11 case appointing a trustee under Section 1104 of the Bankruptcy Code which First Midwest reasonably determines may result in events which are materially injurious to the interests of First Midwest and such order is not reversed or vacated within thirty (30) days; (j) entry of an order of the Bankruptcy Court granting relief from the automatic stay to the holder of a lien on, or security interest in, any other asset the removal of which from the Company's bankruptcy estate is reasonably likely to may have a material adverse effect on the value or operation of the Company's business; (k) the Interim Order or Final Order shall terminate by its terms, shall not remain in full force and effect or shall have been stayed, vacated, reversed, modified, supplemented or amended in a manner which First Midwest reasonably believes is materially injurious to its interests, or, in the event that any such order is the subject of any pending motion or appeal, any performance of any obligation of any party hereto shall have been stayed pending such motion or appeal; (l) the Final Order shall not have been issued prior to the earlier of (i) the next Business Day after the date the Final Hearing is concluded and (ii) the 21st day after the Petition Date or shall fail to approve and affirm the Interim Order in all material respects; (m) the aggregate principal amount outstanding by First Midwest to the Company under the Note exceeds the amount of the Postpetition Facility or the sum of the amounts outstanding under the Loans, the $600,000 Note and the Revolving Credit Agreement exceed the

| | | |
|---|---|---|
| | Borrowing Base from time to time in effect, and in either case, the Company fails to repay the amount of such excess within 5 Business Days after notice from First Midwest; or (n) the Postpetition Credit Agreement, the Note or any Postpetition Collateral Document shall, at any time after their respective execution and delivery, and for any reason, cease to be in full force and effect or be declared null and void, or be revoked or terminated (other than by First Midwest), or the validity or enforceability thereof or hereof shall be contested in writing by the Company or any Guarantor, or the Company or any Guarantor shall deny in writing that it has any or further liability or obligation thereunder or under the Postpetition Credit Agreement, as the case may be. | |
| **Adequate Protection**: [Fed. R. Bankr. P. 4001(b)(1)(B)(iv)] | As adequate protection for First Midwest's interest in the Prepetition Collateral under §§ 361, 362, 363 or 364 of the Bankruptcy Code from and after the Petition Date, and to induce First Midwest to provide the Postpetition Debt:<br><br>(a) <u>Priority of Prepetition Liens/Allowance of First Midwest's Claim</u>. Subject to the rights set forth in Paragraph 7 of the Interim Order and the Carve-Out: (1) the Prepetition Liens shall constitute Priority Liens, subject only to the Postpetition Liens and the Permitted Priority Liens; and (2) the Prepetition Debt shall constitute the legal, valid and binding obligation of each of the Debtors that are obligated on such Prepetition Debt by the terms of the documents governing such debt, by guarantees or otherwise, and their respective estates, enforceable in accordance with the terms of the applicable Prepetition Documents.<br><br>(b) <u>Replacement Liens</u>. To the extent of any diminution in value of First Midwest's interest in the Prepetition Collateral from and after the Petition Date and subject to the Carve-Out, First Midwest will be granted the Replacement Liens as security for payment of the Prepetition Debt. The Replacement Liens: (1) are and shall be in addition to the Prepetition Liens; (2) are and shall be deemed properly perfected, valid and enforceable liens without any further action by | ¶ 4(a)-(d) |

|  |  |  |
|---|---|---|
|  | the Debtors or First Midwest and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; and (3) shall remain in full force and effect notwithstanding any subsequent conversion to chapter 7 or dismissal of the Cases. Notwithstanding the foregoing, the Debtors authorized to and shall execute and deliver to First Midwest such financing statements, mortgages, instruments and other documents as First Midwest may reasonably request from time to time in respect of the Replacement Liens.<br><br>(c) <u>Allowed Code § 507(b) Claim</u>.  As additional adequate protection of the interests of First Midwest in the Prepetition Collateral, to the extent of any diminution in value of First Midwest's interest in the Prepetition Collateral from and after the Petition Date, and subject to the Carve-Out, First Midwest shall have an allowed claim under § 507(b) of the Bankruptcy Code, with priority over: (1) all costs and expenses of administration of the Cases (other than First Midwest's claims under § 364 of the Bankruptcy Code) that are incurred under any provision of the Bankruptcy Code; and (2) the claims of any other party-in-interest under § 507(b) of the Bankruptcy Code.<br><br>(d) <u>Prepetition Adequate Protection Payments</u>.  As additional adequate protection, to the extent any Prepetition Debt remains outstanding, the Debtors will provide adequate protection to First Midwest, in the form of: (a) monthly payments of interest, reasonable fees and other amounts due under the Prepetition Documents; and (b) ongoing payment of First Midwest's reasonable fees, costs and expenses, including, without limitation, legal and other professionals' fees and expenses. |  |
| **Priority of Adequate Protection Liens**: [Fed. R. Bankr. P. 4001(b)(1)(B)(iv)] | Subject to the Carve-Out, the Postpetition Debt will be granted superpriority administrative expense status under § 364(c)(1) of the Bankruptcy Code, with priority over all costs and expenses of administration of the Cases that are incurred under any provision of the | ¶ 3(c)(i); ¶ 3(c)(ii) |

