**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CHELLINO CRANE, INC., *et al.*[1] | § | Case No. 17-14200 (CAD) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**FINAL ORDER AUTHORIZING THE DEBTORS TO: (A) USE CASH COLLATERAL;**
**(B) INCUR POSTPETITION DEBT; AND (C) GRANT ADEQUATE PROTECTION**
**AND PROVIDE SECURITY AND OTHER RELIEF TO FIRST MIDWEST BANK**

This matter came before this Court on the motion (the "Motion") of the above-captioned debtors and debtors in possession  (collectively, the "Debtors") requesting that this Court enter an interim order, and later after notice and a hearing, a final order (this "Final Order"), authorizing the Debtors to: (a) use Cash Collateral; (b) incur Postpetition Debt, pursuant to the terms of the Postpetition Loan Documents; and (c) grant adequate protection and provide security and other relief to First Midwest Bank ("First Midwest").  Unless otherwise indicated, all capitalized terms used as defined terms herein have the meanings ascribed thereto in Exhibit A attached hereto and by this reference are made a part hereof.

This Final Order shall constitute findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052 and shall take effect and be fully enforceable as of the Petition Date. Having examined the Motion, being fully advised of the relevant facts and circumstances surrounding the Motion, having entered the *Order Granting the Debtors to: (A) Use Cash Collateral on an Interim Basis Pending a Final Hearing; (B) Incur Postpetition Debt on an*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Chellino Crane, Inc. (6804); Sam J. Chellino Crane Rental, Inc. (0830); G & B Equipment, LLC (0688); Chellino/Industrial Park Family Limited Partnership (1246); and Chellino Industrial Management, Inc. (0691).  The address for all of the Debtors is 915 Rowell Avenue, Joliet, Illinois 60433 (the "Real Property").

*Interim Basis Pending a Final Hearing; and (C) Grant Adequate Protection and Provide Security and other Relief to First Midwest Bank* on May 10, 2017 (Dkt. 84) (the "Interim Order") and having held the Final Hearing pursuant to §§ 363 and 364 of the Code and Fed. R. Bankr. P. 4001(b) and (c), and objections, if any, having been withdrawn, resolved or overruled by the Court, **THE MOTION IS GRANTED AS SET FORTH BELOW, AND, SUBJECT TO THE RIGHTS SET FORTH IN PARAGRAPH 7 BELOW, THE DEBTORS HEREBY ADMIT, STIPULATE AND AGREE THAT:**

A.     On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Code.  The Debtors have retained possession of their property and continue to have the rights, powers and duties of debtors-in-possession pursuant to §§ 1107 and 1108 of the Code.

B.     The Court has jurisdiction over the Cases and this proceeding pursuant to 28 U.S.C. § 1334. Determination of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue over this Motion is proper under 28 U.S.C. § 1409(a).

C.     On May 17, 2017, the Committee was appointed in these Cases.

D.     The Prepetition Documents evidence and govern the Prepetition Debt, the Prepetition Liens and the prepetition financing relationship between the Debtors and First Midwest.

E.     The Prepetition Debt constitutes the legal, valid and binding obligation of the Debtors, enforceable in accordance with the terms of the Prepetition Documents (other than in respect of the stay of enforcement arising from section 362 of the Code).

4840-4614-5096, v. 2

F.      As of the Petition Date, the Debtors are liable for payment of the Prepetition Debt, and the Debtors stipulate that the Prepetition Debt is valid, enforceable and unavoidable in an amount not less than $ 14,442, 239.84.

G.      The Debtors do not possess and will not assert any offsets, defenses or counterclaims to the Prepetition Debt, and no portion of the Prepetition Debt is subject to contest, objection, recoupment, defense, counterclaim, offset, avoidance, recharacterization, subordination or other claim, cause of action or challenge of any nature under the Code, under applicable non-bankruptcy law or otherwise by the Debtors.

H.      The Prepetition Liens are Priority Liens, subject only to Permitted Priority Liens, if any, and the Prepetition Liens secure payment of all of the Prepetition Debt.

I.      Upon the entry of this Final Order, First Midwest's interests in the Prepetition Collateral will be deemed to be adequately protected; provided, however, that nothing herein shall prejudice First Midwest's rights to later assert that its interest in the Prepetition Collateral lacks adequate protection;

J.      Subject solely to the rights set forth in Paragraph 7 of this Final Order, the Debtors do not have, and hereby release, any claims, counterclaims, causes of action, defenses or setoff rights relating to the Prepetition Documents, the Prepetition Liens, the Prepetition Debt or otherwise, against First Midwest and its affiliates, subsidiaries, agents, officers, directors, employees, advisors, consultants, predecessors in interest, successors and assigns.

K.      First Midwest has consented to the terms of this Final Order and is entitled to the adequate protection as set forth herein pursuant to §§ 361, 362, 363 and 364 of the Code to the extent of any diminution in the value of its interests in the Prepetition Collateral from and after the Petition Date.

4840-4614-5096, v. 2

L.      By reason of taking any actions pursuant to this Final Order, First Midwest is not in control of the operations, management or liquidation of the Debtors or their assets.

M.      The Debtors represent that as of the Petition Date, the Budget contains all expenses necessary and reasonably foreseeable for the administration of its assets and the preservation of the Aggregate Collateral through the period for which the Budget runs, and therefore includes all amounts potentially chargeable to First Midwest under § 506(c) of the Code.  The Debtors agree that no charge under Section 506(c) of the Bankruptcy Code shall be sought, without written consent of First Midwest, for any amounts that are not set forth in the Budget.