| | | |
|---|---|---|
| | Bankruptcy Code; and the Postpetition Debt is entitled to the protections of § 364(e) of the Bankruptcy Code.<br><br>In addition, First Midwest will be granted the Postpetition Liens to secure the Postpetition Debt. Subject to the Carve-Out, the Postpetition Liens: (1) are in addition to the Prepetition Liens; (2) pursuant to §§ 364(c)(2), (c)(3) and 364(d) of the Bankruptcy Code, are Priority Liens senior in priority to all liens on the Postpetition Collateral other than Permitted Priority Liens, without any further action by the Debtors or First Midwest and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; (3) shall not be subject to avoidance or subordination including, without limitation, under § 510(c) of the Bankruptcy Code; and (4) shall not be subject to any security interest or lien that is avoided and preserved pursuant to § 551 of the Bankruptcy Code; and (5) shall remain in full force and effect notwithstanding any subsequent conversion of the Cases to chapter 7 or dismissal of the Cases. | |
| **Findings of Fact Binding on the Debtors and Parties in Interest**:<br>[Fed. R. Bankr. P. 4001(b)(1)(B)(iii)]<br>[Local Bankr. R. 4001-2(A)(2)(b); 4001-2(A)(3)] | The stipulations and admissions contained in the Interim Order, exclusive of the recitals in Paragraphs D through J of the Interim Order, shall be binding on all parties-in-interest, including, without limitation, any Committee. Further, solely to the extent that, (a) a party in interest has timely filed an adversary proceeding challenging the amount, validity, or enforceability of the Prepetition Debt, or the perfection or priority of First Midwest's liens on and security interests in the Prepetition Collateral in respect thereof, or otherwise asserting any claims or causes of action on behalf of the Debtors' estates against First Midwest relating to the Prepetition Debt, by no later than (x) with respect to the Creditors' Committee, the date that is 60 days after the date of its formation, and, with respect to any other party, the date that is 75 days from the entry of the Interim Order, and (b) the Court rules in favor of such party in interest or the Committee in any such timely and properly filed adversary proceeding, then, without further order of the Court, (i) the claims, liens and security interests of First Midwest shall be deemed to be allowed for all purposes in the Cases and shall not be subject to challenge by any party in interest as to extent, validity, priority or otherwise, and (ii) the Debtors and their estates shall be | ¶ 7 |

| | | |
|---|---|---|
| | deemed to have waived, released and discharged First Midwest and its officers, directors, principals, attorneys, consultants, predecessors in interest, and successors and assigns of and from any and all claims and causes of action, indebtedness, and obligations, of every type, which occurred on or prior to the date of entry of the Interim Order with respect to or in connection with the Prepetition Debt, the Prepetition Liens, the Prepetition Documents or otherwise, and (iii) the recitals in Paragraphs D through J of the Interim Order shall be binding on all parties in interest, including, without limitation, the Committee. | |
| **506(c) Waiver**: [Fed. R. Bankr. P. 4001(b)(1)(B)(iii)] [Local Bankr. R. 4001-2(A)(2)(c); 4001-2(A)(3)] | Upon entry of the Final Order, none of the surcharge provisions of Code § 506, the enhancement of collateral provision of Code § 552 or any other legal or equitable doctrine (including, without limitation, unjust enrichment) shall, either before, on, or after the Termination Date, be imposed upon First Midwest or any of the Aggregate Collateral for the benefit of any party in interest, including, without limitation, the Committee, any of the Carveout Professionals, or the Debtor at any time during this Case unless, prior to rendering services or incurring expenses, the amount of which they may thereafter seek to recover from First Midwest or the Aggregate Collateral pursuant to such sections of the Bankruptcy Code, the Committee, any of the Carveout Professionals, or Trustee, as the case may be, first obtains First Midwest's express written consent to the rendering of such specific services or the incurring of such specific expenses. The foregoing requirement shall be in addition to all (and not in lieu of any) of the requirements under applicable law for a recovery from First Midwest or the Aggregate Collateral pursuant to such sections of the Bankruptcy Code; provided, however, that nothing in the Interim Order shall be deemed to constitute First Midwest's consent to any claim under Code § 506(c) asserted for the benefit of any party, and First Midwest shall retain all rights to contest any such claims. | ¶ 4(e) |