N.      The Debtors have an immediate need to use Cash Collateral and incur Postpetition Debt as provided herein, in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs.  The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the Debtors as a going concern and enterprise value.

O.      The Debtors are unable to obtain unsecured credit allowable under § 503(b)(1) of the Code sufficient to finance the administration of their estates. Except as provided below, the Debtors are unable to obtain credit allowable under §§ 364(c)(1), (c)(2) or (c)(3) of the Code on terms more favorable than those offered by First Midwest.

P.      The terms of the Postpetition Debt have been negotiated at arm's length, and the Postpetition Debt is being extended in good faith, as that term is used in § 364(e) of the Code.

Q.      The terms and conditions of the Postpetition Debt are fair and reasonable, the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.

R.      Under the circumstances of these Cases, this Final Order is a fair and reasonable response to the Debtors' request for First Midwest's consent to the use of Cash Collateral and provision of Postpetition Debt, and the entry of this Final Order is in the best interest of the Debtors' estate and its creditors.   Payment of the Prepetition Revolving Line of Credit in accordance with this Final Order is necessary as First Midwest will not otherwise consent to (1) providing the DIP Financing and extending credit to the Debtors thereunder, and (2) the use of its Cash Collateral, or (3) the subordination of its liens to the Carveout.   The Debtors have requested entry of this Final Order pursuant to Fed. R. Bankr. P. 4001(b)(2) and 4001(c)(2) and Local Bankr. R. 4001-2.   Absent granting the relief set forth in this Final Order, the Debtors' estates will be immediately and irreparably harmed.   The use of Cash Collateral and the incurrence of the Postpetition Financing, in accordance with this Final Order are therefore in the best interests of the Debtors' estates.

S.      The notice provided by the Debtors of the Motion, the entry of the Interim Order and the Final Hearing satisfy the requirements of Fed. R. Bankr. P. 2002, 4001(b) and (c) and 9014 and §§ 102(1), 363, 364(c) and (d) of the Code and were otherwise sufficient and appropriate under the circumstances.

**WHEREFORE, IT IS HEREBY ORDERED THAT THE MOTION IS GRANTED AS SET FORTH HEREIN, AND THAT:**

5

1.    <u>Authorization to Use Cash Collateral</u>.  The Debtors are authorized to use Cash Collateral in accordance and as limited by the Budget, subject to the Permitted Variance, and otherwise in accordance with and pursuant to the terms and provisions of this Final Order, including Paragraph 2(d) hereof.  So long as any Prepetition Debt or Postpetition Debt remains outstanding, the Debtors may not use or seek to use Cash Collateral other than pursuant to the terms of this Final Order.

2.    <u>Procedure for Use of Cash Collateral</u>.

(a)    <u>Delivery of Cash Collateral to First Midwest</u>.  The Debtors shall deposit all Cash Collateral now or hereafter in its possession or control into the FMB Account (or otherwise deliver such Cash Collateral to First Midwest in a manner approved in writing by First Midwest) promptly upon receipt thereof.

(b)    <u>Cash Collateral in First Midwest's Possession</u>.  First Midwest is authorized to collect upon, convert to cash and enforce checks, drafts, instruments and other forms of payment now or hereafter coming into its possession or control which constitute Aggregate Collateral or proceeds thereof.

(c)    <u>Application of Cash Collateral</u>.  First Midwest, at its election, is authorized to apply all Cash Collateral now or hereafter in First Midwest's possession or control as follows: (1) first, to the payment of Prepetition Debt, with payments to be applied first to the $600,000 promissory note of Chellino Crane, Inc., dated May 2, 2017, then to the Prepetition Revolving Line of Credit, and then in the following order:  (i) Loan #2014001751 - $3,057,999 Equipment Term Loan; (ii) Loan #2014001469 - $198,376 Equipment Term Loan; (iii) Loan #2014001468 - $3,259,161 Equipment Term Loan; (iv) Loan #20140011467 - $1,222,841 Equipment Term Loan; (v) Equipment Financing Agreement (owed to First Midwest Equipment

Finance Co., a subsidiary of First Midwest) - $281,535; (vi) Loan #2014001470 - $838,037 Mortgage; and (2) after all Prepetition Debt has been paid in full, to payment of Postpetition Debt.

        (d)    <u>Prohibition Against Use of Cash Collateral</u>.  Except as provided for in this Final Order, Debtors will not use or seek to use Cash Collateral, unless, in addition to the satisfaction of all requirements of § 363 of the Code: (1) First Midwest has consented to an order authorizing such use; or (2) at the time such an order is entered, the Postpetition Debt has been indefeasibly paid in full, in cash.

        3.    <u>Authorization to Incur Postpetition Debt</u>.

        (a)    <u>Permitted Uses of Postpetition Debt</u>.  The Debtors are authorized and have agreed to incur Postpetition Debt, in accordance with the terms and provisions of this Final Order and the Postpetition Loan Documents which Postpetition Debt shall be used for all purposes permitted under the Postpetition Credit Agreement, including, without limitation, (i) those expenses enumerated in the Budget, including the Carveout, as and when such expenses become due and payable, subject to the Permitted Variance, (ii) any adequate protection payments to First Midwest, and (iii) the Prepetition Debt.

        (b)    <u>Additional Terms of Postpetition Debt</u>.