| | | |
|---|---|---|
| **Liens on Chapter 5 Causes of Actions**: [Fed. R. Bankr. P. 4001(b)(1)(B)(iii)] [Local R. Bankr. P. 4001-2(A)(2)(d); 4001-2(A)(3)] | Upon entry of the Final Order, the Debtors waive their rights: (a) to return any of the Aggregate Collateral pursuant to section 546(h) of the Bankruptcy Code; (b) to consent to any order permitting any claims pursuant to section 503(b)(9) of the Bankruptcy Code except to the extent permitted in the Budget as previously disclosed to First Midwest and the Court; and (c) to consent to setoff pursuant to section 553 of the Bankruptcy Code or recoupment. | ¶ 9 |
| **Carve Out and Committee Investigation Budget**: [Fed. R. Bankr. P. 4001(b)(1)(B)(iii)] [Local Bankr. R. 4001-2(A)(2)(f); 4001-2(A)(3)] | Subject to the terms and conditions of this paragraph 6, the Postpetition Liens, the DIP Superpriority Claim, the Prepetition Liens, the Replacement Liens, Adequate Protection Superpriority Claims are subordinate to the Carveout. The Carveout (A) with respect to each Carveout Professional: (1) shall equal an aggregate amount not to exceed the lesser of (i) the aggregate amount provided in the Budget for such Carveout Professional for the period commencing on the Petition Date and ending on the Termination Date; and (ii) the aggregate amount of accrued and unpaid fees and expenses allowed at any time by the Court during the period commencing on the Petition Date and ending on the Termination Date; (2) shall be reduced dollar-for-dollar by any payments of fees and expenses to such Carveout Professional; and (3) shall be paid out of any prepetition retainer or property of the estate other than property subject to an unavoidable lien in favor of First Midwest before such payments are made from proceeds of the Postpetition Debt or the Aggregate Collateral and (B) from and after the Termination Date with respect to the Carveout Professionals, shall in the aggregate equal $75,000 for all such professionals. Further, First Midwest shall have the right to reserve against the Maximum DIP Amount an amount equal to the sum of the aggregate amount of unpaid fees and expenses consistent with the Budget for the Carveout Professionals. | ¶ 6; Ex. A, ¶¶ 4-5 |

| | | |
|---|---|---|
| **Roll-Up**:<br>[Local Bankr. R. 4001-2(A)(2)(e)] | Under the terms of the Postpetition Credit Agreement, the Debtors shall comply with any recurring monthly payment obligations with respect to the DIP Lender's prepetition loans and all cash collections constituting the DIP Lender's prepetition Cash Collateral will be used to pay down any loans under the DIP Lender's prepetition loans – a "creeping roll-up", with operating expenses to be funded by borrowings under the terms of the DIP Loan in accordance with the Budget. | ¶ 3(a) |
| **Waiver/Modification of Automatic Stay**:<br>[Fed. R. Bankr. P. 4001(b)(1)(B)(iii)]<br>[Local Bankr. R. 4001-2(A)(2)(i); 4001-2(A)(3)] | Subject to Paragraph 5 of the Interim Order, the automatic stay of § 362 of the Bankruptcy Code will be modified solely with respect to First Midwest to the extent necessary to effectuate the provisions of the Interim Order. | ¶ 11 |
| **Adequacy of Budget**:<br>[Local Bankr. R. 4001-2(A)(4)] | The Debtors have reason to believe that the Budget will be adequate (inclusive of professional fees and disbursements) considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Budget. | Ex. B |

21. The value of the Debtors' estates is dependent primarily on the sustained dedication of their unionized employees to operate the Debtors' cranes. Interruption of the Debtors' business would severely impede their ability to maintain operations and the value of their estates for the benefit of their stakeholders. In order to continue their operations and preserve the value of their estates on a going-forward basis, the Debtors require the immediate use of Cash Collateral and the postpetition financing available under the DIP Loan.

22. Access to the DIP Loan is also immediately necessary to provide comfort to third parties, such as the Debtors' contractual counterparties, vendors, employees, and professionals regarding the adequacy of the Debtors' liquidity.

23. As I explain above (see *infra.* at ¶¶ 15-16) the Debtors explored several avenues for DIP financing, but after much effort, only First Midwest emerged as a willing and viable DIP

lender. None of the potential lenders were willing to provide the financing on an unsecured, administrative claim basis. Moreover, given the magnitude of the Debtors' financing needs, the Debtors determined that it would not be productive to solicit interest for unsecured, administrative expense financing from additional lenders.

24. The Debtors, under my supervision, negotiated vigorously with the DIP Lender concerning the terms of the DIP Loan.

25. The Debtors have determined in the exercise of their business judgment that entry into the DIP Loan is necessary to preserve the assets of their estates and is in the best interests of creditors. Without postpetition funding, the Debtors will lack the liquidity necessary to continue operating. The DIP Loan represents the Debtors' best option for survival, and is in the best interests of the Debtors, their estates, and their creditors. Accordingly, the Debtors' decision to enter into the proposed DIP Loan is a sound exercise of their judgment that warrants approval by the Court.

### IV. Conclusion

26. In conclusion, for the reasons stated herein and in the DIP Financing Motion, I respectfully request that the DIP Financing Motion be granted, together with such other and further relief as this Court deems just and proper.

[*Signature Page Follows*]

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Date: May 8, 2017

_____
A. Jeffrey Zappone
Conway MacKenzie, Inc.
Senior Managing Director

Advisor to:
Chellino Crane Inc.,
Sam J. Chellino Crane Rental, Inc.,
G & B Equipment, LLC,
Chellino/Industrial Park Family Limited Partnership, and
Chellino Industrial Management, Inc.