        (i)    <u>Maximum Amount</u>. The maximum principal amount of Postpetition Debt outstanding shall not at any time exceed the Maximum DIP Amount.

        (ii)    <u>Interest</u>. The Postpetition Debt shall bear interest at a per annum rate equal to Prime plus 3%, payable monthly, and shall require immediate payment to First Midwest of a nonrefundable fee of $138,000, which are hereby found to be fair and reasonable under the circumstances.

4840-4614-5096, v. 2

(iii)   Maturity. The Postpetition Debt shall mature and be due and payable in full on the Termination Date, as set forth in the Postpetition Credit Agreement.

(iv)   Control Agreements. All deposit account control agreements or similar control agreements, and all collateral access agreements, in effect as of the Petition Date shall remain in full force and effect notwithstanding the entry of this Final Order and any subsequent orders amending this Final Order.

(v)   The Postpetition Debt shall be supported by personal guarantees by the Guarantors.

(c)   Superpriority Administrative Expense Status; Postpetition Liens.

(i)   Subject to the Carve-Out, the Postpetition Debt is hereby granted superpriority administrative expense status under § 364(c)(1) of the Code, with priority over all costs and expenses of administration of the Cases that are incurred under any provision of the Code; and the Postpetition Debt is entitled to the protections of § 364(e) of the Code.

(ii)   In addition, First Midwest is hereby granted the Postpetition Liens to secure the Postpetition Debt.  Subject to the Carve-Out, the Postpetition Liens: (1) are in addition to the Prepetition Liens; (2) pursuant to §§ 364(c)(2), (c)(3) and 364(d) of the Code, are Priority Liens senior in priority to all liens on the Postpetition Collateral other than Permitted Priority Liens, without any further action by the Debtors or First Midwest and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; (3) shall not be subject to avoidance or subordination including, without limitation, under § 510(c) of the Code; and (4) shall not be subject to any security interest or lien that is avoided and preserved pursuant to § 551 of the Code; and (5) shall remain in full force and effect notwithstanding any subsequent conversion of the Cases to chapter 7 or dismissal of the Cases.

(iii)   The Debtors are authorized to and shall execute and deliver to First Midwest such postpetition loan agreements, financing statements, mortgages, instruments and other documents as First Midwest may reasonably request from time to time, and any such documents filed by First Midwest shall be deemed filed as of the Petition Date; provided, to the extent there is any conflict between such documents and this Final Order, this Final Order shall govern and control.

8

(d)      Prohibition Against Additional Debt.  The Debtors will not incur or seek to incur debt secured by a lien which is equal to or superior to the Prepetition Liens or the Postpetition Liens, or which is given superpriority administrative expense status under Code § 364(c)(1), unless, in addition to the satisfaction of all requirements of § 364 of the Code: (1) First Midwest has consented to such order; or (2) such credit or debt is used to pay the Postpetition Debt and the Prepetition Debt in full, in cash, immediately upon the entry of such order.

4.      Adequate Protection of Interests of First Midwest in the Prepetition Collateral and the Prepetition Liens.  As adequate protection for First Midwest's interest in the Prepetition Collateral under §§ 361, 362, 363 or 364 of the Code from and after the Petition Date, and to induce First Midwest to provide the Postpetition Debt:

(a)      Priority of Prepetition Liens/Allowance of First Midwest's Claim. Subject to the rights set forth in Paragraph 7 of this Final Order and the Carve-Out: (1) the Prepetition Liens shall constitute Priority Liens, subject only to the Postpetition Liens and the Permitted Priority Liens; and (2) the Prepetition Debt shall constitute the legal, valid and binding obligation of each of the Debtors that are obligated on such Prepetition Debt by the terms of the documents governing such debt, by guarantees or otherwise, and their respective estates, enforceable in accordance with the terms of the applicable Prepetition Documents.

(b)      Replacement Liens.  To the extent of any diminution in value of First Midwest's interest in the Prepetition Collateral from and after the Petition Date and subject to the Carve-Out, First Midwest is hereby granted the Replacement Liens as security for payment of the Prepetition Debt.  The Replacement Liens: (1) are and shall be in addition to the Prepetition Liens; (2) are and shall be deemed properly perfected, valid and enforceable liens

4840-4614-5096, v. 2

without any further action by the Debtors or First Midwest and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; and (3) shall remain in full force and effect notwithstanding any subsequent conversion to chapter 7 or dismissal of the Cases. Notwithstanding the foregoing, the Debtors authorized to and shall execute and deliver to First Midwest such financing statements, mortgages, instruments and other documents as First Midwest may reasonably request from time to time in respect of the Replacement Liens.

(c)      Allowed Code § 507(b) Claim.  As additional adequate protection of the interests of First Midwest in the Prepetition Collateral, to the extent of any diminution in value of First Midwest's interest in the Prepetition Collateral from and after the Petition Date, and subject to the Carve-Out, First Midwest shall have an allowed claim under § 507(b) of the Code, with priority over: (1) all costs and expenses of administration of the Cases (other than First Midwest's claims under § 364 of the Code) that are incurred under any provision of the Code; and (2) the claims of any other party-in-interest under § 507(b) of the Code.

(d)      Prepetition Adequate Protection Payments.  As additional adequate protection, to the extent any Prepetition Debt remains outstanding, the Debtors will provide adequate protection to First Midwest, in the form of: (a) monthly payments of interest, reasonable fees and other amounts due under the Prepetition Documents; and (b) ongoing payment of First Midwest's reasonable fees, costs and expenses, including, without limitation, legal and other professionals' fees and expenses.

(e)      No Surcharge.  None of the surcharge provisions of Code § 506, the enhancement of collateral provision of Code § 552 or any other legal or equitable doctrine (including, without limitation, unjust enrichment) shall, either before, on, or after the

10

Termination Date, be imposed upon First Midwest or any of the Aggregate Collateral for the benefit of any party in interest, including, without limitation, the Committee, any of the Carveout Professionals, or the Debtor at any time during this Case unless, prior to rendering services or incurring expenses, the amount of which they may thereafter seek to recover from First Midwest or the Aggregate Collateral pursuant to such sections of the Code, the Committee, any of the Carveout Professionals, or Trustee, as the case may be, first obtains First Midwest's express written consent to the rendering of such specific services or the incurring of such specific expenses. The foregoing requirement shall be in addition to all (and not in lieu of any) of the requirements under applicable law for a recovery from First Midwest or the Aggregate Collateral pursuant to such sections of the Code; provided, however, that nothing in this Order shall be deemed to constitute First Midwest's consent to any claim under Code § 506(c) asserted for the benefit of any party, and First Midwest shall retain all rights to contest any such claims.

(f)     Right to Credit Bid. In all events, pursuant to § 363(k) of the Code, First Midwest shall have the right to use the Aggregate Debt or any part thereof to credit bid with respect to any bulk or piecemeal sale of all or any portion of the Aggregate Collateral.

(g)     No Marshaling. Neither First Midwest nor any of the Aggregate Collateral shall be subject to the doctrine of marshaling.

5.     Effect of Termination Date. Unless extended by the Court upon the written agreement of First Midwest, upon the Termination Date, without further notice or order of Court: (1) the Debtors' authorization to use Cash Collateral and incur Postpetition Debt hereunder will automatically terminate; (2) at First Midwest's election: (i) the Postpetition Debt shall be immediately due and payable, (ii) the Prepetition Debt shall become immediately due and payable to the extent that it is not due and payable already, and (iii) First Midwest shall be

11

entitled to set off any cash in First Midwest's possession or control and apply such cash in accordance with Paragraph 2(c) of this Final Order; and (3) First Midwest shall be entitled to exercise all of its rights and remedies under the Prepetition Documents, the documents executed in connection with the Postpetition Debt, and applicable law, without further order of the Court.

    6.    <u>Carveout</u>.

    (a)    <u>Carveout Terms</u>. Subject to the terms and conditions of this paragraph 6, the Postpetition Liens, the DIP Superpriority Claim, the Prepetition Liens, the Replacement Liens, Adequate Protection Superpriority Claims are subordinate to the Carveout. The Carveout (A) with respect to each Carveout Professional: (1) shall equal an aggregate amount not to exceed the lesser of (i) the aggregate amount provided in the Budget for such Carveout Professional for the period commencing on the Petition Date and ending on the Termination Date; and (ii) the aggregate amount of accrued and unpaid  fees and expenses allowed at any time by the Court during the period commencing on the Petition Date and ending on the Termination Date; (2) shall be reduced dollar-for-dollar by any payments of fees and expenses to such Carveout Professional; and (3) shall be paid out of any prepetition retainer or property of the estate other than property subject to an unavoidable lien in favor of First Midwest before such payments are made from proceeds of the Postpetition Debt or the Aggregate Collateral and (B) from and after the Termination Date with respect to the Carveout Professionals, shall in the aggregate equal $75,000 for all such professionals.  Further, First Midwest shall have the right to reserve against the Maximum DIP Amount an amount equal to the sum of the aggregate amount of unpaid fees and expenses consistent with the Budget for the Carveout Professionals.

4840-4614-5096, v. 2

(b)      Carveout Usage.   No portion of the Carveout and no Postpetition

Debt or Aggregate Collateral may be used to pay any fees or expenses incurred by any entity,

including the Debtors, the Committee or the Carveout Professionals, in connection with claims

or causes of action adverse to First Midwest's interests in the Aggregate Collateral, including

(1) preventing, hindering or delaying First Midwest's enforcement or realization upon any of the

Aggregate Collateral once an Event of Default has occurred; (2) using or seeking to use Cash

Collateral or incurring indebtedness in violation of the terms hereof, or selling any Aggregate

Collateral without First Midwest's consent; or (3) objecting to or contesting in any manner, or in

raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of the

Aggregate Debt or any mortgages, liens or security interests with respect thereto or any other

rights or interests of First Midwest, or in asserting any claims or causes of action, including,

without limitation, any actions under chapter 5 of the Code, against First Midwest; provided,

however, that up to $15,000 of the Carveout may be used by the Committee to investigate the

validity, extent, amount, perfection, priority, or enforceability of the Prepetition Debt and the

Prepetition Collateral; provided, further, however, that the Carveout may be used to pay fees and

expenses incurred by the Carveout Professionals in connection with the negotiation, preparation

and entry of this Final Order or any amendment hereto consented to by First Midwest.

7.      Binding Effect of Stipulations; Challenge Period.   The stipulations and

admissions contained in this Final Order, exclusive of the recitals in Paragraphs D through J of

this Final Order, shall be binding on all parties-in-interest, including, without limitation, the

Committee.  Further, unless, and solely to the extent that, (a) a party in interest has timely filed

an adversary proceeding challenging the amount, validity, or enforceability of the Prepetition

Debt, or the perfection or priority of First Midwest's liens on and security interests in the

13

Prepetition Collateral in respect thereof, or otherwise asserting any claims or causes of action on behalf of the Debtors' estates against First Midwest relating to the Prepetition Debt, by no later than (x) with respect to the Committee, the date that is 60 days after the date of its formation, and, with respect to any other party, the date that is 75 days from the entry of the Interim Order, and (b) the Court rules in favor of such party in interest or the Committee in any such timely and properly filed adversary proceeding, then, without further order of the Court, (i) the claims, liens and security interests of First Midwest shall be deemed to be allowed for all purposes in the Cases and shall not be subject to challenge by any party in interest as to extent, validity, priority or otherwise, and (ii) the Debtors and their estates shall be deemed to have waived, released and discharged First Midwest and its officers, directors, principals, attorneys, consultants, predecessors in interest, and successors and assigns of and from any and all claims and causes of action, indebtedness, and obligations, of every type, which occurred on or prior to the date of entry of this Final Order with respect to or in connection with the Prepetition Debt, the Prepetition Liens, the Prepetition Documents or otherwise, and (iii) the recitals in Paragraphs D through J of this Final Order shall be binding on all parties in interest, including, without limitation, the Committee.   Notwithstanding anything to the contrary herein, if any such adversary proceeding is timely commenced, the stipulations contained in Paragraphs D through J hereof shall nonetheless remain binding on the Debtors except to the extent that such stipulations are expressly challenged in such adversary proceeding and the Committee prevails by a final order of this Court.

8.    <u>Application of Sale Proceeds</u>.  All proceeds from sales or other dispositions of all or any portion of the Aggregate Collateral shall be remitted to First Midwest for application in accordance with Paragraph 2.

4840-4614-5096, v. 2

9.      <u>Waiver of Right to Return/Consent to Setoff</u>.  The Debtors hereby waive

their rights: (a) to return any of the Aggregate Collateral pursuant to § 546(h) of the Code; (b) to

consent to any order permitting any claims pursuant to § 503(b)(9) of the Code except to the

extent permitted in the Budget as previously disclosed to First Midwest and the Court; and (c) to

consent to setoff pursuant to § 553 of the Code or recoupment.

10.      <u>Force and Effect of Prepetition Documents</u>.  Except as modified herein

and subject to the other provisions of this Final Order and the Code, the Prepetition Documents

shall remain in full force and effect with respect to the Prepetition Debt.  To the extent there

exists any conflict among the terms of the Motion, the Prepetition Documents and this Final

Order, this Final Order shall govern and control.

11.      <u>Modification of Stay</u>.  Subject to Paragraph 5 of this Order, the automatic

stay of § 362 of the Code is hereby modified solely with respect to First Midwest to the extent

necessary to effectuate the provisions of this Order.

12.      <u>No Waiver</u>.  First Midwest shall not be deemed to have suspended or

waived any of their rights or remedies under this Final Order, the Prepetition Documents, the

Code, or applicable nonbankruptcy law unless such suspension or waiver is in writing, signed by

a duly authorized officer of First Midwest, as applicable, and directed to the Debtors.  No failure

of First Midwest to require strict performance by the Debtors, or by any Trustee of any provision

of this Final Order shall waive, affect or diminish any right of First Midwest thereafter to

demand strict compliance and performance therewith, and no delay on the part of First Midwest

in the exercise of any right or remedy under this Final Order, the Prepetition Documents, the

Code, or applicable nonbankruptcy law shall preclude the exercise of any right or remedy.

Further, this Final Order shall not constitute a waiver by First Midwest of any of its rights under

the Prepetition Documents, the Code or applicable nonbankruptcy law, including, without limitation its right to later assert: (1) that its interests in the Aggregate Collateral lack adequate protection within the meaning of §§ 362(d) or 363(e) of the Code or any other provision thereof; or (2) a claim under § 507(b) of the Code.

13.    Amendments.  The Debtors and First Midwest may enter into amendments or modifications of the Budget without further notice and hearing or order of this Court; provided, that (a) such modifications or amendments do not materially and adversely affect the rights of any creditor or other party-in-interest, and (b) notice of any such amendment or modification is filed with this Court.

14.    Reporting.  In addition to all reporting requirements under the Prepetition Documents, the Debtors shall timely provide First Midwest with reports on no less than a weekly basis detailing the Debtors' compliance with the Budget and any changes in its projections including, but not limited to, cash inflows and outflows, weekly borrowing base certificates, accounts receivable aging, accounts payable aging, weekly actual cash flow versus projections, and shall otherwise reasonably cooperate with First Midwest regarding the Budget and the administration of its assets.

15.    Binding Effect.  Except as provided in Paragraph 7 herein, this Final Order shall be binding on all parties in interest in the Cases and their respective successors and assigns, including any Trustee.  If, in accordance with § 364(e) of the Code, this Final Order does not become a final nonappealable order, or if any of the provisions of this Final Order are hereafter modified, amended, vacated or stayed by subsequent order of this Court or any other court, such termination or subsequent order shall not affect: (a) subject to Paragraph 7 of this Final Order, the stipulations, representations, and findings contained in this Final Order and the relief granted

16

by and the releases contained in this Final Order (including, without limitation, Paragraphs 2(d), 3(d) and 7); and (b) the priority, validity, enforceability or effectiveness of any lien, security interest or other benefit or claim authorized hereby with respect to Cash Collateral used or Postpetition Debt incurred prior to the effective date of such termination or subsequent order. All such liens, security interests, claims and other benefits shall be governed in all respects by the original provisions of this Final Order, and First Midwest shall be entitled to all the rights, remedies, privileges and benefits granted hereto, including the liens and priorities granted herein, with respect to the Postpetition Debt.  Except as otherwise explicitly set forth in this Final Order, no third party is intended to be, or shall be deemed to be, a third-party beneficiary of this Final Order.

16.    <u>Survival</u>.  The provisions of this Final Order, and any actions taken pursuant to or in reliance upon the terms hereof, shall survive entry of, and govern in the event of any conflict with, any order which may be entered in the Cases: (a) confirming any chapter 11 plan, (b) converting the Cases to cases under chapter 7 of the Code, (c) dismissing the Cases, (d) withdrawing of the reference of the Cases from this Court, or (e) providing for abstention from handling or retaining of jurisdiction of the Cases in this Court.  The terms and provisions of this Final Order, including, without limitation, the rights granted First Midwest under §§ 364(c) and (d) of the Code, shall continue in full force and effect until all of the Aggregate Debt is indefeasibly paid in full in cash and discharged.

Dated: _____, 2017
Chicago, Illinois

_____
UNITED STATES BANKRUPTCY JUDGE

4840-4614-5096, v. 2

# EXHIBIT A

## DEFINED TERMS

1.      ***Aggregate Collateral***.   Collectively, the Prepetition Collateral and the Postpetition Collateral.

2.      ***Aggregate Debt***.   Collectively, the Prepetition Debt and the Postpetition Debt.

3.      ***Budget***.   The budget attached to this Final Order as <u>Exhibit B</u>, as amended, modified or supplemented from time to time, as may be agreed to in writing by First Midwest.

4.      ***Carveout***.   Collectively, (a) all fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), and (b) the allowed fees and disbursements as may be awarded by the Court to a Carveout Professional from time to time pursuant to § 330 of the Code, in the aggregate amount set forth in Paragraph 6 of this Final Order.

5.      ***Carveout Professionals***.   Sugar Felsenthal Grais & Hammer LLP and Conway MacKenzie, Inc.

6.      ***Cases***.   The Debtors' chapter 11 cases or any superseding chapter 7 cases of the Debtors.

7.      ***Cash Collateral***.   All "cash collateral," as that term is defined in § 363(a) of the Code, in which First Midwest has an interest, all deposits subject to setoff rights in favor of First Midwest, and all cash arising from the collection or other conversion to cash of the Aggregate Collateral, including from the sale of inventory and the collection of accounts receivable.

8.      ***Code***.   The United States Bankruptcy Code (11 U.S.C. §§ 101 <u>et</u> <u>seq</u>.), as amended, and any successor statute. Unless otherwise indicated, all statutory section references in this Final Order are to the Code.

9.      *Committee*.   The official committee appointed on May 17, 2017 to represent unsecured creditors in these Cases pursuant to § 1102 of the Code.

10.      *Debtors*.  Chellino Crane Inc.; Sam J. Chellino Crane Rental, Inc.; G & B Equipment, LLC; Chellino/Industrial Park Family Limited Partnership; and Chellino Industrial Management, Inc.

11.      *Event(s) of Default*.  An Event of Default includes any of the following: (a) the Company shall fail to pay (i) any interest due on the Note (as defined in the Postpetition Credit Agreement) by three (3) days after the same becomes due; (ii) any other amount due and payable under the Postpetition Credit Agreement (other than a principal payment on any Note) by three (3) days after Company receives written demand from First Midwest therefor; or (iii) any principal amount due on the Note when due; (b) the Company shall default in the performance or observance of any agreement, covenant, condition, provision or term contained in Article V or section 6.01 of the Postpetition Credit Agreement; (c) the Company or any Guarantor shall default in the performance or observance of any of the other agreements, covenants, conditions, provisions or terms in the Postpetition Credit Agreement or any of the Postpetition Collateral Documents (as defined in the Postpetition Credit Agreement) continuing for a period of thirty days after written notice thereof is given to the Company by First Midwest; (d) any representation or warranty made by the Company in the Postpetition Credit Agreement or any certificate delivered pursuant to the Postpetition Credit Agreement, or any financial statement delivered to the First Midwest under the Postpetition Credit Agreement, by the Company or any Guarantor shall prove to have been false in any material respect as of the time when made or given; (e) a final judgment which, together with other outstanding final judgments against the Company exceeds an aggregate of $10,000 shall be entered against the Company and shall remain outstanding and unsatisfied, unbonded, unstayed or uninsured after 60 days from the date of entry thereof; or any judgment which exceeds $20,000 shall be entered against the Company; (f) any lien purported to be created by any Postpetition Loan Document or the Interim Order or Final Order in any of the collateral secured by the Postpetition Collateral Documents purported to be covered thereby shall, for any reason, cease to be valid except collateral released as permitted by any Postpetition Loan Document or Interim Order or Final Order; (g) entry of an order of the Bankruptcy Court converting the chapter 11 case of the Company to a case under

4840-4614-5096, v. 2

chapter 7 of the Bankruptcy Code and such order is not reversed or vacated within thirty (30) days; (h) entry of an order of the Bankruptcy Court dismissing or suspending the chapter 11 case of the Company; (i) entry of an order of the Bankruptcy Court in the Company's chapter 11 case appointing a trustee under Section 1104 of the Bankruptcy Code which First Midwest reasonably determines may result in events which are materially injurious to the interests of First Midwest and such order is not reversed or vacated within thirty (30) days; (j) entry of an order of the Bankruptcy Court granting relief from the automatic stay to the holder of a lien on, or security interest in, any other asset the removal of which from the Company's bankruptcy estate is reasonably likely to may have a material adverse effect on the value or operation of the Company's business; (k) the Interim Order or Final Order shall terminate by its terms, shall not remain in full force and effect or shall have been stayed, vacated, reversed, modified, supplemented or amended in a manner which First Midwest reasonably believes is materially injurious to its interests, or, in the event that any such order is the subject of any pending motion or appeal, any performance of any obligation of any party hereto shall have been stayed pending such motion or appeal; (l) the Final Order shall not have been issued prior to the earlier of (i) the next Business Day after the date the Final Hearing is concluded and (ii) the 21st day after the Petition Date or shall fail to approve and affirm the Interim Order in all material respects; (m) the aggregate principal amount outstanding by First Midwest to the Company under the Note exceeds the amount of the Postpetition Facility or the sum of the amounts outstanding under the Loans, the $600,000 Note and the Revolving Credit Agreement exceed the Borrowing Base from time to time in effect, and in either case, the Company fails to repay the amount of such excess within 5 Business Days after notice from First Midwest; or   (n) the Postpetition Credit Agreement, the Note or any Postpetition Collateral Document shall, at any time after their respective execution and delivery, and for any reason, cease to be in full force and effect or be declared null and void, or be revoked or terminated (other than by First Midwest), or the validity or enforceability thereof or hereof shall be contested in writing by the Company or any Guarantor, or the Company or any Guarantor shall deny in writing that it has any or further liability or obligation thereunder or under the Postpetition Credit Agreement, as the case may be.

12. ***Final Hearing***.  The final hearing on the Motion conducted in accordance with Fed R. Bankr. P. 4001.

3

13.     ***FMB Account***.  A collection account in the name of Chellino Crane, Inc. at First Midwest.

14.     ***Guaranties.***     Collectively, (a) Commercial Guaranty for Loan No. 2014001300, dated as of July 5, 2016, executed by Sam J. Chellino Crane Rental, Inc.; (b) Commercial Guaranty for Loan No. 2014001300, dated as of July 5, 2016, executed by Frank J. Chellino; (c) Commercial Guaranty for Loan No. 2014001300, dated as of July 5, 2016, executed by Gregory Chellino; (d) Commercial Guaranty for Loan No. 2014001467, dated as of December 29, 2014, executed by Sam J. Chellino Crane Rental, Inc.; (e) Commercial Guaranty for Loan No. 2014001467, dated as of December 29, 2014, executed by Frank J. Chellino; (f) Commercial Guaranty for Loan No. 2014001467, dated as of December 29, 2014, executed by Gregory Chellino; (g) Commercial Guaranty for Loan No. 2014001468, dated as of December 29, 2014, executed by Sam J. Chellino Crane Rental, Inc.; (h) Commercial Guaranty for Loan No. 2014001468, dated as of December 29, 2014, executed by Frank J. Chellino; (i) Commercial Guaranty for Loan No. 2014001468, dated as of December 29, 2014, executed by Gregory Chellino; (j) Commercial Guaranty for Loan No. 2014001469, dated as of December 29, 2014, executed by Sam J. Chellino Crane Rental, Inc.; (k) Commercial Guaranty for Loan No. 2014001469, dated as of December 29, 2014, executed by Frank J. Chellino; (l) Commercial Guaranty for Loan No. 2014001469, dated as of December 29, 2014, executed by Gregory Chellino; (m) Commercial Guaranty for Loan No. 2014001470, dated as of December 30, 2014, executed by Sam J. Chellino Crane Rental, Inc.; (n) Commercial Guaranty for Loan No. 2014001470, dated as of December 30, 2014, executed by Frank J. Chellino; (o) Commercial Guaranty for Loan No. 2014001470, dated as of December 30, 2014, executed by Gregory Chellino; (p) Commercial Guaranty for Loan No. 2014001751, dated as of January 15, 2015, executed by Sam J. Chellino Crane Rental, Inc.; (q) Commercial Guaranty for Loan No. 2014001751, dated as of January 15, 2015, executed by Frank J. Chellino; and (r) Commercial Guaranty for Loan No. 2014001751, dated as of January 15, 2015, executed by Gregory Chellino (each a "Guaranty," collectively the "Guaranties").

15.     ***Guarantors***.  Collectively, (a) Sam J. Chellino Crane Rental, Inc., (b) Frank J. Chellino, and (c) Gregory Chellino (each a "Guarantor," collectively the "Guarantors").

4

16.    ***Maximum DIP Amount***.  $7,017,903.06.

17.    ***Permitted Priority Liens***.  Collectively, (a) the Carveout, and (b) liens in favor of third parties upon the Prepetition Collateral, which third-party liens, as of the Petition Date: (1) had priority under applicable law over the Prepetition Liens, (2) were not subordinated by agreement or applicable law, and (3) were non-avoidable, valid, properly perfected and enforceable as of the Petition Date; provided, however, that Permitted Priority Liens shall not include proceeds of Prepetition Collateral which consist of rental payments on leased equipment

18.    ***Permitted Variance***.  An amount equal to 10% of the cumulative amount set forth in the Budget.

19.    ***Petition Date***.  May 5, 2017.

20.    ***Postpetition Collateral***.  (a) All of the real and personal property of the Debtors that  have granted a mortgage or security interest to First Midwest, or any of its subsidiaries, to secure Prepetition Debt, and their respective estates, of any description whatsoever, wherever located and whenever arising or acquired, including, without limitation all cash, accounts, receivables, inventory, equipment, fixtures, chattel paper, general intangibles all leaseholds, all commercial torts, all interests in any joint venture, all licenses and permits, all other Prepetition Collateral, and all proceeds, rents, issues, profits and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any of the foregoing; provided, however, that the Postpetition Collateral shall not include property to the extent that such property is subject to a valid and enforceable agreement with the Small Business Administration which prohibits the granting of a lien in favor of First Midwest.

(b)    A mortgage on the real estate and personal property owned by Chellino/Industrial Park Family Limited Partnership and now or hereafter located at 915 Rowell Avenue, Joliet, Illinois.

(c)    A pledge of notes owed by Chellino Crane, Inc. to the individual Guarantors.

4840-4614-5096, v. 2

21.     ***Postpetition Debt***.  All indebtedness or obligations of the Debtors to First Midwest incurred on or after the Petition Date pursuant to this Interim Order or otherwise, including all advances made by First Midwest to pay the Carveout.

22.     ***Postpetition Liens***.  Priority Liens in the Aggregate Collateral, subject only to Permitted Priority Liens.

23.     ***Postpetition Credit Agreement***.  The postpetition loan agreement to be entered into between Chellino Crane, Inc. (the "Company") and First Midwest.

24.     ***Postpetition Loan Documents***.  Collectively, the Postpetition Credit Agreement, the Note (as defined in the Postpetition Credit Agreement) and the Postpetition Collateral Documents (as defined in the Postpetition Credit Agreement).

25.     ***Prepetition Collateral***.  All of the "Collateral" (as that term is defined in the Prepetition Documents) existing as of the Petition Date, and all proceeds, rents, issues, profits and products thereof.

26.     ***Prepetition Credit Agreement***.  That certain Business Loan Agreement (Asset Based) dated as of December 5, 2014 by and between the Chellino Crane, Inc. and Standard Bank and Trust Company ("Standard Bank"), as predecessor in interest to First Midwest, as amended, modified and supplemented from time to time.

27.     ***Prepetition Debt***.  All indebtedness or obligations of the Debtors under the Prepetition Documents as of the Petition Date, including fees, costs, interest, and expenses as and when due and payable pursuant to the Prepetition Documents.

28.     ***Prepetition Documents***.  The Prepetition Credit Agreement and all security agreements, pledge agreements, promissory notes and other documents, entered into by any of the Debtors and First Midwest, or any of its subsidiaries, including, without limitation, the following documents, among others, each as amended: Commercial Security Agreement, dated as of December 5, 2014, among Chellino Crane, Inc. and Standard Bank; Certain Promissory Notes numbered 2014001751, 2014001300, 2014001467, 2014001468, 2014001469, and 2014001470 (the "Notes"); Separate Business Loan Agreements (the "Business Loan

Agreements"); Separate Security Agreements (the "Security Agreements") between the Guarantors and Standard Bank; the Guaranties; and the Prepetition Third Party Documents.

29.     ***Prepetition Liens***.  First Midwest's security interests in the Prepetition Collateral under the Prepetition Documents, subject only to Permitted Priority Liens and Postpetition Liens.

30.     ***Prepetition Revolving Line of Credit.***  Pursuant to that certain Business Loan Agreement dated as of December 29, 2014, Standard Bank and Trust Company, as predecessor in interest to First Midwest, provided a credit facility to Chellino Crane, Inc., the outstanding principal balance of which, as of the Petition Date, was approximately $5,217,903.06.

31.     ***Prepetition Third Party Documents***.  Collectively, the Debtors' deposit account control agreements, leases, licenses, collateral access agreements, landlord agreements, warehouse agreements bailment agreements, insurance policies, contracts or other similar agreements in which First Midwest has an interest.

32.     ***Priority Liens***.  Liens that are first priority, properly perfected, valid and enforceable security interests, and that are not subject to any claims, counterclaims, defenses, setoff, recoupment or deduction, and which are otherwise unavoidable and not subject to recharacterization or subordination pursuant to any provision of the Code, any agreement, or applicable nonbankruptcy law.

33.     ***Replacement Liens***.  Priority Liens in the Postpetition Collateral granted to First Midwest pursuant to this Final Order, subject only to the Postpetition Liens and the Permitted Priority Liens.

34.     ***Termination Date***.  At First Midwest's election, the earlier to occur of: (a) the date on which First Midwest provides, via facsimile or overnight mail, written notice to counsel for the Debtors and counsel for the Committee of the occurrence and continuance of an Event of Default; and (b) the Final Order shall not have been issued prior to the earlier of (i) the next Business Day after the date the Final Hearing is concluded and (ii) the 21st day after the Petition Date or shall fail to approve and affirm the Interim Order in all material respects.

35.    ***Trustee***.  Any chapter 11 or chapter 7 trustee appointed or elected in the

Cases.

## EXHIBIT B

## BUDGET

**To Be Provided**

4840-4614-5096, v. 2