**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CHELLINO CRANE, INC., *et al.*[1] | § | Case No. 17-14200 (CAD) |
| | § | |
| Debtors. | § | (Jointly Administered) |

**SUPPLEMENTAL STATEMENT IN SUPPORT OF
ENTRY OF FINAL ORDER AUTHORIZING THE DEBTORS TO
(A) USE CASH COLLATERAL; (B) INCUR POSTPETITION DEBT;
AND (C) GRANT ADEQUATE PROTECTION AND PROVIDE SECURITY
AND OTHER RELIEF TO FIRST MIDWEST BANK**

Chellino Crane, Inc., *et al.* (collectively, the "Debtors"), debtors and debtors-in-possession in the above-captioned Chapter 11 case (the "Chapter 11 Case"), by and through their counsel, submit this supplemental statement ("Statement") in support of entry of a final order, substantially in the form attached hereto as **Exhibit 1** (the "Final Order"), authorizing the Debtors to: (a) use Cash Collateral; (b) incur Postpetition Debt, pursuant to the terms of the Postpetition Loan Documents; and (c) grant adequate protection and provide security and other relief to First Midwest Bank ("First Midwest").  Unless otherwise indicated, all capitalized terms not otherwise defined herein ("Defined Terms") have the meanings ascribed to them in the Final Order including Exhibit A to the Final Order

**Background**

1.     The Debtors filed their initial motion to use cash collateral and incur postpetition debt on May 5, 2017 (dkt. 11).  The Debtors have since operated under the authority of an initial

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Chellino Crane, Inc. (6804); Sam J. Chellino Crane Rental, Inc. (0830); G & B Equipment, LLC (0688); Chellino/Industrial Park Family Limited Partnership (1246); and Chellino Industrial Management, Inc. (0691).  The address for all of the Debtors is 915 Rowell Avenue, Joliet, Illinois 60433.

interim order granted May 10, 2017 (dkt. 84), and a second interim order granted June 9, 2017 (dkt. 205) (collectively, the "Interim Orders").

2.    While operating under the Interim Orders, the Debtors have continued to negotiate the terms of the use of cash collateral and postpetition financing with First Midwest and the Committee.  In addition, the Debtors have attempted to address the concerns of this Court, the United States Trustee, and certain other lenders and parties in interest with respect to the structure of the proposed financing.

3.    The results of these efforts are incorporated into the proposed Final Order.

4.    The purpose of this Supplemental Statement is to describe and clarify certain key material modifications in the Final Order, as against the originally proposed final order:

(a)    Elimination of the Roll-Up.  First Midwest has agreed to provide postpetition financing without a roll-up of its prepetition secured debt, subject to the modification described in the next section.

(b)    Postpetition Superpriority Lien in A/R Increase.  In exchange for elimination of the roll-up, the Debtors have added, to the existing proposed protections under Sections 362, 363, and 364 of the Bankruptcy Code, the following additional protection to First Midwest as a condition to postpetition financing.  First Midwest shall be granted a superpriority lien (a "Priming Lien") pursuant to Sections 364(c)(2), 364 (c)(3), and 364(d) of the Bankruptcy Code in accounts receivable of the Debtors that are part of the Aggregate Collateral ("Primed Collateral"), but solely to the extent that the value of the Primed Collateral increases from the Petition Date through the Termination Date.

(c)    Elimination of Adequate Protection Payments to First Midwest.  Under the Final Order, First Midwest will not receive adequate protection payments from the Debtor, though it retains its right to adequate protection to the extent of diminution of value of its collateral, and the right to seek additional adequate protection later.

5.    To further aid the Court and parties in interest, appended hereto is a redline of the proposed Final Order against the draft final order submitted with the original motion (**Exhibit 2**),

as well as a redline of the proposed Final Order against the second interim order entered on June

9, 2017 (**Exhibit 3**).

6.      In further support of entry of the Final Order, the Debtors submit the declarations

of A. Jeffrey Zappone, Senior Managing Director of Conway Mackenzie, the Debtors' financial

advisor (the "Zappone Declaration"), appended as **Exhibit 4**, and Mary Brown of First Midwest

(the "Brown Declaration"), appended as **Exhibit 5**.    These individuals will be available to

testify, if necessary, at the Final Hearing on June 21, 2017.

7.      Finally, the Debtors have separately submitted the proposed Final Order (Exhibit

1) in fillable PDF format.


Dated: June 16, 2017                      Respectfully submitted,

                                          SUGAR FELSENTHAL GRAIS & HAMMER LLP


                                          /s/ Jonathan P. Friedland
                                          Jonathan P. Friedland (IL ARDC No. 6257902)
                                          Mark S. Melickian (IL ARDC No. 6220943)
                                          Jack O'Connor. (IL ARDC No. 6302674)
                                          30 N. LaSalle Street, Suite 3000
                                          Chicago, IL 60602
                                          Telephone:          (312) 704-9400
                                          Facsimile:          (312) 372-7951
                                          jfriedland@sfgh.com
                                          mmelickian@sfgh.com
                                          joconnor@sfgh.com

                                          COUNSEL FOR DEBTORS
                                          AND DEBTORS-IN-POSSESSION

# **Exhibit 1**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

Eastern Division

| | | |
|---|---|---|
| In Re: | ) | BK No.:   17-14200 |
| Chellino Crane, Inc., et al. | ) | (Jointly Administered) |
| | ) | |
| | ) | Chapter:  11 |
| | ) | Honorable Carol A. Doyle |
| | ) | |
| Debtor(s) | ) | |

**Final Authorizing the Debtors to (A) Use Cash Collateral;**
**(B) Incur Postpetition Debt; and (C) Grant Adequate**
**Protection and Provide Security and Other Relief to First Midwest Bank**

This matter came before this Court on the motion (the "Motion") of the above-captioned debtors and debtors in possession  (collectively, the "Debtors") requesting that this Court enter an interim order, and later after notice and a hearing, a final order (this "Final Order"), authorizing the Debtors to: (a) use Cash Collateral; (b) incur Postpetition Debt, pursuant to the terms of the Postpetition Loan Documents; and (c) grant adequate protection and provide security and other relief to First Midwest Bank ("First Midwest").  Unless otherwise indicated, all capitalized terms used as defined terms herein have the meanings ascribed in Exhibit 1 attached hereto and by this reference are made a part hereof.

This Final Order shall constitute findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052 and shall take effect and be fully enforceable as of the Petition Date.

Having examined the Motion, being fully advised of the relevant facts and circumstances surrounding the Motion, having entered the Order Granting the Debtors to: (A) Use Cash Collateral on an Interim Basis Pending a Final Hearing; (B) Incur Postpetition Debt on an Interim Basis Pending a Final Hearing; and (C) Grant Adequate Protection and Provide Security and other Relief to First Midwest Bank on May 10, 2017 (Dkt. 84) (the "Interim Order"); and, the Court having set an initial date for hearing on entry of the Final Order of June 1, 2017 ("Final Hearing"); and, the Court having entered the Second Interim Order Authorizing the Debtors to (A) Use Cash Collateral; (B) Incur Postpetition Debt; and (C) Grant Adequate Protection and Provide Security and Other Relief to First Midwest Bank on June 9, 2017 (dkt 205), which order set the date for a Final Hearing on June 21, 2017; and, having held the Final Hearing on June 21, 2017, pursuant to §§ 363 and 364 of the Code and Fed. R. Bankr. P. 4001(b) and (c); and, objections, if any, having been withdrawn, resolved or overruled by the Court, THE MOTION IS GRANTED AS SET FORTH BELOW, AND, SUBJECT TO THE RIGHTS SET FORTH IN PARAGRAPH 6(d) BELOW, THE DEBTORS HEREBY ADMIT, STIPULATE AND AGREE THAT:

A. On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Code.  The Debtors have retained possession of their property and continue to have the rights, powers and duties of debtors-in-possession pursuant to §§ 1107 and 1108 of the Code.

B. The Court has jurisdiction over the Cases and this proceeding pursuant to 28 U.S.C. § 1334. Determination of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue over this Motion is proper under 28 U.S.C. § 1409(a).

C. On  May 16, 2017, the Office of the United States Trustee (the "UST") appointed the members of

the Official Committee of Unsecured Creditors (the "Committee") in these Cases.  On May 17, 2017, the UST filed the Notice of Appointment of Official Unsecured Creditor's Committee (Dkt. 113).

D. The Prepetition Documents evidence and govern the Prepetition Debt, the Prepetition Liens and the prepetition financing relationship between the Debtors and First Midwest.

E. The Prepetition Debt constitutes the legal, valid and binding obligation of the Debtors, enforceable in accordance with the terms of the Prepetition Documents (other than in respect of the stay of enforcement arising from section 362 of the Code).

F. As of the Petition Date, the Debtors are liable for payment of the Prepetition Debt, and the Debtors stipulate that the Prepetition Debt is valid, enforceable and unavoidable in an amount not less than $14,442,239.84.

G. The Debtors do not possess and will not assert any offsets, defenses or counterclaims to the Prepetition Debt, and no portion of the Prepetition Debt is subject to contest, objection, recoupment, defense, counterclaim, offset, avoidance, recharacterization, subordination or other claim, cause of action or challenge of any nature under the Code, under applicable non-bankruptcy law or otherwise by the Debtors.

H. The Prepetition Liens are Priority Liens, subject and subordinate only to the Carveout and Permitted Priority Liens, if any, and the Prepetition Liens secure payment of all of the Prepetition Debt.

I. Upon the entry of this Final Order, First Midwest's interests in the Prepetition Collateral will be deemed to be adequately protected; provided, however, that nothing herein shall prejudice First Midwest's rights to later assert that its interest in the Prepetition Collateral lacks adequate protection.

J. Subject solely to the rights set forth in Paragraph 6(d) of this Final Order, the Debtors do not have, and hereby release, any claims, counterclaims, causes of action, defenses or setoff rights relating to the Prepetition Documents, the Prepetition Liens, the Prepetition Debt or otherwise, against First Midwest and its affiliates, subsidiaries, agents, officers, directors, employees, advisors, consultants, predecessors in interest, successors and assigns.

K. First Midwest has consented to the terms of this Final Order and is entitled to the adequate protection as set forth herein pursuant to §§ 361, 362, 363 and 364 of the Code to the extent of any diminution in the value of its interests in the Prepetition Collateral from and after the Petition Date.

L. By reason of taking any actions pursuant to this Final Order, First Midwest is not in control of the operations, management or liquidation of the Debtors or their assets.

M. The Debtors represent that as of the Petition Date, the Budget contains all expenses necessary and reasonably foreseeable for the administration of its assets and the preservation of the Aggregate Collateral through the period for which the Budget runs, and therefore includes all amounts potentially chargeable to First Midwest under § 506(c) of the Code.  The Debtors agree that no charge under Section 506(c) of the Bankruptcy Code shall be sought, without written consent of First Midwest, for any amounts that are not set forth in the Budget.

N. The Debtors have an immediate need to use Cash Collateral and incur Postpetition Debt as provided herein, in order to permit, among other things, the orderly continuation of the operation of

their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs. The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the Debtors as a going concern and enterprise value.

O. The Debtors are unable to obtain unsecured credit allowable under § 503(b)(1) of the Code sufficient to finance the administration of their estates. Except as provided below, the Debtors are unable to obtain credit allowable under §§ 364(c)(1), (c)(2) or (c)(3) of the Code on terms more favorable than those offered by First Midwest.

P. The terms of the Postpetition Debt have been negotiated at arm's length, and the Postpetition Debt is being extended in good faith, as that term is used in § 364(e) of the Code.

Q. The terms and conditions of the Postpetition Debt and the liens and claims granted herein are fair and reasonable, the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.

R. Under the circumstances of these Cases, this Final Order is a fair and reasonable response to the Debtors' request for First Midwest's consent to the use of Cash Collateral and provision of Postpetition Debt, and the entry of this Final Order is in the best interest of the Debtors' estate and its creditors. Absent approval of the terms set forth in this Final Order, First Midwest will not otherwise consent to (1) providing the DIP Financing and extending credit to the Debtors thereunder, and (2) the use of its Cash Collateral, or (3) the subordination of its liens to the Carveout. The Debtors have requested entry of this Final Order pursuant to Fed. R. Bankr. P. 4001(b)(2) and 4001(c)(2) and Local Bankr. R. 4001-2. Absent granting the relief set forth in this Final Order, the Debtors' estates will be immediately and irreparably harmed. The use of Cash Collateral and the incurrence of the Postpetition Financing, in accordance with this Final Order are therefore in the best interests of the Debtors' estates.
S. The notice provided by the Debtors of the Motion, the entry of the Interim Order, the entry of the Second Interim Order, and the Final Hearing satisfy the requirements of Fed. R. Bankr. P. 2002, 4001 (b) and (c) and 9014 and §§ 102(1), 363, 364(c) and (d) of the Code and were otherwise sufficient and appropriate under the circumstances.

WHEREFORE, IT IS HEREBY ORDERED THAT THE MOTION IS GRANTED AS SET FORTH HEREIN, AND THAT:

1. Authorization to Use Cash Collateral. The Debtors are authorized to use Cash Collateral in accordance and as limited by the Budget (as attached hereto as Exhibit 2), subject to the Permitted Variance, and otherwise in accordance with and pursuant to the terms and provisions of this Final Order, including Paragraph 2(d) hereof. So long as any Prepetition Debt or Postpetition Debt remains outstanding, the Debtors may not use or seek to use Cash Collateral other than pursuant to the terms of this Final Order.

2. Procedure for Use of Cash Collateral.

(a) Delivery of Cash Collateral to First Midwest. The Debtors shall deposit all Cash Collateral now or hereafter in its possession or control into the FMB Account (or otherwise deliver such Cash Collateral to First Midwest in a manner approved in writing by First Midwest) promptly upon receipt

thereof.

(b) Cash Collateral in First Midwest's Possession.  First Midwest is authorized to collect upon, convert to cash and enforce checks, drafts, instruments and other forms of payment now or hereafter coming into its possession or control which constitute Aggregate Collateral or proceeds thereof.

(c) Application of Cash Collateral.  First Midwest is authorized to apply all Cash Collateral now or hereafter in First Midwest's possession or control as follows: (1) first, to payment of Postpetition Debt, and (2) second, after all Postpetition Debt has been paid in full and subject to the rights, if any, of holders of Permitted Priority Liens, to Prepetition Debt.

(d) Prohibition Against Use of Cash Collateral.  Except as provided for in this Final Order, Debtors will not use or seek to use Cash Collateral, unless, in addition to the satisfaction of all requirements of § 363 of the Code: (1) First Midwest has consented to an order authorizing such use; or (2) at the time such an order is entered, the Postpetition Debt has been indefeasibly paid in full, in cash.

(e) Permitted Priority Liens.  Subject to the rights of First Midwest with respect to Priming Liens set forth in Section 3(c)(iv) herein, the right of First Midwest to receive and apply Cash Collateral shall be subject and subordinate to any Permitted Priority Liens.

3. Authorization to Incur Postpetition Debt.

(a) Permitted Uses of Postpetition Debt.  The Debtors are authorized and have agreed to incur Postpetition Debt, in accordance with the terms and provisions of this Final Order and the Postpetition Loan Documents which Postpetition Debt shall be used for all purposes permitted under the Postpetition Credit Agreement, including, without limitation, those expenses enumerated in the Budget, including the Carveout, as and when such expenses become due and payable, subject to the Permitted Variance.

(b) Additional Terms of Postpetition Debt.

(i) Maximum Amount. The maximum principal amount of Postpetition Debt outstanding shall not at any time exceed the Maximum DIP Amount.

(ii) Interest. The Postpetition Debt shall bear interest at a per annum rate equal to Prime plus 3%, payable monthly, and shall require immediate payment to First Midwest of a nonrefundable fee of $138,000, which are hereby found to be fair and reasonable under the circumstances.

(iii) Maturity. The Postpetition Debt shall mature and be due and payable in full on the Termination Date, as set forth in the Postpetition Credit Agreement.

(iv) Control Agreements. All deposit account control agreements or similar control agreements, and all collateral access agreements, in effect as of the Petition Date shall remain in full force and effect notwithstanding the entry of this Final Order and any subsequent orders amending this Final Order.

(v) The Postpetition Debt shall be supported by personal guarantees by the Guarantors.

(c) Superpriority Administrative Expense Status; Postpetition Liens; Priming Liens.

(i) The Postpetition Debt is hereby granted superpriority administrative expense status under § 364(c)(1) of the Code, with priority over all costs and expenses of administration of the Cases that are incurred under any provision of the Code; and the Postpetition Debt is entitled to the protections of § 364(e) of the Code.

(ii) In addition, First Midwest is hereby granted the Postpetition Liens to secure the Postpetition Debt.  Subject to subparagraph 3(c)(iii) below, the Postpetition Liens: (1) are in addition to the Prepetition Liens; (2) pursuant to §§ 364(c)(2), (c)(3) and 364(d) of the Code, are liens senior in priority to all liens on the Postpetition Collateral; without any further action by the Debtors or First Midwest and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; (3) shall not be subject to avoidance or subordination including, without limitation, under § 510(c) of the Code; and (4) shall not be subject to any security interest or lien that is avoided and preserved pursuant to § 551 of the Code; and (5) shall remain in full force and effect notwithstanding any subsequent conversion of the Cases to chapter 7 or dismissal of the Cases.

(iii) Notwithstanding anything else in subparagraph (3)(c)(ii)  to the contrary, the Postpetition Liens are and shall be subject and subordinate to the Carveout and the Permitted Priority Liens.

(iv) In addition, First Midwest is hereby granted the Priming Liens to secure the Postpetition Debt.  The Priming Liens: (1) are in addition to the Prepetition Liens and the Postpetition Liens; (2) pursuant to §§ 364(c)(2), (c)(3) and 364(d) of the Code, are liens senior in priority to all liens on the Postpetition Collateral; without any further action by the Debtors or First Midwest and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; (3) shall not be subject to avoidance or subordination including, without limitation, under § 510(c) of the Code; and (4) shall not be subject to any security interest or lien that is avoided and preserved pursuant to § 551 of the Code; and (5) shall remain in full force and effect notwithstanding any subsequent conversion of the Cases to chapter 7 or dismissal of the Cases.

(v) Notwithstanding anything in the Financing Agreement or this Final Order to the contrary, the Postpetition Liens and the Priming Liens shall not attach to and shall not be satisfied from assets of the Debtors' estates that were unencumbered as of the Petition Date, including but not limited to commercial tort claims and actions arising under chapter 5 of the Code (collectively, the "Unencumbered Assets")

(vi) The Debtors are authorized to and shall execute and deliver to First Midwest such postpetition loan agreements, financing statements, mortgages, instruments and other documents as First Midwest may reasonably request from time to time, and any such documents filed by First Midwest shall be deemed filed as of the Petition Date; provided, to the extent there is any conflict between such documents and this Final Order, this Final Order shall govern and control.

(d) Prohibition Against Additional Debt.  The Debtors will not incur or seek to incur debt secured by a lien which is equal to or superior to the Prepetition Liens, the Postpetition Liens or the Priming Liens, or which is given superpriority administrative expense status under Code § 364(c)(l), unless, in addition to the satisfaction of all requirements of§ 364 of the Code: (1) First Midwest has consented to such order; or (2) such credit or debt is used to pay the Postpetition Debt and the Prepetition Debt in full, in cash, immediately  upon the entry of such order.

4. Adequate Protection of Interests of First Midwest in the Prepetition Collateral and the Prepetition

Liens.  As adequate protection for First Midwest's interest in the Prepetition Collateral under §§ 361, 362, 363 or 364 of the Code from and after the Petition Date, and to induce First Midwest to provide the Postpetition Debt:

(a) Priority of Prepetition Liens/Allowance of First Midwest's Claim.  Subject to the rights set forth in Paragraph 6(d) of this Final Order: (1) the Prepetition Liens shall constitute Priority Liens, subject and subordinate only to the Postpetition Liens, the Priming Liens and the Permitted Priority Liens; and (2) the Prepetition Debt shall constitute the legal, valid and binding obligation of each of the Debtors that are obligated on such Prepetition Debt by the terms of the documents governing such debt, by guarantees or otherwise, and their respective estates, enforceable in accordance with the terms of the applicable Prepetition Documents.

(b) Replacement Liens.  To the extent of any diminution in value of First Midwest's interest in the Prepetition Collateral from and after the Petition Date and subject to the Carveout, First Midwest is hereby granted the Replacement Liens as security for payment of the Prepetition Debt.  The Replacement Liens: (1) are and shall be in addition to the Prepetition Liens; (2) are and shall be deemed properly perfected, valid and enforceable liens, subject and subordinate to the Postpetition Liens, the Priming Liens and the Permitted Priority Liens, without any further action by the Debtors or First Midwest and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; and (3) shall remain in full force and effect notwithstanding any subsequent conversion to chapter 7 or dismissal of the Cases. Notwithstanding the foregoing, the Debtors authorized to and shall execute and deliver to First Midwest such financing statements, mortgages, instruments and other documents as First Midwest may reasonably request from time to time in respect of the Replacement Liens.

(c) Allowed Code § 507(b) Claim.  As additional adequate protection of the interests of First Midwest in the Prepetition Collateral, to the extent of any diminution in value of First Midwest's interest in the Prepetition Collateral from and after the Petition Date, and subject to the Carveout, First Midwest shall have an allowed claim under § 507(b) of the Code, with priority over: (1) all costs and expenses of administration of the Cases (other than First Midwest's claims under § 364 of the Code) that are incurred under any provision of the Code; and (2) the claims of any other party-in-interest under § 507(b) of the Code.

(d) No Surcharge.  No surcharge under Code § 506(c), enhancement of collateral provision of Code § 552 or any other legal or equitable doctrine (including, without limitation, unjust enrichment) of the Bankruptcy Code shall be imposed upon First Midwest or the Aggregate Collateral with respect to First Midwest for the benefit of any party in interest, including, without limitation, the Committee, any of the Carveout Professionals, or the Debtors for any amounts that are not set forth in the Budget; provided, however, that nothing in this provision shall bind any Trustee appointed in these cases under chapter 11 or chapter 7 of the Bankruptcy Code.

(e) Right to Credit Bid.  In all events, pursuant to § 363(k) of the Code, and subject to the rights, if any, of any holder of a Permitted Priority Lien, First Midwest shall have the right to use the Aggregate Debt or any part thereof to credit bid with respect to any bulk or piecemeal sale of all or any portion of the Aggregate Collateral.

(f) No Marshaling.  Neither First Midwest nor any of the Aggregate Collateral shall be subject to the doctrine of marshaling.

5. Effect of Termination Date.  Unless extended by the Court upon the written agreement of First Midwest, upon the Termination Date, without further notice or order of Court: (1) the Debtors' authorization to use Cash Collateral and incur Postpetition Debt hereunder will automatically terminate; (2) at First Midwest's election: (i) the Postpetition Debt shall be immediately due and payable, (ii) the Prepetition Debt shall become immediately due and payable to the extent that it is not due and payable already, and (iii) First Midwest shall be entitled to set off any cash in First Midwest's possession or control and apply such cash in accordance with Paragraph 2(c) of this Final Order; and (3) First Midwest shall be entitled to exercise all of its rights and remedies under the Prepetition Documents, the documents executed in connection with the Postpetition Debt, and applicable law, without further order of the Court.

6. Carveout.

(a) Carveout Priority. Subject to the terms and conditions of this paragraph 6, the Postpetition Liens, the Priming Liens, the DIP Superpriority Claim, the Prepetition Liens, the Replacement Liens, and the Adequate Protection Superpriority Claims are subordinate to the Carveout.

(b) Carveout Scope.  The Carveout includes all fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a).  The Carveout (A) with respect to each Carveout Professional: (1) shall equal an aggregate amount not to exceed the lesser of (i) the aggregate amount provided in the Budget for such Carveout Professional for the period commencing on the Petition Date and ending on the Termination Date; and (ii) the aggregate amount of accrued fees and expenses during the period commencing on the Petition Date and ending on the Termination Date, and allowed by the Court at any time; (2) shall be reduced dollar-for-dollar by any payments of fees and expenses to such Carveout Professional; and (3) shall, to the extent cash is available, be paid first out of any prepetition retainer or any proceeds of unencumbered assets; and (B) from and after the Termination Date with respect to the Carveout Professionals, shall in the aggregate equal $75,000 for such professionals.  Further, First Midwest shall have the right to reserve against the Maximum DIP Amount an amount equal to the sum of the aggregate amount of unpaid fees and expenses consistent with the Budget for the Carveout Professionals.

(c) Limitation on Use.  No portion of the Carveout and no Postpetition Debt or Aggregate Collateral may be used to pay any fees or expenses incurred by any entity, including the Debtors, the Committee or the Carveout Professionals, in connection with claims or causes of action adverse to First Midwest's interests in the Aggregate Collateral, including (1) preventing, hindering or delaying First Midwest's enforcement or realization upon any of the Aggregate Collateral once an Event of Default has occurred; (2) using or seeking to use Cash Collateral or incurring indebtedness in violation of the terms hereof, or selling any Aggregate Collateral without First Midwest's consent; or (3) objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of the Aggregate Debt or any mortgages, liens or security interests with respect thereto or any other rights or interests of First Midwest, or in asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Code, against First Midwest; provided, however, that up to $15,000 of the Carveout may be used by the Committee to investigate the validity, extent, amount, perfection, priority, or enforceability of the Prepetition Debt and the Prepetition Collateral; provided, further, however, that the Carveout may be used to pay fees and expenses incurred by the Carveout Professionals in connection with the negotiation, preparation and entry of this Final Order or any amendment hereto consented to by First Midwest.

(d) Binding Effect of Stipulations; Challenge Period.  The stipulations and admissions contained

in this Final Order, exclusive of the recitals in Paragraphs D through J of this Final Order, shall be binding on all parties-in-interest, including, without limitation, the Committee.  Further, unless, and solely to the extent that, (a) a party in interest has timely filed an adversary proceeding challenging the amount, validity, or enforceability of the Prepetition Debt, or the perfection or priority of First Midwest's liens on and security interests in the Prepetition Collateral in respect thereof, or otherwise asserting any claims or causes of action on behalf of the Debtors' estates against First Midwest relating to the Prepetition Debt, by no later than (x) with respect to the Committee, the date that is 60 days after the date of its formation, and, with respect to any other party, the date that is 75 days from the entry of the Interim Order, and (b) the Court rules in favor of such party in interest or the Committee in any such timely and properly filed adversary proceeding, then, without further order of the Court, (i) the claims, liens and security interests of First Midwest shall be deemed to be allowed for all purposes in the Cases and shall not be subject to challenge by any party in interest as to extent, validity, priority or otherwise, and (ii) the Debtors and their estates shall be deemed to have waived, released and discharged First Midwest and its officers, directors, principals, attorneys, consultants, predecessors in interest, and successors and assigns of and from any and all claims and causes of action, indebtedness, and obligations, of every type, which occurred on or prior to the date of entry of this Final Order with respect to or in connection with the Prepetition Debt, the Prepetition Liens, the Prepetition Documents or otherwise, and (iii) the recitals in Paragraphs D through J of this Final Order shall be binding on all parties in interest, including, without limitation, the Committee.  Notwithstanding anything to the contrary herein, if any such adversary proceeding is timely commenced, the stipulations contained in Paragraphs D through J hereof shall nonetheless remain binding on the Debtors except to the extent that such stipulations are expressly challenged in such adversary proceeding and the Committee prevails by a final order of this Court.  Notwithstanding the foregoing, nothing in this Final Order shall limit the right of any person claiming a Permitted Priority Lien from asserting that it has priority over First Midwest in property of the Debtors' estates after the expiration of the Challenge Period established by the second sentence in this Section 6, and all rights of a party asserting a Permitted Priority Lien to assert a priority challenge are expressly preserved.

7. Application of Sale Proceeds. All proceeds from sales or other dispositions of all or any portion of the Aggregate Collateral that is not subject to a Permitted Priority Lien shall be remitted to First Midwest for application in accordance with Paragraph 2.  All proceeds from sales or other dispositions of all or any portion of the Aggregate Collateral that is subject to a Permitted Priority Lien shall be remitted:  first, subject to any rights of the Debtors under Code § 506(c), to holders of Permitted Priority Liens in accordance to the portion of the proceeds of sale attributable to the Aggregate Collateral that is subject to such holder's Permitted Priority Lien, for application against the claim of such holder of a Permitted Priority Lien; and, second, to the extent that any proceeds remain after the claim of such holder of such Permitted Priority Lien has been paid in full, including with respect to any post-petition interest, fees, costs, or other charges to which such holder is entitled under Section 506(b) of the Bankruptcy Code, to First Midwest for application in accordance with Paragraph 2.

8. Waiver of Right to Return/Consent to Setoff.  The Debtors hereby waive their rights: (a) to return any of the Aggregate Collateral pursuant to § 546(h) of the Code; (b) to consent to any order permitting any claims pursuant to § 503(b)(9) of the Code except to the extent permitted in the Budget as previously disclosed to First Midwest and the Court; and (c) to consent to setoff pursuant to § 553 of the Code or recoupment.

9. Force and Effect of Prepetition Documents.  Except as modified herein and subject to the other provisions of this Final Order and the Code, the Prepetition Documents shall remain in full force and effect with respect to the Prepetition Debt.  To the extent there exists any conflict among the terms of

the Motion, the Prepetition Documents and this Final Order, this Final Order shall govern and control.

10. Modification of Stay.  Subject to Paragraph 5 of this Order, the automatic stay of § 362 of the Code is hereby modified solely with respect to First Midwest to the extent necessary to effectuate the provisions of this Order.

11. No Waiver.  First Midwest shall not be deemed to have suspended or waived any of their rights or remedies under this Final Order, the Prepetition Documents, the Code, or applicable nonbankruptcy law unless such suspension or waiver is in writing, signed by a duly authorized officer of First Midwest, as applicable, and directed to the Debtors.  No failure of First Midwest to require strict performance by the Debtors, or by any Trustee or any provision of this Final Order shall waive, affect or diminish any right of First Midwest thereafter to demand strict compliance and performance therewith, and no delay on the part of First Midwest in the exercise of any right or remedy under this Final Order, the Prepetition Documents, the Code, or applicable nonbankruptcy law shall preclude the exercise of any right or remedy.  Further, this Final Order shall not constitute a waiver by First Midwest of any of its rights under the Prepetition Documents, the Code or applicable nonbankruptcy law, including, without limitation its right to later assert: (1) that its interests in the Aggregate Collateral lack adequate protection within the meaning of §§ 362(d) or 363(e) of the Code or any other provision thereof; or (2) a claim under § 507(b) of the Code.

12. Amendments.  The Debtors and First Midwest may enter into amendments or modifications of the Budget and the Maximum DIP Amount without further notice and hearing or order of this Court; provided, that (a) such modifications or amendments do not materially and adversely affect the rights of any creditor or other party-in-interest, (b) the Committee consents to such modification, and (c) notice of any such amendment or modification is filed with this Court.

13. Reporting.  In addition to all reporting requirements under the Prepetition Documents, the Debtors shall timely provide First Midwest with reports on no less than a weekly basis detailing the Debtors' compliance with the Budget and any changes in its projections including, but not limited to, cash inflows and outflows, weekly borrowing base certificates, accounts receivable aging, accounts payable aging, weekly actual cash flow versus projections, and shall otherwise reasonably cooperate with First Midwest regarding the Budget and the administration of its assets.

14. Binding Effect.  Except as provided in Paragraph 6 herein, this Final Order shall be binding on all parties in interest in the Cases and their respective successors and assigns, including any Trustee.  If, in accordance with § 364(e) of the Code, this Final Order does not become a final nonappealable order, or if any of the provisions of this Final Order are hereafter modified, amended, vacated or stayed by subsequent order of this Court or any other court, such termination or subsequent order shall not affect: (a) subject to Paragraph 6 of this Final Order, the stipulations, representations, and findings contained in this Final Order and the relief granted by and the releases contained in this Final Order (including, without limitation, Paragraphs 2(d), 3(d) and 6); and (b) the priority, validity, enforceability or effectiveness of any lien, security interest or other benefit or claim authorized hereby with respect to Cash Collateral used or Postpetition Debt incurred prior to the effective date of such termination or subsequent order. All such liens, security interests, claims and other benefits shall be governed in all respects by the original provisions of this Final Order, and First Midwest shall be entitled to all the rights, remedies, privileges and benefits granted hereto, including the liens and priorities granted herein, with respect to the Postpetition Debt.  Except as otherwise explicitly set forth in this Final Order, no third party is intended to be, or shall be deemed to be, a third-party beneficiary of this Final Order.

15. Survival.  The provisions of this Final Order, and any actions taken pursuant to or in reliance upon the terms hereof, shall survive entry of, and govern in the event of any conflict with, any order which may be entered in the Cases: (a) confirming any chapter 11 plan, (b) converting the Cases to cases under chapter 7 of the Code, (c) dismissing the Cases, (d) withdrawing of the reference of the Cases from this Court, or (e) providing for abstention from handling or retaining of jurisdiction of the Cases in this Court.  The terms and provisions of this Final Order, including, without limitation, the rights granted First Midwest under §§ 364(c) and (d) of the Code, shall continue in full force and effect until all of the Aggregate Debt is indefeasibly paid in full in cash and discharged.

Enter:


Honorable Carol A. Doyle

United States Bankruptcy Judge

Dated:

**Prepared by:**

Jonathan P. Friedland, Esq. (IL No. 6257902)
Mark S. Melickian (IL No. 6229843)
Jack O'Connor, Esq. (IL No. 6302674)
SUGAR FELSENTHAL GRAIS & HAMMER LLP
30 N. LaSalle St., Ste. 3000
Chicago, Illinois 60602
Telephone: 312.704.9400
Facsimile: 312.372.7951
jfriedland@sfgh.com
mmelickian@sfgh.com
joconnor@sfgh.com

Counsel to the Debtors and Debtors in Possession

# **Exhibit A**

## EXHIBIT A

## DEFINED TERMS

1.      ***Aggregate Collateral***.   Collectively, the Prepetition Collateral and the Postpetition Collateral.

2.      ***Aggregate Debt***.   Collectively, the Prepetition Debt and the Postpetition Debt.

3.      ***Budget***.   The budget attached to the Second Interim Order as Exhibit B, as amended, modified or supplemented from time to time, as may be agreed to in writing by First Midwest.

4.      ***Carveout***.   Collectively, (a) all fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), and (b) the allowed fees and disbursements as may be awarded by the Court to a Carveout Professional from time to time pursuant to § 330 of the Code, in the aggregate amount set forth in paragraph 4(b) of the Final Order.

5.      ***Carveout Professionals***.   Sugar Felsenthal Grais & Hammer LLP, Conway MacKenzie, Inc., Brown Rudnick LLP, Freeborn & Peters LLP, Emerald Capital Partners, and FocalPoint Partners LLC.

6.      ***Cases***.   The Debtors' chapter 11 cases or any superseding chapter 7 cases of the Debtors.

7.      ***Cash Collateral***.   All "cash collateral," as that term is defined in § 363(a) of the Code, in which First Midwest has an interest, all deposits subject to setoff rights in favor of First Midwest, and all cash arising from the collection or other conversion to cash of the Aggregate Collateral, including from the sale of inventory and the collection of accounts receivable.

8.      ***Code***.   The United States Bankruptcy Code (11 U.S.C. §§ 101 et seq.), as amended, and any successor statute. Unless otherwise indicated, all statutory section references in this Final Order are to the Code.

9.      ***Committee***.  The official committee of unsecured creditors appointed on May 16, 2017, and identified in the notice of appointment filed by the Office of the United States Trustee on May 17, 2017, to represent unsecured creditors in these Cases pursuant to § 1102 of the Code.

10.      ***Debtors***.  Chellino Crane Inc.; Sam J. Chellino Crane Rental, Inc.; G & B Equipment, LLC; Chellino/Industrial Park Family Limited Partnership; and Chellino Industrial Management, Inc.

11.      ***Event(s) of Default***.  An Event of Default includes any of the following: (a) the Company shall fail to pay (i) any interest due on the Note (as defined in the Postpetition Credit Agreement) by three (3) days after the same becomes due; (ii) any other amount due and payable under the Postpetition Credit Agreement (other than a principal payment on any Note) by three (3) days after Company receives written demand from First Midwest therefor; or (iii) any principal amount due on the Note when due; (b) the Company shall default in the performance or observance of any agreement, covenant, condition, provision or term contained in Article V or section 6.01 of the Postpetition Credit Agreement; (c) the Company or any Guarantor shall default in the performance or observance of any of the other agreements, covenants, conditions, provisions or terms in the Postpetition Credit Agreement or any of the Postpetition Collateral Documents (as defined in the Postpetition Credit Agreement) continuing for a period of thirty days after written notice thereof is given to the Company by First Midwest; (d) any representation or warranty made by the Company in the Postpetition Credit Agreement or any certificate delivered pursuant to the Postpetition Credit Agreement, or any financial statement delivered to the First Midwest under the Postpetition Credit Agreement, by the Company or any Guarantor shall prove to have been false in any material respect as of the time when made or given; (e) [OMITTED]; (f) any lien purported to be created by any Postpetition Loan Document or the Interim Order or Final Order in any of the collateral secured by the Postpetition Collateral Documents purported to be covered thereby shall, for any reason, cease to be valid except collateral released as permitted by any Postpetition Loan Document or Interim Order or Final Order; (g) entry of an order of the Bankruptcy Court converting the chapter 11 case of the Company to a case under chapter 7 of the Bankruptcy Code and such order is not reversed or vacated within thirty (30) days; (h) entry of an order of the Bankruptcy Court

2

dismissing or suspending the chapter 11 case of the Company; (i) entry of an order of the Bankruptcy Court in the Company's chapter 11 case appointing a trustee under Section 1104 of the Bankruptcy Code which First Midwest reasonably determines may result in events which are materially injurious to the interests of First Midwest and such order is not reversed or vacated within thirty (30) days; (j) entry of an order of the Bankruptcy Court granting relief from the automatic stay to the holder of a lien on, or security interest in, any other asset the removal of which from the Company's bankruptcy estate that has a material adverse effect on the value or operation of the Company's business; (k) the Interim Order or Final Order shall terminate by its terms, shall not remain in full force and effect or shall have been stayed, vacated, reversed, modified, supplemented or amended in a manner which First Midwest reasonably believes is materially injurious to its interests, or, in the event that any such order is the subject of any pending motion or appeal, any performance of any obligation of any party hereto shall have been stayed pending such motion or appeal; (l) the Final Order shall not have been issued within two (2) Business Days after the date the Final Hearing is concluded; (m) the aggregate principal amount outstanding by First Midwest to the Company under the Note exceeds the amount of the Postpetition Facility or the sum of the amounts outstanding under the Loans, the $600,000 Note and the Revolving Credit Agreement exceed the Borrowing Base from time to time in effect, and in either case, the Company fails to repay the amount of such excess within 5 Business Days after notice from First Midwest; or  (n) the Postpetition Credit Agreement, the Note or any Postpetition Collateral Document shall, at any time after their respective execution and delivery, and for any reason, cease to be in full force and effect or be declared null and void, or be revoked or terminated (other than by First Midwest), or the validity or enforceability thereof or hereof shall be contested in writing by the Company or any Guarantor, or the Company or any Guarantor shall deny in writing that it has any or further liability or obligation thereunder or under the Postpetition Credit Agreement, as the case may be.

12.     ***Final Hearing***.  The final hearing on the Motion conducted in accordance with Fed R. Bankr. P. 4001.

13.     ***FMB Account***.  A collection account in the name of Chellino Crane, Inc. at First Midwest.

3

14. ***Guaranties.*** Collectively, (a) Commercial Guaranty for Loan No. 2014001300, dated as of July 5, 2016, executed by Sam J. Chellino Crane Rental, Inc.; (b) Commercial Guaranty for Loan No. 2014001300, dated as of July 5, 2016, executed by Frank J. Chellino; (c) Commercial Guaranty for Loan No. 2014001300, dated as of July 5, 2016, executed by Gregory Chellino; (d) Commercial Guaranty for Loan No. 2014001467, dated as of December 29, 2014, executed by Sam J. Chellino Crane Rental, Inc.; (e) Commercial Guaranty for Loan No. 2014001467, dated as of December 29, 2014, executed by Frank J. Chellino; (f) Commercial Guaranty for Loan No. 2014001467, dated as of December 29, 2014, executed by Gregory Chellino; (g) Commercial Guaranty for Loan No. 2014001468, dated as of December 29, 2014, executed by Sam J. Chellino Crane Rental, Inc.; (h) Commercial Guaranty for Loan No. 2014001468, dated as of December 29, 2014, executed by Frank J. Chellino; (i) Commercial Guaranty for Loan No. 2014001468, dated as of December 29, 2014, executed by Gregory Chellino; (j) Commercial Guaranty for Loan No. 2014001469, dated as of December 29, 2014, executed by Sam J. Chellino Crane Rental, Inc.; (k) Commercial Guaranty for Loan No. 2014001469, dated as of December 29, 2014, executed by Frank J. Chellino; (l) Commercial Guaranty for Loan No. 2014001469, dated as of December 29, 2014, executed by Gregory Chellino; (m) Commercial Guaranty for Loan No. 2014001470, dated as of December 30, 2014, executed by Sam J. Chellino Crane Rental, Inc.; (n) Commercial Guaranty for Loan No. 2014001470, dated as of December 30, 2014, executed by Frank J. Chellino; (o) Commercial Guaranty for Loan No. 2014001470, dated as of December 30, 2014, executed by Gregory Chellino; (p) Commercial Guaranty for Loan No. 2014001751, dated as of January 15, 2015, executed by Sam J. Chellino Crane Rental, Inc.; (q) Commercial Guaranty for Loan No. 2014001751, dated as of January 15, 2015, executed by Frank J. Chellino; and (r) Commercial Guaranty for Loan No. 2014001751, dated as of January 15, 2015, executed by Gregory Chellino (each a "Guaranty," collectively the "Guaranties").

15. ***Guarantors***. Collectively, (a) Sam J. Chellino Crane Rental, Inc., (b) Frank J. Chellino, and (c) Gregory Chellino (each a "Guarantor," collectively the "Guarantors").

16. ***Maximum DIP Amount***. $1,450,000.

17.      ***Permitted Priority Liens***.  The liens in favor of third parties upon assets of the Debtors' estates, which third-party liens, as of the Petition Date: (1) had priority under applicable law over the Prepetition Liens, (2) were not subordinated by agreement or applicable law, and (3) were non-avoidable, valid, properly perfected and enforceable as of the Petition Date.

18.      ***Permitted Variance***.  An amount equal to 10% of the cumulative amount set forth in the Budget.

19.      ***Petition Date***.  May 5, 2017.

20.      ***Postpetition Collateral***.  (a) All of the real and personal property of the Debtors that have granted a mortgage or security interest to First Midwest, or any of its subsidiaries, to secure Prepetition Debt, and their respective estates, of any description whatsoever, wherever located and whenever arising or acquired, including, without limitation all cash, accounts, receivables, inventory, equipment, fixtures, chattel paper, general intangibles all leaseholds, all commercial torts, all interests in any joint venture, all licenses and permits, all other Prepetition Collateral, and all proceeds, rents, issues, profits and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any of the foregoing; provided, however, that the Postpetition Collateral shall not include property to the extent that such property is subject to a valid and enforceable agreement with the Small Business Administration which prohibits the granting of a lien in favor of First Midwest.

(b)      A mortgage on the real estate and personal property owned by Chellino/ Industrial Park Family Limited Partnership and now or hereafter located at 915 Rowell Avenue, Joliet, Illinois.

(c)      A pledge of notes owed by Chellino Crane, Inc. to the individual Guarantors.

21.      ***Postpetition Debt***.  All indebtedness or obligations of the Debtors to First Midwest incurred on or after the Petition Date pursuant to this Interim Order or otherwise, including all advances made by First Midwest to pay the Carveout.

5

22.    ***Postpetition Liens***.   Priority Liens in the Aggregate Collateral, subject only to Permitted Priority Liens.

23.    ***Postpetition Credit Agreement***.   The postpetition loan agreement to be entered into between Chellino Crane, Inc. (the "<u>Company</u>") and First Midwest.

24.    ***Postpetition Loan Documents***.   Collectively, the Postpetition Credit Agreement, the Note (as defined in the Postpetition Credit Agreement) and the Postpetition Collateral Documents (as defined in the Postpetition Credit Agreement).

25.    ***Prepetition Collateral***.   All of the "Collateral" (as that term is defined in the Prepetition Documents) of First Midwest existing as of the Petition Date, and all proceeds, rents, issues, profits and products thereof.

26.    ***Prepetition Credit Agreement***.   That certain Business Loan Agreement (Asset Based) dated as of December 5, 2014 by and between the Chellino Crane, Inc. and Standard Bank and Trust Company ("<u>Standard Bank</u>"), as predecessor in interest to First Midwest, as amended, modified and supplemented from time to time.

27.    ***Prepetition Debt***.   All indebtedness or obligations of the Debtors under the Prepetition Documents as of the Petition Date, including fees, costs, interest, and expenses as and when due and payable pursuant to the Prepetition Documents.

28.    ***Prepetition Documents***.   The Prepetition Credit Agreement and all security agreements, pledge agreements, promissory notes and other documents, entered into by any of the Debtors and First Midwest, or any of its subsidiaries, including, without limitation, the following documents, among others, each as amended: Commercial Security Agreement, dated as of December 5, 2014, among Chellino Crane, Inc. and Standard Bank; Certain Promissory Notes numbered 2014001751, 2014001300, 2014001467, 2014001468, 2014001469, and 2014001470 (the "<u>Notes</u>"); Separate Business Loan Agreements (the "<u>Business Loan Agreements</u>"); Separate Security Agreements (the "<u>Security Agreements</u>") between the Guarantors and Standard Bank; the Guaranties; and the Prepetition Third Party Documents.

29.    ***Prepetition Liens***.  First Midwest's security interests in the Prepetition Collateral under the Prepetition Documents, subject only to Permitted Priority Liens and Postpetition Liens.

30.    ***Prepetition Revolving Line of Credit.***  Pursuant to that certain Business Loan Agreement dated as of December 29, 2014, Standard Bank and Trust Company, as predecessor in interest to First Midwest, provided a credit facility to Chellino Crane, Inc., the outstanding principal balance of which, as of the Petition Date, was approximately $5,217,903.06.

31.    ***Prepetition Third Party Documents***.  Collectively, the Debtors' deposit account control agreements, leases, licenses, collateral access agreements, landlord agreements, warehouse agreements bailment agreements, insurance policies, contracts or other similar agreements in which First Midwest has an interest.

32.    ***Primed Collateral.***  Accounts receivable of the Debtors that are part of the Aggregate Collateral.

33.    ***Priming Liens***.  Priority Liens in Primed Collateral, senior to priority to all liens on such collateral, including any Permitted Priority Liens, but solely to the extent that the value of the Primed Collateral increases from the Petition Date through the Termination Date.

34.    ***Priority Liens***.  Liens that are first priority, properly perfected, valid and enforceable security interests, and that are not subject to any claims, counterclaims, defenses, setoff, recoupment or deduction, and which are otherwise unavoidable and not subject to recharacterization or subordination pursuant to any provision of the Code, any agreement, or applicable nonbankruptcy law.

35.    ***Replacement Liens***.  Priority Liens in the Postpetition Collateral granted to First Midwest pursuant to this Final Order, subject only to the Postpetition Liens and the Permitted Priority Liens.

36.    ***Termination Date***.  At First Midwest's election, the earlier to occur of: (a) the date on which First Midwest provides, via facsimile or overnight mail, written notice to counsel for the Debtors and counsel for the Committee of the occurrence and continuance of an Event of Default; and (b) the Final Order shall not have been issued within two (2) Business Days after the date the Final Hearing is concluded.

37.    ***Trustee***.  Any chapter 11 or chapter 7 trustee appointed or elected in the Cases.

# **Exhibit B**

Chellino Crane, Inc. — Working Draft
DIP Cash Flow Analysis — Confidential
Monthly Cash Flow

| | Pre-Filing May-17 | (5/1 - 5/5) May-17 | (5/5 - 5/31) May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Exit | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | |
| Rental/Labor Revenue | | 390,332 | 1,989,287 | 1,621,028 | 2,450,492 | 2,795,224 | 3,403,165 | | 12,649,528 |
| Other Revenue | | | | | | | | | |
| **Total Cash Receipts** | - | 390,332 | 1,989,287 | 1,621,028 | 2,450,492 | 2,795,224 | 3,403,165 | | 12,649,528 |
| | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | |
| Compensation & Benefits | | 283,248 | 1,432,874 | 1,642,920 | 1,742,931 | 2,149,847 | 2,671,255 | | 9,923,074 |
| Rental Related Costs | | 7,000 | 35,463 | 74,799 | 81,584 | 116,797 | 73,024 | | 388,666 |
| Operating Expenses | | 20,337 | 57,967 | 100,700 | 100,700 | 100,700 | 111,200 | | 491,604 |
| Insurance/Other | | 95,147 | | 324,711 | 112,807 | 163,654 | 87,807 | | 784,125 |
| **Total Operating Disbursements** | - | 405,732 | 1,526,303 | 2,143,129 | 2,038,022 | 2,530,997 | 2,943,285 | | 11,587,469 |
| | | | | | | | | | |
| **Extraordinary Professionals** | | | | | | | | | |
| Conway MacKenzie - Financial Advisory Fees | 70,325 | 24,690 | - | 96,317 | 95,680 | 95,680 | 95,680 | 140,439 | 618,812 |
| Conway MacKenzie - Financial Advisory Fees (Retainer) | 50,000 | - | - | - | - | - | - | - | 50,000 |
| SFGH - Legal Counsel | | | | 172,000 | 104,000 | 104,000 | 84,000 | 196,000 | 660,000 |
| SFGH - Legal Counsel (Retainer) | 150,000 | - | - | | | | | | 150,000 |
| Epiq | | | | 40,000 | 25,000 | 25,000 | 25,000 | | 115,000 |
| UCC (1) | | | | 95,000 | 95,000 | 95,000 | 95,000 | 95,000 | 475,000 |
| Trustee/Administrative Fees | | | | | 13,000 | | 8,667 | | 21,667 |
| Other (FMB & Other Legal) | | | | 30,000 | 20,000 | 30,000 | 20,000 | 20,000 | 120,000 |
| Investment Banking Fees (2) | | | | 25,000 | 25,000 | 25,000 | 25,000 | | 100,000 |
| **Total Extraordinary Professional Fees** | 270,325 | 24,690 | - | 458,317 | 377,680 | 374,680 | 353,347 | 451,439 | 2,310,478 |
| | | | | | | | | | |
| **Notes Payable** | | | | | | | | | |
| Interest Payments | | | | | | | | | |
| DIP Interest (3) | | | | | 4,375 | 4,375 | 5,542 | 5,542 | 19,833 |
| DIP Fees (4) | | | | 138,000 | | | | | 138,000 |
| Tail Expenses | | | | | | | | 250,000 | 250,000 |
| Note Payments | | | | | | | | | |
| **Total Notes Payable Disbursements** | - | - | - | 138,000 | 4,375 | 4,375 | 5,542 | 255,542 | 407,833 |
| | | | | | | | | | |
| **Operating Leases** | | | | | | | | | |
| Nations Equipment Finance | | | | | | | | | |
| Mardian | | | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | | 85,000 |
| Continental | | | | | | | | | |
| Other | | | | | | | | | |
| **Total Operating Lease Disbursements** | - | - | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | | 85,000 |
| | | | | | | | | | |
| **Past Due / Critical Payments** | | | | | | | | | |
| Union Dues | 100,000 | - | | 100,000 | - | - | - | | 200,000 |
| Payroll Taxes | | | | | | | | | |
| **Total Past Due/Critical Payments** | 100,000 | - | - | 100,000 | - | - | - | | 200,000 |
| | | | | | | | | | |
| Beginning Cash Balance | 174,633 | 174,308 | 134,218 | 580,202 | 94,784 | 108,199 | 176,371 | 260,362 | 174,633 |
| Plus: Cash Receipts | - | 390,332 | 1,989,287 | 1,621,028 | 2,450,492 | 2,795,224 | 3,403,165 | - | 12,649,528 |
| Less: Cash Disbursements | (370,325) | (430,422) | (1,543,303) | (2,856,446) | (2,437,077) | (2,927,052) | (3,319,173) | (706,981) | (14,590,780) |
| Net Cash Flow | (370,325) | (40,090) | 445,984 | (1,235,418) | 13,415 | (131,828) | 83,991 | (706,981) | (1,941,252) |
| Other Borrowings | 370,000 | | | | | | | | 370,000 |
| DIP Borrowings/(Repayment) | | - | | 750,000 | | 200,000 | | 500,000 | 1,450,000 |
| **Ending Cash Balance** | $174,308 | $134,218 | $580,202 | $94,784 | $108,199 | $176,371 | $260,362 | $53,381 | $53,381 |
| | | | | | | | | | |
| September Cash Flow | | | | | | | | | |
| Ending Cash Flow | | | | | | | | | |
| | | | | | | | | | |
| **DIP - Beginning Balance** | - | - | | - | 750,000 | 750,000 | 950,000 | 950,000 | 950,000 |
| Borrowing/Repayment | - | - | | 750,000 | | 200,000 | | 500,000 | 500,000 |
| **DIP - Ending Balance** | - | - | | 750,000 | 750,000 | 950,000 | 950,000 | 1,450,000 | 1,450,000 |
| | | | | | | | | | |
| **Total Borrowings (Pre-Petition & DIP)** | 370,000 | 370,000 | 370,000 | 1,120,000 | 1,120,000 | 1,320,000 | 1,320,000 | 1,820,000 | 1,820,000 |
| Line of Credit | 5,217,903 | 5,217,903 | 5,217,903 | 5,217,903 | 5,217,903 | 5,217,903 | 5,217,903 | 5,217,903 | 5,217,903 |
| **Total Borrowings** | 5,587,903 | 5,587,903 | 5,587,903 | 6,337,903 | 6,337,903 | 6,537,903 | 6,537,903 | 7,037,903 | 7,037,903 |
| | | | | | | | | | |
| **AR - Ending Balance** | 3,381,562 | 3,530,897 | 3,301,690 | 4,404,534 | 4,823,622 | 5,602,228 | 6,669,687 | | 6,669,687 |
| AR - Ineligible | 541,050 | (325,416) | (325,416) | (325,416) | (325,416) | (325,416) | (325,416) | | |
| **AR - Net Available BB** | 2,840,512 | 3,205,481 | 2,976,274 | 4,079,118 | 4,498,206 | 5,276,812 | 6,344,271 | | 6,344,271 |
| | | | | | | | | | |
| Borrowing Availability (80%) | 2,272,410 | 2,564,385 | 2,381,019 | 3,263,295 | 3,598,565 | 4,221,450 | 5,075,417 | | 5,075,417 |
| Total Borrowing | 5,587,903 | 5,587,903 | 5,587,903 | 6,337,903 | 6,337,903 | 6,537,903 | 6,537,903 | | 7,037,903 |
| **Excess (Deficit) Availability** | (3,315,494) | (3,023,518) | (3,206,884) | (3,074,609) | (2,739,339) | (2,316,454) | (1,462,486) | | (1,962,486) |
| | | | | | | | | | |
| **AR - Ending Balance** | 3,381,562 | 3,530,897 | 3,301,690 | 4,404,534 | 4,823,622 | 5,602,228 | 6,669,687 | | 6,669,687 |
| Total Borrowing | 5,587,903 | 5,587,903 | 5,587,903 | 6,337,903 | 6,337,903 | 6,537,903 | 6,537,903 | | 7,037,903 |
| **Variance** | (2,206,342) | (2,057,006) | (2,286,214) | (1,933,369) | (1,514,281) | (935,675) | 131,784 | | (368,216) |

**Notes:**
(1) UCC Professionals (Legal & Financial Advisor) will be paid at an assumed combined run-rate of $95,000 per month
(2) Investment banking success fee is assumed to be paid as a deduct from sale proceeds and will not be paid out of the DIP provided by First Midwest Bank
(3) DIP Interest will be paid on the incremental new money that is borrowed by the debtor during the post-petition period; this will be paid monthly in arrears
(4) DIP Fees will be paid out in two installments: one payment of $50,000 to occur during the interim DIP period and one payment of $83,000 to be paid once the final order is signed

# Exhibit 2

Redline proposed Final DIP Order v Original Filed proposed Final DIP Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CHELLINO CRANE, INC., *et al.*[1] | § | Case No. 17-14200 (CAD) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

## FINAL ORDER AUTHORIZING THE DEBTORS TO: (A) USE CASH COLLATERAL; (B) INCUR POSTPETITION DEBT; AND (C) GRANT ADEQUATE PROTECTION AND PROVIDE SECURITY AND OTHER RELIEF TO FIRST MIDWEST BANK

This matter came before this Court on the motion (the "Motion") of the above-captioned debtors and debtors in possession (collectively, the "Debtors") requesting that this Court enter an interim order, and later after notice and a hearing, a final order (this "Final Order"), authorizing the Debtors to: (a) use Cash Collateral; (b) incur Postpetition Debt, pursuant to the terms of the Postpetition Loan Documents; and (c) grant adequate protection and provide security and other relief to First Midwest Bank ("First Midwest"). Unless otherwise indicated, all capitalized terms used as defined terms herein have the meanings ascribed ~~thereto~~ in **Exhibit ~~A~~1** attached hereto and by this reference are made a part hereof.

This Final Order shall constitute findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052 and shall take effect and be fully enforceable as of the Petition Date.

Having examined the Motion, being fully advised of the relevant facts and circumstances surrounding the Motion, having entered the *Order Granting the Debtors to: (A) Use Cash Collateral on an Interim Basis Pending a Final Hearing; (B) Incur Postpetition Debt*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Chellino Crane, Inc. (6804); Sam J. Chellino Crane Rental, Inc. (0830); G & B Equipment, LLC (0688); Chellino/Industrial Park Family Limited Partnership (1246); and Chellino Industrial Management, Inc. (0691). The address for all of the Debtors is 915 Rowell Avenue, Joliet, Illinois 60433 (the "Real Property").

Redline proposed Final DIP Order v Original Filed proposed Final DIP Order

*on an Interim Basis Pending a Final Hearing; and (C) Grant Adequate Protection and Provide*

*Security and other Relief to First Midwest Bank* on May 10, 2017 (Dkt. 84) (the "Interim

Order"")"); and, the Court having set an initial date for hearing on entry of the Final Order of June

1, 2017 ("Final Hearing"); and, the Court having entered the *Second Interim Order Authorizing*

*the Debtors to (A) Use Cash Collateral; (B) Incur Postpetition Debt; and (C) Grant Adequate*

*Protection and Provide Security and Other Relief to First Midwest Bank* on June 9, 2017 (dkt

205), which order set the date for a Final Hearing on June 21, 2017; and, having held the Final

Hearing on June 21, 2017, pursuant to §§ 363 and 364 of the Code and Fed. R. Bankr. P. 4001(b)

and (c),),; and, objections, if any, having been withdrawn, resolved or overruled by the Court,

**THE MOTION IS GRANTED AS SET FORTH BELOW, AND, SUBJECT TO THE**

**RIGHTS SET FORTH IN PARAGRAPH 76(d) BELOW, THE DEBTORS HEREBY**

**ADMIT, STIPULATE AND AGREE THAT:**

        A.      On the Petition Date, each of the Debtors filed a voluntary petition for relief under

chapter 11 of the Code.  The Debtors have retained possession of their property and continue to

have the rights, powers and duties of debtors-in-possession pursuant to §§ 1107 and 1108 of the

Code.

        B.      The Court has jurisdiction over the Cases and this proceeding pursuant to 28

U.S.C. § 1334. Determination of the Motion constitutes a core proceeding as defined in 28

U.S.C. § 157(b)(2). Venue over this Motion is proper under 28 U.S.C. § 1409(a).

        C.      On  May 17, 2017, the Committee was appointed in these Cases.

        C.      On  May 16, 2017, the Office of the United States Trustee (the "UST") appointed

the members of the Official Committee of Unsecured Creditors (the "Committee") in these

Cases.  On May 17, 2017, the UST filed the *Notice of Appointment of Official Unsecured Creditor's Committee* (Dkt. 113).

D.      The Prepetition Documents evidence and govern the Prepetition Debt, the Prepetition Liens and the prepetition financing relationship between the Debtors and First Midwest.

E.      The Prepetition Debt constitutes the legal, valid and binding obligation of the Debtors, enforceable in accordance with the terms of the Prepetition Documents (other than in respect of the stay of enforcement arising from section 362 of the Code).

F.      As of the Petition Date, the Debtors are liable for payment of the Prepetition Debt, and the Debtors stipulate that the Prepetition Debt is valid, enforceable and unavoidable in an amount not less than $14,442,239.84.

G.      The Debtors do not possess and will not assert any offsets, defenses or counterclaims to the Prepetition Debt, and no portion of the Prepetition Debt is subject to contest, objection, recoupment, defense, counterclaim, offset, avoidance, recharacterization, subordination or other claim, cause of action or challenge of any nature under the Code, under applicable non-bankruptcy law or otherwise by the Debtors.

H.      The Prepetition Liens are Priority Liens, subject and subordinate only to the Carveout and Permitted Priority Liens, if any, and the Prepetition Liens secure payment of all of the Prepetition Debt.

I.      Upon the entry of this Final Order, First Midwest's interests in the Prepetition Collateral will be deemed to be adequately protected; provided, however, that nothing herein shall prejudice First Midwest's rights to later assert that its interest in the Prepetition Collateral lacks adequate protection;

3

J.      Subject solely to the rights set forth in Paragraph 76(d) of this Final Order, the Debtors do not have, and hereby release, any claims, counterclaims, causes of action, defenses or setoff rights relating to the Prepetition Documents, the Prepetition Liens, the Prepetition Debt or otherwise, against First Midwest and its affiliates, subsidiaries, agents, officers, directors, employees, advisors, consultants, predecessors in interest, successors and assigns.

K.      First Midwest has consented to the terms of this Final Order and is entitled to the adequate protection as set forth herein pursuant to §§ 361, 362, 363 and 364 of the Code to the extent of any diminution in the value of its interests in the Prepetition Collateral from and after the Petition Date.

L.      By reason of taking any actions pursuant to this Final Order, First Midwest is not in control of the operations, management or liquidation of the Debtors or their assets.

M.      The Debtors represent that as of the Petition Date, the Budget contains all expenses necessary and reasonably foreseeable for the administration of its assets and the preservation of the Aggregate Collateral through the period for which the Budget runs, and therefore includes all amounts potentially chargeable to First Midwest under § 506(c) of the Code.  The Debtors agree that no charge under Section 506(c) of the Bankruptcy Code shall be sought, without written consent of First Midwest, for any amounts that are not set forth in the Budget.

N.      The Debtors have an immediate need to use Cash Collateral and incur Postpetition Debt as provided herein, in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs.  The access of the Debtors to sufficient working capital and liquidity through

the use of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the Debtors as a going concern and enterprise value.

O.      The Debtors are unable to obtain unsecured credit allowable under § 503(b)(1) of the Code sufficient to finance the administration of their estates. Except as provided below, the Debtors are unable to obtain credit allowable under §§ 364(c)(1), (c)(2) or (c)(3) of the Code on terms more favorable than those offered by First Midwest.

P.      The terms of the Postpetition Debt have been negotiated at arm's length, and the Postpetition Debt is being extended in good faith, as that term is used in § 364(e) of the Code.

Q.      The terms and conditions of the Postpetition Debt and the liens and claims granted herein are fair and reasonable, the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.

R.      Under the circumstances of these Cases, this Final Order is a fair and reasonable response to the Debtors' request for First Midwest's consent to the use of Cash Collateral and provision of Postpetition Debt, and the entry of this Final Order is in the best interest of the Debtors' estate and its creditors. PaymentAbsent approval of the Prepetition Revolving Line of Creditterms set forth in accordance withthis Final Order is necessary as, First Midwest will not otherwise consent to (1) providing the DIP Financing and extending credit to the Debtors thereunder, and (2) the use of its Cash Collateral, or (3) the subordination of its liens to the Carveout.  The Debtors have requested entry of this Final Order pursuant to Fed. R. Bankr. P. 4001(b)(2) and 4001(c)(2) and Local Bankr. R. 4001-2.  Absent granting the relief set forth in this Final Order, the Debtors' estates will be immediately and irreparably harmed.  The use of

Redline proposed Final DIP Order v Original Filed proposed Final DIP Order

Cash Collateral and the incurrence of the Postpetition Financing, in accordance with this Final

Order are therefore in the best interests of the Debtors' estates.

S.      The notice provided by the Debtors of the Motion, the entry of the Interim Order,

the entry of the Second Interim Order, and the Final Hearing satisfy the requirements of Fed. R.

Bankr. P. 2002, 4001(b) and (c) and 9014 and §§ 102(1), 363, 364(c) and (d) of the Code and

were otherwise sufficient and appropriate under the circumstances.

**WHEREFORE, IT IS HEREBY ORDERED THAT THE MOTION IS**

**GRANTED AS SET FORTH HEREIN, AND THAT:**

1.      <u>Authorization to Use Cash Collateral</u>.  The Debtors are authorized to use

Cash Collateral in accordance and as limited by the Budget, (as attached hereto as **Exhibit 2**),

subject to the Permitted Variance, and otherwise in accordance with and pursuant to the terms

and provisions of this Final Order, including Paragraph 2(d) hereof.  So long as any Prepetition

Debt or Postpetition Debt remains outstanding, the Debtors may not use or seek to use Cash

Collateral other than pursuant to the terms of this Final Order.

2.      <u>Procedure for Use of Cash Collateral</u>.

(a)      <u>Delivery of Cash Collateral to First Midwest</u>.  The Debtors shall

deposit all Cash Collateral now or hereafter in its possession or control into the FMB Account

(or otherwise deliver such Cash Collateral to First Midwest in a manner approved in writing by

First Midwest) promptly upon receipt thereof.

(b)      <u>Cash Collateral in First Midwest's Possession</u>.  First Midwest is

authorized to collect upon, convert to cash and enforce checks, drafts, instruments and other

forms of payment now or hereafter coming into its possession or control which constitute

Aggregate Collateral or proceeds thereof.

(c)     Application of Cash Collateral.  First Midwest, at its election, is authorized to apply all Cash Collateral now or hereafter in First Midwest's possession or control as follows: (1) first, to the payment of Prepetition Debt, with payments to be applied first to the $600,000 promissory note of Chellino Crane, Inc., dated May 2, 2017, then to the Prepetition Revolving Line of Credit, and then in the following order: (i) Loan #2014001751 – $3,057,999 Equipment Term Loan; (ii) Loan #2014001469 – $198,376 Equipment Term Loan; (iii) Loan #2014001468 – $3,259,161 Equipment Term Loan; (iv) Loan #20140011467 – $1,222,841 Equipment Term Loan; (v) Equipment Financing Agreement (owed to First Midwest Equipment Finance Co., a subsidiary of First Midwest) – $281,535; (vi) Loan #2014001470 – $838,037 Mortgage; and (2) after all Prepetition Debt has been paid in full, to payment of Postpetition Debt.payment of Postpetition Debt, and (2) second, after all Postpetition Debt has been paid in full and subject to the rights, if any, of holders of Permitted Priority Liens, to Prepetition Debt.

(d)     Prohibition Against Use of Cash Collateral.  Except as provided for in this Final Order, Debtors will not use or seek to use Cash Collateral, unless, in addition to the satisfaction of all requirements of § 363 of the Code: (1) First Midwest has consented to an order authorizing such use; or (2) at the time such an order is entered, the Postpetition Debt has been indefeasibly paid in full, in cash.

(e)     Permitted Priority Liens.  Subject to the rights of First Midwest with respect to Priming Liens set forth in Section 3(c)(iv) herein, the right of First Midwest to receive and apply Cash Collateral shall be subject and subordinate to any Permitted Priority Liens.

3.     Authorization to Incur Postpetition Debt.

7

(a)     <u>Permitted Uses of Postpetition Debt</u>.  The Debtors are authorized and have agreed to incur Postpetition Debt, in accordance with the terms and provisions of this Final Order and the Postpetition Loan Documents which Postpetition Debt shall be used for all purposes permitted under the Postpetition Credit Agreement, including, without limitation, (i) those expenses enumerated in the Budget, including the Carveout, as and when such expenses become due and payable, subject to the Permitted Variance, (ii) any adequate protection payments to First Midwest, and (iii) the Prepetition Debt..

(b)     <u>Additional Terms of Postpetition Debt</u>.

(i)     <u>Maximum Amount</u>. The maximum principal amount of Postpetition Debt outstanding shall not at any time exceed the Maximum DIP Amount.

(ii)    <u>Interest</u>. The Postpetition Debt shall bear interest at a per annum rate equal to Prime plus 3%, payable monthly, and shall require immediate payment to First Midwest of a nonrefundable fee of $138,000, which are hereby found to be fair and reasonable under the circumstances.

(iii)   <u>Maturity</u>. The Postpetition Debt shall mature and be due and payable in full on the Termination Date, as set forth in the Postpetition Credit Agreement.

(iv)    <u>Control Agreements</u>. All deposit account control agreements or similar control agreements, and all collateral access agreements, in effect as of the Petition Date shall remain in full force and effect notwithstanding the entry of this Final Order and any subsequent orders amending this Final Order.

(v)     The Postpetition Debt shall be supported by personal guarantees by the Guarantors.

(c)     <u>Superpriority Administrative Expense Status; Postpetition Liens</u>.; Priming Liens.

(i)     Subject to the Carve Out, theThe Postpetition Debt is hereby granted superpriority administrative expense status under § 364(c)(1) of the Code, with priority over all costs and expenses of administration of the Cases that are incurred under any provision of the

8

Code; and the Postpetition Debt is entitled to the protections of § 364(e) of the Code.

(ii)    In addition, First Midwest is hereby granted the Postpetition Liens to secure the Postpetition Debt.  Subject to ~~the Carve-Out~~subparagraph 3(c)(iii) below, the Postpetition Liens: (1) are in addition to the Prepetition Liens; (2) pursuant to §§ 364(c)(2), (c)(3) and 364(d) of the Code, are ~~Priority Liens senior in priority to all liens on the Postpetition Collateral other than Permitted Priority Liens,~~liens senior in priority to all liens on the Postpetition Collateral; without any further action by the Debtors or First Midwest and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; (3) shall not be subject to avoidance or subordination including, without limitation, under § 510(c) of the Code; and (4) shall not be subject to any security interest or lien that is avoided and preserved pursuant to § 551 of the Code; and (5) shall remain in full force and effect notwithstanding any subsequent conversion of the Cases to chapter 7 or dismissal of the Cases.

(iii)    Notwithstanding anything else in subparagraph (3)(c)(ii)  to the contrary, the Postpetition Liens are and shall be subject and subordinate to the Carveout and the Permitted Priority Liens.

~~(ii)~~(iv) In addition, First Midwest is hereby granted the Priming Liens to secure the Postpetition Debt.  The Priming Liens: (1) are in addition to the Prepetition Liens and the Postpetition Liens; (2) pursuant to §§ 364(c)(2), (c)(3) and 364(d) of the Code, are liens senior in priority to all liens on the Postpetition Collateral; without any further action by the Debtors or First Midwest and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; (3) shall not be subject to avoidance or subordination including, without limitation, under § 510(c) of the Code; and (4) shall not be subject to any security interest or lien that is avoided and preserved pursuant to § 551 of the Code; and (5) shall remain in full force and effect notwithstanding any subsequent conversion of the Cases to chapter 7 or dismissal of the Cases.

(v)    Notwithstanding anything in the Financing Agreement or this Final Order to the contrary, the Postpetition Liens and the Priming Liens shall not attach to and shall not be satisfied from assets of the Debtors' estates that were unencumbered as of the Petition Date, including but not limited to commercial tort claims and actions arising under chapter 5 of the Code (collectively, the "Unencumbered Assets")

~~(iii)~~(vi)The Debtors are authorized to and shall execute and deliver to First Midwest such postpetition loan agreements,

9

financing statements, mortgages, instruments and other documents as First Midwest may reasonably request from time to time, and any such documents filed by First Midwest shall be deemed filed as of the Petition Date; provided, to the extent there is any conflict between such documents and this Final Order, this Final Order shall govern and control.

(d)     <u>Prohibition Against Additional Debt</u>.  The Debtors will not incur or seek to incur debt secured by a lien which is equal to or superior to the Prepetition Liens or, the Postpetition Liens <u>or the Priming Liens</u>, or which is given superpriority administrative expense status under Code § 364(c)(1l), unless, in addition to the satisfaction of all requirements of§ 364 of the Code: (1) First Midwest has consented to such order; or (2) such credit or debt is used to pay the Postpetition Debt and the Prepetition Debt in full, in cash, immediately  upon the entry of such order.

4.     <u>Adequate Protection of Interests of First Midwest in the Prepetition Collateral and the Prepetition Liens</u>.  As adequate protection for First Midwest's interest in the Prepetition Collateral under §§ 361, 362, 363 or 364 of the Code from and after the Petition Date, and to induce First Midwest to provide the Postpetition Debt:

(a)     <u>Priority of Prepetition Liens/Allowance of First Midwest's Claim</u>. Subject to the rights set forth in Paragraph 76(d) of this Final Order and the Carve-Out: (1) the Prepetition Liens shall constitute Priority Liens, subject and subordinate only to the Postpetition Liens, the Priming Liens and the Permitted Priority Liens; and (2) the Prepetition Debt shall constitute the legal, valid and binding obligation of each of the Debtors that are obligated on such Prepetition Debt by the terms of the documents governing such debt, by guarantees or otherwise, and their respective estates, enforceable in accordance with the terms of the applicable Prepetition Documents.

Redline proposed Final DIP Order v Original Filed proposed Final DIP Order

(b)  <u>Replacement Liens</u>.  To the extent of any diminution in value of

First Midwest's interest in the Prepetition Collateral from and after the Petition Date and subject

to the <s>Carve Out</s>Carveout, First Midwest is hereby granted the Replacement Liens as security for

payment of the Prepetition Debt.  The Replacement Liens: (1) are and shall be in addition to the

Prepetition Liens; (2) are and shall be deemed properly perfected, valid and enforceable liens<u>,

subject and subordinate to the Postpetition Liens, the Priming Liens and the Permitted Priority

Liens,</u> without any further action by the Debtors or First Midwest and without the execution,

filing or recordation of any financing statements, security agreements, mortgages or other

documents or instruments; and (3) shall remain in full force and effect notwithstanding any

subsequent conversion to chapter 7 or dismissal of the Cases. Notwithstanding the foregoing, the

Debtors authorized to and shall execute and deliver to First Midwest such financing statements,

mortgages, instruments and other documents as First Midwest may reasonably request from time

to time in respect of the Replacement Liens.

(c)  <u>Allowed Code § 507(b) Claim</u>.  As additional adequate protection

of the interests of First Midwest in the Prepetition Collateral, to the extent of any diminution in

value of First Midwest's interest in the Prepetition Collateral from and after the Petition Date,

and subject to the <s>Carve Out</s>Carveout, First Midwest shall have an allowed claim under § 507(b)

of the Code, with priority over: (1) all costs and expenses of administration of the Cases (other

than First Midwest's claims under § 364 of the Code) that are incurred under any provision of

the Code; and (2) the claims of any other party-in-interest under § 507(b) of the Code.

<s>(d)  Prepetition Adequate Protection Payments.  As additional adequate

protection, to the extent any Prepetition Debt remains outstanding, the Debtors will provide

adequate protection to First Midwest, in the form of: (a) monthly payments of interest,</s>

Redline proposed Final DIP Order v Original Filed proposed Final DIP Order

reasonable fees and other amounts due under the Prepetition Documents; and (b) ongoing payment of First Midwest's reasonable fees, costs and expenses, including, without limitation, legal and other professionals' fees and expenses.

(e)(d)    No Surcharge.  None of theNo surcharge provisions of under Code § 506, the(c), enhancement of collateral provision of Code § 552 or any other legal or equitable doctrine (including, without limitation, unjust enrichment) of the Bankruptcy Code shall, either before, on, or after the Termination Date, be imposed upon First Midwest or any of the Aggregate Collateral with respect to First Midwest for the benefit of any party in interest, including, without limitation, the Committee, any of the Carveout Professionals, or the Debtor at any time during this Case unless, prior to rendering services or incurring expenses, the amount of which they may thereafter seek to recover from First Midwest or the Aggregate Collateral pursuant to such sections of the Code, the Committee, any of the Carveout Professionals, or Trustee, as the case may be, first obtains First Midwest's express written consent to the rendering of such specific services or the incurring of such specific expenses.  The foregoing requirement shall be in addition to all (and not in lieu of any) of the requirements under applicable law for a recovery from First Midwest or the Aggregate Collateral pursuant to such sections of the Code; provided, however, that nothing in this Order shall be deemed to constitute First Midwest's consent to any claim under Code § 506(c) asserted for the benefit of any party, and First Midwest shall retain all rights to contest any such claimsDebtors for any amounts that are not set forth in the Budget; *provided, however*, that nothing in this provision shall bind any Trustee appointed in these cases under chapter 11 or chapter 7 of the Bankruptcy Code.

(f)(e)    Right to Credit Bid.  In all events, pursuant to § 363(k) of the Code, and subject to the rights, if any, of any holder of a Permitted Priority Lien, First Midwest

12

shall have the right to use the Aggregate Debt or any part thereof to credit bid with respect to any bulk or piecemeal sale of all or any portion of the Aggregate Collateral.

(g)(f)   No Marshaling.  Neither First Midwest nor any of the Aggregate Collateral shall be subject to the doctrine of marshaling.

5.   Effect of Termination Date.  Unless extended by the Court upon the written agreement of First Midwest, upon the Termination Date, without further notice or order of Court: (1) the Debtors' authorization to use Cash Collateral and incur Postpetition Debt hereunder will automatically terminate; (2) at First Midwest's election: (i) the Postpetition Debt shall be immediately due and payable, (ii) the Prepetition Debt shall become immediately due and payable to the extent that it is not due and payable already, and (iii) First Midwest shall be entitled to set off any cash in First Midwest's possession or control and apply such cash in accordance with Paragraph 2(c) of this Final Order; and (3) First Midwest shall be entitled to exercise all of its rights and remedies under the Prepetition Documents, the documents executed in connection with the Postpetition Debt, and applicable law, without further order of the Court.

6.   Carveout.

(a)   Carveout TermsPriority. Subject to the terms and conditions of this paragraph 6, the Postpetition Liens, the Priming Liens, the DIP Superpriority Claim, the Prepetition Liens, the Replacement Liens, and the Adequate Protection Superpriority Claims are subordinate to the Carveout.

(a)(b)   Carveout Scope.  The Carveout includes all fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a).  The Carveout (A) with respect to each Carveout Professional: (1) shall equal an aggregate amount not to exceed the lesser of (i) the aggregate amount provided in the Budget for such Carveout Professional for the

period commencing on the Petition Date and ending on the Termination Date; and (ii) the aggregate amount of accrued ~~and unpaid~~ fees and expenses ~~allowed at any time by the Court~~ during the period commencing on the Petition Date and ending on the Termination Date, and allowed by the Court at any time; (2) shall be reduced dollar-for-dollar by any payments of fees and expenses to such Carveout Professional; and (3) shall, to the extent cash is available, be paid first out of any prepetition retainer or ~~property of the estate other than property subject to an unavoidable lien in favor of First Midwest before such payments are made from~~any proceeds of ~~the Postpetition Debt or the Aggregate Collateral~~unencumbered assets; and (B) from and after the Termination Date with respect to the Carveout Professionals, shall in the aggregate equal $75,000 for ~~all~~ such professionals.  Further, First Midwest shall have the right to reserve against the Maximum DIP Amount an amount equal to the sum of the aggregate amount of unpaid fees and expenses consistent with the Budget for the Carveout Professionals.

~~(b)~~(c)   ~~Carveout Usage.~~Limitation on Use.   No portion of the Carveout and no Postpetition Debt or Aggregate Collateral may be used to pay any fees or expenses incurred by any entity, including the Debtors, the Committee or the Carveout Professionals, in connection with claims or causes of action adverse to First Midwest's interests in the Aggregate Collateral, including (1) preventing, hindering or delaying First Midwest's enforcement or realization upon any of the Aggregate Collateral once an Event of Default has occurred; (2) using or seeking to use Cash Collateral or incurring indebtedness in violation of the terms hereof, or selling any Aggregate Collateral without First Midwest's consent; or (3) objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of the Aggregate Debt or any mortgages, liens or security interests with respect thereto or any other rights or interests of First Midwest, or in asserting any claims or

Redline proposed Final DIP Order v Original Filed proposed Final DIP Order

causes of action, including, without limitation, any actions under chapter 5 of the Code, against First Midwest; provided, however, that up to $15,000 of the Carveout may be used by the Committee to investigate the validity, extent, amount, perfection, priority, or enforceability of the Prepetition Debt and the Prepetition Collateral; provided, further, however, that the Carveout may be used to pay fees and expenses incurred by the Carveout Professionals in connection with the negotiation, preparation and entry of this Final Order or any amendment hereto consented to by First Midwest.

(e)(d)   Binding Effect of Stipulations; Challenge Period.  The stipulations and admissions contained in this Final Order, exclusive of the recitals in Paragraphs D through J of this Final Order, shall be binding on all parties-in-interest, including, without limitation, the Committee.  Further, unless, and solely to the extent that, (a) a party in interest has timely filed an adversary proceeding challenging the amount, validity, or enforceability of the Prepetition Debt, or the perfection or priority of First Midwest's liens on and security interests in the Prepetition Collateral in respect thereof, or otherwise asserting any claims or causes of action on behalf of the Debtors' estates against First Midwest relating to the Prepetition Debt, by no later than (x) with respect to the Committee, the date that is 60 days after the date of its formation, and, with respect to any other party, the date that is 75 days from the entry of the Interim Order, and (b) the Court rules in favor of such party in interest or the Committee in any such timely and properly filed adversary proceeding, then, without further order of the Court, (i) the claims, liens and security interests of First Midwest shall be deemed to be allowed for all purposes in the Cases and shall not be subject to challenge by any party in interest as to extent, validity, priority or otherwise, and (ii) the Debtors and their estates shall be deemed to have waived, released and discharged First Midwest and its officers, directors, principals, attorneys, consultants,

15

Redline proposed Final DIP Order v Original Filed proposed Final DIP Order

predecessors in interest, and successors and assigns of and from any and all claims and causes of action, indebtedness, and obligations, of every type, which occurred on or prior to the date of entry of this Final Order with respect to or in connection with the Prepetition Debt, the Prepetition Liens, the Prepetition Documents or otherwise, and (iii) the recitals in Paragraphs D through J of this Final Order shall be binding on all parties in interest, including, without limitation, the Committee.   Notwithstanding anything to the contrary herein, if any such adversary proceeding is timely commenced, the stipulations contained in Paragraphs D through J hereof shall nonetheless remain binding on the Debtors except to the extent that such stipulations are expressly challenged in such adversary proceeding and the Committee prevails by a final order of this Court.  Notwithstanding the foregoing, nothing in this Final Order shall limit the right of any person claiming a Permitted Priority Lien from asserting that it has priority over First Midwest in property of the Debtors' estates after the expiration of the Challenge Period established by the second sentence in this Section 6, and all rights of a party asserting a Permitted Priority Lien to assert a priority challenge are expressly preserved.

7.     Application of Sale Proceeds.  All proceeds from sales or other dispositions of all or any portion of the Aggregate Collateral that is not subject to a Permitted Priority Lien shall be remitted to First Midwest for application in accordance with Paragraph 2. All proceeds from sales or other dispositions of all or any portion of the Aggregate Collateral that is subject to a Permitted Priority Lien shall be remitted:  first, subject to any rights of the Debtors under Code § 506(c), to holders of Permitted Priority Liens in accordance to the portion of the proceeds of sale attributable to the Aggregate Collateral that is subject to such holder's Permitted Priority Lien, for application against the claim of such holder of a Permitted Priority Lien; and, second, to the extent that any proceeds remain after the claim of such holder of such

Redline proposed Final DIP Order v Original Filed proposed Final DIP Order

Permitted Priority Lien has been paid in full, including with respect to any post-petition interest, fees, costs, or other charges to which such holder is entitled under Section 506(b) of the Bankruptcy Code, to First Midwest for application in accordance with Paragraph 2.

8.    Waiver of Right to Return/Consent to Setoff.    The Debtors hereby waive their rights: (a) to return any of the Aggregate Collateral pursuant to § 546(h) of the Code; (b) to consent to any order permitting any claims pursuant to § 503(b)(9) of the Code except to the extent permitted in the Budget as previously disclosed to First Midwest and the Court; and (c) to consent to setoff pursuant to § 553 of the Code or recoupment.

9.    Force and Effect of Prepetition Documents.    Except as modified herein and subject to the other provisions of this Final Order and the Code, the Prepetition Documents shall remain in full force and effect with respect to the Prepetition Debt.    To the extent there exists any conflict among the terms of the Motion, the Prepetition Documents and this Final Order, this Final Order shall govern and control.

10.    Modification of Stay.    Subject to Paragraph 5 of this Order, the automatic stay of § 362 of the Code is hereby modified solely with respect to First Midwest to the extent necessary to effectuate the provisions of this Order.

11.    No Waiver.    First Midwest shall not be deemed to have suspended or waived any of their rights or remedies under this Final Order, the Prepetition Documents, the Code, or applicable nonbankruptcy law unless such suspension or waiver is in writing, signed by a duly authorized officer of First Midwest, as applicable, and directed to the Debtors.    No failure of First Midwest to require strict performance by the Debtors, or by any Trustee of any provision of this Final Order shall waive, affect or diminish any right of First Midwest thereafter to demand strict compliance and performance therewith, and no delay on the part of First Midwest

17

Redline proposed Final DIP Order v Original Filed proposed Final DIP Order

in the exercise of any right or remedy under this Final Order, the Prepetition Documents, the

Code, or applicable nonbankruptcy law shall preclude the exercise of any right or remedy.

Further, this Final Order shall not constitute a waiver by First Midwest of any of its rights under

the Prepetition Documents, the Code or applicable nonbankruptcy law, including, without

limitation its right to later assert: (1) that its interests in the Aggregate Collateral lack adequate

protection within the meaning of §§ 362(d) or 363(e) of the Code or any other provision thereof;

or (2) a claim under § 507(b) of the Code.

12.     Amendments.  The Debtors and First Midwest may enter into amendments

or modifications of the Budget and the Maximum DIP Amount without further notice and

hearing or order of this Court; provided, that (a) such modifications or amendments do not

materially and adversely affect the rights of any creditor or other party-in-interest, and (b)(b) the

Committee consents to such modification, and (c) notice of any such amendment or modification

is filed with this Court.

13.     Reporting.  In addition to all reporting requirements under the Prepetition

Documents, the Debtors shall timely provide First Midwest with reports on no less than a weekly

basis detailing the Debtors' compliance with the Budget and any changes in its projections

including, but not limited to, cash inflows and outflows, weekly borrowing base certificates,

accounts receivable aging, accounts payable aging, weekly actual cash flow versus projections,

and shall otherwise reasonably cooperate with First Midwest regarding the Budget and the

administration of its assets.

14.     Binding Effect.  Except as provided in Paragraph 76 herein, this Final

Order shall be binding on all parties in interest in the Cases and their respective successors and

assigns, including any Trustee.  If, in accordance with § 364(e) of the Code, this Final Order

Redline proposed Final DIP Order v Original Filed proposed Final DIP Order

does not become a final nonappealable order, or if any of the provisions of this Final Order are hereafter modified, amended, vacated or stayed by subsequent order of this Court or any other court, such termination or subsequent order shall not affect: (a) subject to Paragraph 7̶6 of this Final Order, the stipulations, representations, and findings contained in this Final Order and the relief granted by and the releases contained in this Final Order (including, without limitation, Paragraphs 2(d), 3(d) and 7̶6); and (b) the priority, validity, enforceability or effectiveness of any lien, security interest or other benefit or claim authorized hereby with respect to Cash Collateral used or Postpetition Debt incurred prior to the effective date of such termination or subsequent order. All such liens, security interests, claims and other benefits shall be governed in all respects by the original provisions of this Final Order, and First Midwest shall be entitled to all the rights, remedies, privileges and benefits granted hereto, including the liens and priorities granted herein, with respect to the Postpetition Debt.  Except as otherwise explicitly set forth in this Final Order, no third party is intended to be, or shall be deemed to be, a third-party beneficiary of this Final Order.

15.    <u>Survival</u>.   The provisions of this Final Order, and any actions taken pursuant to or in reliance upon the terms hereof, shall survive entry of, and govern in the event of any conflict with, any order which may be entered in the Cases: (a) confirming any chapter 11 plan, (b) converting the Cases to cases under chapter 7 of the Code, (c) dismissing the Cases, (d) withdrawing of the reference of the Cases from this Court, or (e) providing for abstention from handling or retaining of jurisdiction of the Cases in this Court.  The terms and provisions of this Final Order, including, without limitation, the rights granted First Midwest under §§ 364(c) and (d) of the Code, shall continue in full force and effect until all of the Aggregate Debt is indefeasibly paid in full in cash and discharged.

Redline proposed Final DIP Order v Original Filed proposed Final DIP Order

Dated: _____, 2017

Chicago, Illinois                              UNITED STATES BANKRUPTCY JUDGE

Redline proposed Final DIP Order v Original Filed proposed Final DIP Order

## EXHIBIT A

## DEFINED TERMS

1.    ***Aggregate Collateral***.   Collectively, the Prepetition Collateral and the Postpetition Collateral.

2.    ***Aggregate Debt***.   Collectively, the Prepetition Debt and the Postpetition Debt.

3.    ***Budget***.   The budget attached to this Final Order as Exhibit B, as amended, modified or supplemented from time to time, as may be agreed to in writing by First Midwest.

4.    ***Carveout***.   Collectively, (a) all fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), and (b) the allowed fees and disbursements as may be awarded by the Court to a Carveout Professional from time to time pursuant to § 330 of the Code, in the aggregate amount set forth in Paragraph 6 of this Final Order.

5.    ***Carveout Professionals***.   Sugar Felsenthal Grais & Hammer LLP and Conway MacKenzie, Inc.

6.    ***Cases***.   The Debtors' chapter 11 cases or any superseding chapter 7 cases of the Debtors.

7.    ***Cash Collateral***.   All "cash collateral," as that term is defined in § 363(a) of the Code, in which First Midwest has an interest, all deposits subject to setoff rights in favor of First Midwest, and all cash arising from the collection or other conversion to cash of the Aggregate Collateral, including from the sale of inventory and the collection of accounts receivable.

8.    ***Code***.   The United States Bankruptcy Code (11 U.S.C. §§ 101 et seq.), as amended, and any successor statute. Unless otherwise indicated, all statutory section references in this Final Order are to the Code.

9.    ***Committee***.   The official committee appointed on May 17, 2017 to represent unsecured creditors in these Cases pursuant to § 1102 of the Code.

10.    ***Debtors***.   Chellino Crane Inc.; Sam J. Chellino Crane Rental, Inc.; G & B Equipment, LLC; Chellino/Industrial Park Family Limited Partnership; and Chellino Industrial Management, Inc.

11.    ***Event(s) of Default***.   An Event of Default includes any of the following: (a) the Company shall fail to pay (i) any interest due on the Note (as defined in the Postpetition Credit Agreement) by three (3) days after the same becomes due; (ii) any other amount due and payable under the Postpetition Credit Agreement (other than a principal payment on any Note) by three (3) days after Company receives written demand from First Midwest therefor; or (iii) any principal amount due on the Note when due; (b) the Company shall default in the performance or observance of any agreement, covenant, condition, provision or term contained in Article V or section 6.01 of the Postpetition Credit Agreement; (c) the Company or any Guarantor shall default in the performance or observance of any of the other agreements, covenants, conditions, provisions or terms in the Postpetition Credit Agreement or any of the Postpetition Collateral Documents (as defined in the Postpetition Credit Agreement) continuing for a period of thirty days after written notice thereof is given to the Company by First Midwest; (d) any representation or warranty made by the Company in the Postpetition Credit Agreement or any certificate delivered pursuant to the Postpetition Credit Agreement, or any financial statement delivered to the First Midwest under the Postpetition Credit Agreement, by the Company or any Guarantor shall prove to have been false in any material respect as of the time when made or given; (e) a final judgment which, together with other outstanding final judgments against the Company exceeds an aggregate of $10,000 shall be entered against the Company and shall remain outstanding and unsatisfied, unbonded, unstayed or uninsured after 60 days from the date of entry thereof; or any judgment which exceeds $20,000 shall be entered against the Company; (f) any lien purported to be created by any Postpetition Loan Document or the Interim Order or Final Order in any of the collateral secured by the Postpetition Collateral Documents purported to be covered thereby shall, for any reason, cease to be valid except collateral released as permitted by any Postpetition Loan Document or Interim Order or Final Order; (g) entry of an order of the Bankruptcy Court converting the chapter 11 case of the Company to a case under

2

chapter 7 of the Bankruptcy Code and such order is not reversed or vacated within thirty (30) days; (h) entry of an order of the Bankruptcy Court dismissing or suspending the chapter 11 case of the Company; (i) entry of an order of the Bankruptcy Court in the Company's chapter 11 case appointing a trustee under Section 1104 of the Bankruptcy Code which First Midwest reasonably determines may result in events which are materially injurious to the interests of First Midwest and such order is not reversed or vacated within thirty (30) days; (j) entry of an order of the Bankruptcy Court granting relief from the automatic stay to the holder of a lien on, or security interest in, any other asset the removal of which from the Company's bankruptcy estate is reasonably likely to may have a material adverse effect on the value or operation of the Company's business; (k) the Interim Order or Final Order shall terminate by its terms, shall not remain in full force and effect or shall have been stayed, vacated, reversed, modified, supplemented or amended in a manner which First Midwest reasonably believes is materially injurious to its interests, or, in the event that any such order is the subject of any pending motion or appeal, any performance of any obligation of any party hereto shall have been stayed pending such motion or appeal; (l) the Final Order shall not have been issued prior to the earlier of (i) the next Business Day after the date the Final Hearing is concluded and (ii) the 21st day after the Petition Date or shall fail to approve and affirm the Interim Order in all material respects; (m) the aggregate principal amount outstanding by First Midwest to the Company under the Note exceeds the amount of the Postpetition Facility or the sum of the amounts outstanding under the Loans, the $600,000 Note and the Revolving Credit Agreement exceed the Borrowing Base from time to time in effect, and in either case, the Company fails to repay the amount of such excess within 5 Business Days after notice from First Midwest; or   (n) the Postpetition Credit Agreement, the Note or any Postpetition Collateral Document shall, at any time after their respective execution and delivery, and for any reason, cease to be in full force and effect or be declared null and void, or be revoked or terminated (other than by First Midwest), or the validity or enforceability thereof or hereof shall be contested in writing by the Company or any Guarantor, or the Company or any Guarantor shall deny in writing that it has any or further liability or obligation thereunder or under the Postpetition Credit Agreement, as the case may be.

        12.   *Final Hearing*.  The final hearing on the Motion conducted in accordance with Fed R. Bankr. P. 4001.

3

Redline proposed Final DIP Order v Original Filed proposed Final DIP Order

13.   *FMB Account*. A collection account in the name of Chellino Crane, Inc. at First Midwest.

14.   *Guaranties*. Collectively, (a) Commercial Guaranty for Loan No. 2014001300, dated as of July 5, 2016, executed by Sam J. Chellino Crane Rental, Inc.; (b) Commercial Guaranty for Loan No. 2014001300, dated as of July 5, 2016, executed by Frank J. Chellino; (c) Commercial Guaranty for Loan No. 2014001300, dated as of July 5, 2016, executed by Gregory Chellino; (d) Commercial Guaranty for Loan No. 2014001467, dated as of December 29, 2014, executed by Sam J. Chellino Crane Rental, Inc.; (e) Commercial Guaranty for Loan No. 2014001467, dated as of December 29, 2014, executed by Frank J. Chellino; (f) Commercial Guaranty for Loan No. 2014001467, dated as of December 29, 2014, executed by Gregory Chellino; (g) Commercial Guaranty for Loan No. 2014001468, dated as of December 29, 2014, executed by Sam J. Chellino Crane Rental, Inc.; (h) Commercial Guaranty for Loan No. 2014001468, dated as of December 29, 2014, executed by Frank J. Chellino; (i) Commercial Guaranty for Loan No. 2014001468, dated as of December 29, 2014, executed by Gregory Chellino; (j) Commercial Guaranty for Loan No. 2014001469, dated as of December 29, 2014, executed by Sam J. Chellino Crane Rental, Inc.; (k) Commercial Guaranty for Loan No. 2014001469, dated as of December 29, 2014, executed by Frank J. Chellino; (l) Commercial Guaranty for Loan No. 2014001469, dated as of December 29, 2014, executed by Gregory Chellino; (m) Commercial Guaranty for Loan No. 2014001470, dated as of December 30, 2014, executed by Sam J. Chellino Crane Rental, Inc.; (n) Commercial Guaranty for Loan No. 2014001470, dated as of December 30, 2014, executed by Frank J. Chellino; (o) Commercial Guaranty for Loan No. 2014001470, dated as of December 30, 2014, executed by Gregory Chellino; (p) Commercial Guaranty for Loan No. 2014001751, dated as of January 15, 2015, executed by Sam J. Chellino Crane Rental, Inc.; (q) Commercial Guaranty for Loan No. 2014001751, dated as of January 15, 2015, executed by Frank J. Chellino; and (r) Commercial Guaranty for Loan No. 2014001751, dated as of January 15, 2015, executed by Gregory Chellino (each a "Guaranty," collectively the "Guaranties").

15.   *Guarantors*. Collectively, (a) Sam J. Chellino Crane Rental, Inc., (b) Frank J. Chellino, and (c) Gregory Chellino (each a "Guarantor," collectively the "Guarantors").

Redline proposed Final DIP Order v Original Filed proposed Final DIP Order

16.    *Maximum DIP Amount*.  $7,017,903.06.

17.    *Permitted Priority Liens*.  Collectively, (a) the Carveout, and (b) liens in favor of third parties upon the Prepetition Collateral, which third-party liens, as of the Petition Date: (1) had priority under applicable law over the Prepetition Liens, (2) were not subordinated by agreement or applicable law, and (3) were non-avoidable, valid, properly perfected and enforceable as of the Petition Date; provided, however, that Permitted Priority Liens shall not include proceeds of Prepetition Collateral which consist of rental payments on leased equipment

18.    *Permitted Variance*.  An amount equal to 10% of the cumulative amount set forth in the Budget.

19.    *Petition Date*.  May 5, 2017.

20.    *Postpetition Collateral*.  (a) All of the real and personal property of the Debtors that  have granted a mortgage or security interest to First Midwest, or any of its subsidiaries, to secure Prepetition Debt, and their respective estates, of any description whatsoever, wherever located and whenever arising or acquired, including, without limitation all cash, accounts, receivables, inventory, equipment, fixtures, chattel paper, general intangibles all leaseholds, all commercial torts, all interests in any joint venture, all licenses and permits, all other Prepetition Collateral, and all proceeds, rents, issues, profits and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any of the foregoing; provided, however, that the Postpetition Collateral shall not include property to the extent that such property is subject to a valid and enforceable agreement with the Small Business Administration which prohibits the granting of a lien in favor of First Midwest.

(b)    A mortgage on the real estate and personal property owned by Chellino/ Industrial Park Family Limited Partnership and now or hereafter located at 915 Rowell Avenue, Joliet, Illinois.

(c)    A pledge of notes owed by Chellino Crane, Inc. to the individual Guarantors.

Redline proposed Final DIP Order v Original Filed proposed Final DIP Order

21.   ***Postpetition Debt***.  All indebtedness or obligations of the Debtors to First Midwest incurred on or after the Petition Date pursuant to this Interim Order or otherwise, including all advances made by First Midwest to pay the Carveout.

22.   ***Postpetition Liens***.  Priority Liens in the Aggregate Collateral, subject only to Permitted Priority Liens.

23.   ***Postpetition Credit Agreement***.  The postpetition loan agreement to be entered into between Chellino Crane, Inc. (the "Company") and First Midwest.

24.   ***Postpetition Loan Documents***.  Collectively, the Postpetition Credit Agreement, the Note (as defined in the Postpetition Credit Agreement) and the Postpetition Collateral Documents (as defined in the Postpetition Credit Agreement).

25.   ***Prepetition Collateral***.  All of the "Collateral" (as that term is defined in the Prepetition Documents) existing as of the Petition Date, and all proceeds, rents, issues, profits and products thereof.

26.   ***Prepetition Credit Agreement***.  That certain Business Loan Agreement (Asset Based) dated as of December 5, 2014 by and between the Chellino Crane, Inc. and Standard Bank and Trust Company ("Standard Bank"), as predecessor in interest to First Midwest, as amended, modified and supplemented from time to time.

27.   ***Prepetition Debt***.  All indebtedness or obligations of the Debtors under the Prepetition Documents as of the Petition Date, including fees, costs, interest, and expenses as and when due and payable pursuant to the Prepetition Documents.

28.   ***Prepetition Documents***.  The Prepetition Credit Agreement and all security agreements, pledge agreements, promissory notes and other documents, entered into by any of the Debtors and First Midwest, or any of its subsidiaries, including, without limitation, the following documents, among others, each as amended: Commercial Security Agreement, dated as of December 5, 2014, among Chellino Crane, Inc. and Standard Bank; Certain Promissory Notes numbered 2014001751, 2014001300, 2014001467, 2014001468, 2014001469, and 2014001470 (the "Notes"); Separate Business Loan Agreements (the "Business Loan

6

Redline proposed Final DIP Order v Original Filed proposed Final DIP Order

Agreements"); Separate Security Agreements (the "Security Agreements") between the Guarantors and Standard Bank; the Guaranties; and the Prepetition Third Party Documents.

29.  ***Prepetition Liens***.  First Midwest's security interests in the Prepetition Collateral under the Prepetition Documents, subject only to Permitted Priority Liens and Postpetition Liens.

30.  ***Prepetition Revolving Line of Credit***.  Pursuant to that certain Business Loan Agreement dated as of December 29, 2014, Standard Bank and Trust Company, as predecessor in interest to First Midwest, provided a credit facility to Chellino Crane, Inc., the outstanding principal balance of which, as of the Petition Date, was approximately $5,217,903.06.

31.  ***Prepetition Third Party Documents***.  Collectively, the Debtors' deposit account control agreements, leases, licenses, collateral access agreements, landlord agreements, warehouse agreements bailment agreements, insurance policies, contracts or other similar agreements in which First Midwest has an interest.

32.  ***Priority Liens***.  Liens that are first priority, properly perfected, valid and enforceable security interests, and that are not subject to any claims, counterclaims, defenses, setoff, recoupment or deduction, and which are otherwise unavoidable and not subject to recharacterization or subordination pursuant to any provision of the Code, any agreement, or applicable nonbankruptcy law.

33.  ***Replacement Liens***.  Priority Liens in the Postpetition Collateral granted to First Midwest pursuant to this Final Order, subject only to the Postpetition Liens and the Permitted Priority Liens.

34.  ***Termination Date***.  At First Midwest's election, the earlier to occur of: (a) the date on which First Midwest provides, via facsimile or overnight mail, written notice to counsel for the Debtors and counsel for the Committee of the occurrence and continuance of an Event of Default; and (b) the Final Order shall not have been issued prior to the earlier of (i) the next Business Day after the date the Final Hearing is concluded and (ii) the 21st day after the Petition Date or shall fail to approve and affirm the Interim Order in all material respects.

Redline proposed Final DIP Order v Original Filed proposed Final DIP Order

35.    *Trustee*.  Any chapter 11 or chapter 7 trustee appointed or elected in the Cases.

Redline proposed Final DIP Order v Original Filed proposed Final DIP Order

**EXHIBIT B**

**BUDGET**

**[attached]**

# **Exhibit 3**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CHELLINO CRANE, INC., *et al.*[1] | § | Case No. 17-14200 (CAD) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**FINAL ORDER AUTHORIZING THE DEBTORS TO: (A) USE CASH COLLATERAL;
(B) INCUR POSTPETITION DEBT; AND (C) GRANT ADEQUATE PROTECTION
AND PROVIDE SECURITY AND OTHER RELIEF TO FIRST MIDWEST BANK**

This matter ~~having come~~came before this Court on the motion (the "~~"~~Motion~~"~~)") of the above-captioned debtors and debtors in possession (collectively, the "~~"~~Debtors~~"~~)") requesting that this Court enter an interim order ~~(the "First Interim Order")~~, and later after notice and a hearing, a final order (~~the "~~this "Final Order~~")~~."), authorizing the Debtors to: (a) use Cash Collateral; (b) incur ~~postpetition debt up to a maximum amount of $300,000 on an interim basis through the entry of the Final Order, and up to a maximum amount of $7,017,903.06~~Postpetition Debt, pursuant to the ~~Final Order (the "Postpetition Debt") the entry of the Final Order (the "~~terms of the Postpetition ~~Debt"):~~Loan Documents; and (c) grant adequate protection and provide security and other relief to First Midwest Bank ~~("~~("First Midwest~~"); and,~~").  Unless otherwise indicated, all capitalized terms used as defined terms herein have the ~~Court having granted~~meanings ascribed in **Exhibit 1** attached hereto and by this reference are made a part hereof.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Chellino Crane, Inc. (6804); Sam J. Chellino Crane Rental, Inc. (0830); G & B Equipment, LLC (0688); Chellino/Industrial Park Family Limited Partnership (1246); and Chellino Industrial Management, Inc. (0691).  The address for all of the Debtors is 915 Rowell Avenue, Joliet, Illinois 60433 (the "Real Property").

This Final Order shall constitute findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052 and shall take effect and be fully enforceable as of the Petition Date.

Having examined the Motion ~~and approved the First~~, being fully advised of the relevant facts and circumstances surrounding the Motion, having entered the *Order Granting the Debtors to: (A) Use Cash Collateral on an Interim Basis Pending a Final Hearing; (B) Incur Postpetition Debt on an* Interim ~~Order~~*Basis Pending a Final Hearing; and (C) Grant Adequate Protection and Provide Security and other Relief to First Midwest Bank* on May 10, 2017 (~~dkt. 84);~~Dkt. 84) (the "Interim Order"); and, the Court having set ~~a~~an initial date for hearing on entry of the Final Order of June 1, 2017 ("Final Hearing~~"), with an objection deadline of May 25, 2017; and, upon agreement~~"); and, the Court having entered the *Second Interim Order Authorizing the Debtors to (A) Use Cash Collateral; (B) Incur Postpetition Debt; and (C) Grant Adequate Protection and Provide Security and Other Relief to First Midwest Bank* on June 9, 2017 (dkt 205), which order set the date for a Final Hearing on June 21, 2017; and, having held the Final Hearing on June 21, 2017, pursuant to §§ 363 and 364 of the ~~Debtors,~~Code and Fed. R. Bankr. P. 4001(b) and (c); and, objections, if any, having been withdrawn, resolved or overruled by the Court, **THE MOTION IS GRANTED AS SET FORTH BELOW, AND, SUBJECT TO THE RIGHTS SET FORTH IN PARAGRAPH 6(d) BELOW, THE DEBTORS HEREBY ADMIT, STIPULATE AND AGREE THAT:**

A.     On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Code.  The Debtors have retained possession of their property and continue to have the rights, powers and duties of debtors-in-possession pursuant to §§ 1107 and 1108 of the Code.

Redline proposed Final DIP Order v Second Interim Order

B.     The Court has jurisdiction over the Cases and this proceeding pursuant to 28 U.S.C. § 1334. Determination of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue over this Motion is proper under 28 U.S.C. § 1409(a).

C.     On May 16, 2017, the Office of the United States Trustee (the "UST") appointed the members of the Official Committee of Unsecured Creditors ("(the "Committee")") in these Cases.  On May 17, 2017, the UST filed the *Notice of Appointment of Official Unsecured Creditor's Committee* (Dkt. 113).

D.     The Prepetition Documents evidence and govern the Prepetition Debt, the Prepetition Liens and the prepetition financing relationship between the Debtors and First Midwest (collectively, the "Parties")..

E.     The Prepetition Debt constitutes the legal, valid and binding obligation of the Debtors, enforceable in accordance with the terms of the Prepetition Documents (other than in respect of the stay of enforcement arising from section 362 of the Code).

F.     As of the Petition Date, the Debtors are liable for payment of the Prepetition Debt, and the Debtors stipulate that the Prepetition Debt is valid, enforceable and unavoidable in an amount not less than $14,442,239.84.

G.     The Debtors do not possess and will not assert any offsets, defenses or counterclaims to the Prepetition Debt, and no portion of the Prepetition Debt is subject to contest, objection, recoupment, defense, counterclaim, offset, avoidance, recharacterization, subordination or other claim, cause of action or challenge of any nature under the Code, under applicable non-bankruptcy law or otherwise by the Debtors.

H.     The Prepetition Liens are Priority Liens, subject and subordinate only to the Carveout and Permitted Priority Liens, if any, and the Prepetition Liens secure payment of all of the Prepetition Debt.

I.     Upon the entry of this ~~Court having entered a~~ Final Order, First Midwest's interests in the Prepetition Collateral will be deemed to be adequately protected; provided, however, that nothing herein shall prejudice First Midwest's rights to later assert that its interest in the Prepetition Collateral lacks adequate protection;

J.     Subject solely to the rights set forth in Paragraph 6(d) of this Final Order, the Debtors do not have, and hereby release, any claims, counterclaims, causes of action, defenses or setoff rights relating to the Prepetition Documents, the Prepetition Liens, the Prepetition Debt or otherwise, against First Midwest and its affiliates, subsidiaries, agents, officers, directors, employees, advisors, consultants, predecessors in interest, successors and assigns.

K.     First Midwest has consented to the terms of this Final Order and is entitled to the adequate protection as set forth herein pursuant to §§ 361, 362, 363 and 364 of the Code to the extent of any diminution in the value of its interests in the Prepetition Collateral from and after the Petition Date.

L.     By reason of taking any actions pursuant to this Final Order, First Midwest is not in control of the operations, management or liquidation of the Debtors or their assets.

M.     The Debtors represent that as of the Petition Date, the Budget contains all expenses necessary and reasonably foreseeable for the administration of its assets and the preservation of the Aggregate Collateral through the period for which the Budget runs, and therefore includes all amounts potentially chargeable to First Midwest under § 506(c) of the Code.  The Debtors agree that no charge under Section 506(c) of the Bankruptcy Code shall be

sought, without written consent of First Midwest, for any amounts that are not set forth in the Budget.

N.      The Debtors have an immediate need to use Cash Collateral and incur Postpetition Debt as provided herein, in order continuing the Final Hearing to June 7, 2017, to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs.  The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the Debtors as a going concern and enterprise value.

O.      The Debtors are unable to obtain unsecured credit allowable under § 503(b)(1) of the Code sufficient to finance the administration of their estates. Except as provided below, the Debtors are unable to obtain credit allowable under §§ 364(c)(1), (c)(2) or (c)(3) of the Code on terms more favorable than those offered by First Midwest.

P.      The terms of the Postpetition Debt have been negotiated at 10:30arm's length, and the Postpetition Debt is being extended in good faith, as that term is used in § 364(e) of the Code.

Q.      The terms and conditions of the Postpetition Debt and the liens and claims granted herein are fair and reasonable, the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.

R.      Under the circumstances of these Cases, this Final Order is a.m. fair and reasonable response to the Debtors' request for First Midwest's consent to the use of Cash

Redline proposed Final DIP Order v Second Interim Order

Collateral and provision of Postpetition Debt, and the entry of this Final Order is in the best interest of the Debtors' estate and its creditors.  Absent approval of the terms set forth in this Final Order, First Midwest will not otherwise consent to (1) providing the DIP Financing and extending ~~the deadline for objections to~~ credit to the Debtors thereunder, and (2) the use of its Cash Collateral, or (3) the subordination of its liens to the Carveout.  The Debtors have requested entry of ~~the proposed Final Order to June 1, 2017, for the Committee and certain other parties that have provided comments to the Final Order (Dkt. 146); and, to accommodate on going negotiations between the Parties, a consent order further extending the objection deadline to~~ this Final Order pursuant to Fed. R. Bankr. P. 4001(b)(2) and 4001(c)(2) and Local Bankr. R. 4001-2.  Absent granting the relief set forth in this Final Order, the Debtors' estates will be immediately and irreparably harmed.  The use of Cash Collateral and the incurrence of the Postpetition Financing, in accordance with this Final Order are therefore in the best interests of the Debtors' estates.

~~A.~~S.    The notice provided by the Debtors of the Motion, the entry of the ~~Final Order for the Committee and certain other parties to June 5, 2017 (Dkt. 179); and, the Parties having further agreed to continue the Final Hearing for an additional two weeks and extend the objection deadline for the Committee and certain other parties to~~Interim Order, the entry of the ~~Final Order, subject to entry of this second Interim Order (~~"Second Interim Order"~~);~~, and~~, for~~ the ~~reasons stated on~~Final Hearing satisfy the ~~record at~~requirements of Fed. R. Bankr. P. 2002, 4001(b) and (c) and 9014 and §§ 102(1), 363, 364(c) and (d) of the ~~hearings held on May 9, 2017, and June 7, 2017,~~Code and were otherwise sufficient and appropriate under the circumstances.

Redline proposed Final DIP Order v Second Interim Order

## **WHEREFORE, IT IS HEREBY ORDERED THAT: THE MOTION IS GRANTED AS SET FORTH HEREIN, AND THAT:**

1.        1.      Authorization to Use Cash Collateral.  The Debtors are authorized to use Cash Collateral in accordance and as limited by the Budget, (as attached hereto as **Exhibit 2**), subject to the Permitted Variance, and otherwise in accordance with and pursuant to the terms and provisions of this ~~Second Interim Order, through the entry of the~~Final Order, including Paragraph 2(d) hereof.  So long as any Prepetition Debt or Postpetition Debt remains outstanding, the Debtors may not use or seek to use Cash Collateral other than pursuant to the terms of this Final Order.

        ~~2.        Authorization to Incur Postpetition Debt.~~
        2.      (a)      Procedure for Use of Cash Collateral.

        (a)      Delivery of Cash Collateral to First Midwest.  The Debtors shall deposit all Cash Collateral now or hereafter in its possession or control into the FMB Account (or otherwise deliver such Cash Collateral to First Midwest in a manner approved in writing by First Midwest) promptly upon receipt thereof.

        (b)      Cash Collateral in First Midwest's Possession.  First Midwest is authorized to collect upon, convert to cash and enforce checks, drafts, instruments and other forms of payment now or hereafter coming into its possession or control which constitute Aggregate Collateral or proceeds thereof.

        (c)      Application of Cash Collateral.  First Midwest is authorized to apply all Cash Collateral now or hereafter in First Midwest's possession or control as follows: (1) first, to payment of Postpetition Debt, and (2) second, after all Postpetition Debt has been

Redline proposed Final DIP Order v Second Interim Order

paid in full and subject to the rights, if any, of holders of Permitted Priority Liens, to Prepetition Debt.

(d)     Prohibition Against Use of Cash Collateral.  Except as provided for in this Final Order, Debtors will not use or seek to use Cash Collateral, unless, in addition to the satisfaction of all requirements of § 363 of the Code: (1) First Midwest has consented to an order authorizing such use; or (2) at the time such an order is entered, the Postpetition Debt has been indefeasibly paid in full, in cash.

(e)     Permitted Priority Liens.  Subject to the rights of First Midwest with respect to Priming Liens set forth in Section 3(c)(iv) herein, the right of First Midwest to receive and apply Cash Collateral shall be subject and subordinate to any Permitted Priority Liens.

3.     Authorization to Incur Postpetition Debt.

(a)     Permitted Uses of Postpetition Debt.  The Debtors are authorized and have agreed to incur ~~the~~ Postpetition Debt, in accordance with the terms and provisions of this ~~Second Interim~~Final Order, and the Postpetition Loan Documents which Postpetition Debt shall be used for all purposes permitted under the Postpetition Credit Agreement, including, without                                                                   limitation, those expenses enumerated in the Budget~~.~~, including the Carveout, as and when such expenses become due and payable, subject to the Permitted Variance.

(b)     ~~(b)~~ Additional Terms of Postpetition Debt.

(i)     Maximum Amount. The maximum principal amount of Postpetition Debt outstanding shall not at any time exceed the Maximum DIP Amount.

(ii)     Interest. The Postpetition Debt shall bear interest at a per annum rate equal to Prime plus 3%, payable monthly, and shall

8

require immediate payment to First Midwest of a nonrefundable fee of $138,000, which are hereby found to be fair and reasonable under the circumstances.

(iii)    Maturity. The Postpetition Debt shall mature and be due and payable in full on the Termination Date, as set forth in the Postpetition Credit Agreement.

(iv)    Control Agreements. All deposit account control agreements or similar control agreements, and all collateral access agreements, in effect as of the Petition Date shall remain in full force and effect notwithstanding the entry of this Final Order and any subsequent orders amending this Final Order.

(v)    The Postpetition Debt shall be supported by personal guarantees by the Guarantors.

(b)(c)    Superpriority Administrative Expense Status; Postpetition Liens.; Priming Liens.

(i)    ────────────(i)────The Postpetition Debt is hereby granted superpriority administrative expense status under § 364(c)(1) of the Code, with priority over all costs and expenses of administration of the Cases that are incurred under any provision of the Code; and the Postpetition Debt is entitled to the protections of § 364(e) of the Code; provided, however, such superpriority expense claim shall not be satisfied from Unencumbered Assets (as defined below)..

(ii)    ────────────(ii)────In addition to the Prepetition Liens, First Midwest is hereby granted the Postpetition Liens to secure the Postpetition Debt.  Subject to subparagraph 3(c)(iii) below, the Postpetition Liens: (1) are in addition to the Prepetition Liens; (2) pursuant to §§ 364(c)(2), (c)(3) and 364(d) of the Code to the extent of the Postpetition Debt in , are liens senior in priority to all liens on the AggregatePostpetition Collateral subject; without any further action by the Debtors or First Midwest and subordinate only to Permitted Priority Liens, which Postpetition Liens (xwithout the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; (3) shall not be subject to avoidance or subordination including, without limitation, under § 510(c) of the Code; (yand (4) shall not be subject to any security interest or lien that is avoided and preserved pursuant to § 551 of the Code; and (z5) shall remain in full force and effect notwithstanding any subsequent conversion of the Cases to chapter 7 or dismissal of the Cases.

      (iii) ————————————(iii) Limitations on Postpetition Liens and Obligations.  Notwithstanding anything else in subparagraph (3)(c)(ii)  to the contrary, the Postpetition Liens are and shall be subject and subordinate to the Carveout and the Permitted Priority Liens.

      (iv)  In addition, First Midwest is hereby granted the Priming Liens to secure the Postpetition Debt.  The Priming Liens: (1) are in addition to the Prepetition Liens and the Postpetition Liens; (2) pursuant to §§ 364(c)(2), (c)(3) and 364(d) of the Code, are liens senior in priority to all liens on the Postpetition Collateral; without any further action by the Debtors or First Midwest and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; (3) shall not be subject to avoidance or subordination including, without limitation, under § 510(c) of the Code; and (4) shall not be subject to any security interest or lien that is avoided and preserved pursuant to § 551 of the Code; and (5) shall remain in full force and effect notwithstanding any subsequent conversion of the Cases to chapter 7 or dismissal of the Cases.

      (iii)(v) Notwithstanding anything in the Financing Agreement or this Second InterimFinal Order to the contrary, the Postpetition Liens and the Priming Liens shall not attach to and shall not be satisfied from assets of the Debtors' estates that were unencumbered as of the Petition Date, including but not limited to commercial tort claims and actions arising under chapter 5 of the Code (collectively, the "Unencumbered Assets").  .")

      (vi)  ————————(c)  The Debtors are authorized to and shall execute and deliver to First Midwest such postpetition loan agreements, financing statements, mortgages, instruments and other documents as First Midwest may reasonably request from time to time, and any such documents filed by First Midwest shall be deemed filed as of the Petition Date; provided, to the extent there is any conflict between such documents and this Final Order, this Final Order shall govern and control.

   (c)(d)  Prohibition againstAgainst Additional Debt.  The Debtors will not incur or seek to incur debt secured by a lien which is equal to or superior to the Prepetition Liens or, the Postpetition Liens or the Priming Liens, or which is given superpriority administrative expense status under Code § 364(c)(l), unless, in addition to the satisfaction of all requirements of§ 364 of the Code: (1) First Midwest has consented to such order; or (2) such credit or debt is

Redline proposed Final DIP Order v Second Interim Order

used to pay the Postpetition Debt and the Prepetition Debt in full, in cash, immediately upon the entry of such order.

2.4.       3.       Adequate Protection of Interests of First Midwest in the Prepetition Collateral and the Prepetition Liens.  As adequate protection for First ~~Midwest's~~ Midwest's interest in the Prepetition Collateral under §§ 361, 362, 363 or 364 of the Code from and after the Petition Date, and to induce First Midwest to provide the Postpetition Debt:

(a)       (a)       Priority of Prepetition Liens/Allowance of First ~~Midwest's~~Midwest's Claim.  Subject to the rights set forth in Paragraph 5̶6(d) of this ~~Second Interim~~Final Order: (1̶1) the Prepetition Liens shall constitute Priority Liens, subject and subordinate only to the Postpetition Liens, the Priming Liens and the Permitted Priority Liens; and (2) the Prepetition Debt shall constitute the legal, valid and binding obligation of each of the Debtors that are obligated on such Prepetition Debt by the terms of the documents governing such debt, by guarantees or otherwise, and their respective estates, enforceable in accordance with the terms of the applicable Prepetition Documents.

(b)       (b)       Replacement Liens.  To the extent of any diminution in value of First ~~Midwest's~~Midwest's interest in the Prepetition Collateral from and after the Petition Date and subject to the Carveout, First Midwest is hereby granted the Replacement Liens as security for payment of the Prepetition Debt.  The Replacement Liens: (1) are and shall be in addition to the Prepetition Liens; (2) are and shall be deemed properly perfected, valid and enforceable liens, subject and subordinate to the Postpetition Liens, the Priming Liens and the Permitted Priority Liens, without any further action by the Debtors or First Midwest and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; and (3) shall remain in full force and

Redline proposed Final DIP Order v Second Interim Order

effect notwithstanding any subsequent conversion to chapter 7 or dismissal of the Cases. Notwithstanding the foregoing, the Debtors authorized to and shall execute and deliver to First Midwest such financing statements, mortgages, instruments and other documents as First Midwest may reasonably request from time to time in respect of the Replacement Liens.

(c)     ~~(c)~~ Allowed Code § 507(b) Claim.     As additional adequate protection of the interests of First Midwest in the Prepetition Collateral, to the extent of any diminution in value of First ~~Midwest's~~Midwest's interest in the Prepetition Collateral from and after the Petition Date, and subject to the Carveout, First Midwest shall have an allowed claim under~~§~~ § 507(b) of the Code, with priority over: (1) all costs and expenses of administration of the Cases (other than First ~~Midwest's~~Midwest's claims under § 364 of the Code) that are incurred under any provision of the Code; and (2) the claims of any other party-in-interest under § 507(b) of the Code.

~~4.      Carveout.~~

(d)     ~~(~~No Surcharge.  No surcharge under Code § 506(c), enhancement of collateral provision of Code § 552 or any other legal or equitable doctrine (including, without limitation, unjust enrichment) of the Bankruptcy Code shall be imposed upon First Midwest or the Aggregate Collateral with respect to First Midwest for the benefit of any party in interest, including, without limitation, the Committee, any of the Carveout Professionals, or the Debtors for any amounts that are not set forth in the Budget; *provided, however*, that nothing in this provision shall bind any Trustee appointed in these cases under chapter 11 or chapter 7 of the Bankruptcy Code.

(e)     Right to Credit Bid.  In all events, pursuant to § 363(k) of the Code, and subject to the rights, if any, of any holder of a~~)   Carveout~~ Permitted Priority~~.~~ Lien, First Midwest shall have the right to use the Aggregate Debt or any part thereof to credit bid with

12

Redline proposed Final DIP Order v Second Interim Order

respect to any bulk or piecemeal sale of all or any portion of the Aggregate Collateral.

(f)     No Marshaling.  Neither First Midwest nor any of the Aggregate

Collateral shall be subject to the doctrine of marshaling.

5.     Effect of Termination Date.  Unless extended by the Court upon the

written agreement of First Midwest, upon the Termination Date, without further notice or order

of Court: (1) the Debtors' authorization to use Cash Collateral and incur Postpetition Debt

hereunder will automatically terminate; (2) at First Midwest's election: (i) the Postpetition Debt

shall be immediately due and payable, (ii) the Prepetition Debt shall become immediately due

and payable to the extent that it is not due and payable already, and (iii) First Midwest shall be

entitled to set off any cash in First Midwest's possession or control and apply such cash in

accordance with Paragraph 2(c) of this Final Order; and (3) First Midwest shall be entitled to

exercise all of its rights and remedies under the Prepetition Documents, the documents executed

in connection with the Postpetition Debt, and applicable law, without further order of the Court.

6.     Carveout.

(d)(a)  Carveout Priority.  Subject to the terms and conditions of this

paragraph 46, the Postpetition Liens, the Priming Liens, the DIP Superpriority Claim, the

Prepetition Liens, the Replacement Liens, and the Adequate Protection, and the Superpriority

Claims are subordinate to the Carveout.

(e)(b)    ——(b)——Carveout Scope.  The Carveout includes all fees

payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a).  The

Carveout (A) with respect to each Carveout Professional: (1) shall equal an aggregate amount not

to exceed the lesser of (i) the aggregate amount provided in the Budget for such Carveout

Professional for the period commencing on the Petition Date and ending on the Termination

13

Redline proposed Final DIP Order v Second Interim Order

Date; and (ii) the aggregate amount of accrued fees and expenses during the period commencing

on the Petition Date and ending on the Termination Date, and allowed by the Court at any time;

(2) shall be reduced dollar-for-dollar by any payments of fees and expenses to such Carveout

Professional; and (3) shall, to the extent cash is available, be paid first out of any prepetition

retainer or any proceeds of unencumbered assets; and (B) from and after the Termination Date

with respect to the Carveout Professionals, shall in the aggregate equal $75,000 for such

professionals.  Further, First Midwest shall have the right to reserve against the Maximum DIP

Amount an amount equal to the sum of the aggregate amount of unpaid fees and expenses

consistent with the Budget for the Carveout Professionals.

(f)(c)          (c)  Limitation on Use.  No portion of the Carveout and

no Postpetition Debt or Aggregate Collateral may be used to pay any fees or expenses incurred

by any entity, including the Debtors, the Committee or the Carveout Professionals, in connection

with claims or causes of action adverse to First Midwest's interests in the Aggregate Collateral,

including (1) preventing, hindering or delaying First Midwest's enforcement or realization upon

any of the Aggregate Collateral once an Event of Default has occurred; (2) using or seeking to

use Cash Collateral or incurring indebtedness in violation of the terms hereof, or selling any

Aggregate Collateral without First Midwest's consent; or (3) objecting to or contesting in any

manner, or in raising any defenses to, the validity, extent, amount, perfection, priority or

enforceability of the Aggregate Debt or any mortgages, liens or security interests with respect

thereto or any other rights or interests of First Midwest, or in asserting any claims or causes of

action, including, without limitation, any actions under chapter 5 of the Code, against First

Midwest; provided, however, that up to $15,000 of the Carveout may be used by the Committee

to investigate the validity, extent, amount, perfection, priority, or enforceability of the Prepetition

Redline proposed Final DIP Order v Second Interim Order

Debt and the Prepetition Collateral; provided, further, however, that the Carveout may be used to pay fees and expenses incurred by the Carveout Professionals in connection with the negotiation, preparation and entry of this ~~Second Interim~~Final Order or any amendment hereto consented to by First Midwest.

~~(g)~~(d)      ~~5.~~   Binding Effect of Stipulations; Challenge Period. ~~This Second Interim~~ The stipulations and admissions contained in this Final Order, exclusive of the recitals in Paragraphs D through J of this Final Order, shall be binding on all parties-in-interest, including, without limitation, ~~any~~the Committee.  Further, unless, and solely to the extent that, (a) a party in interest has timely filed an adversary proceeding challenging the amount, validity, or enforceability of the Prepetition Debt, or the perfection or priority of First ~~Midwest's~~ Midwest's liens on and security interests in the Prepetition Collateral in respect thereof, or otherwise asserting any claims or causes of action on behalf of the ~~Debtors'~~Debtors' estates against First Midwest relating to the Prepetition Debt, by no later than (x) with respect to the ~~Creditors'~~ Committee, the date that is 60 days after the date of its formation, and, with respect to any other party, the date that is 75 days from the entry of the ~~First~~ Interim Order, and (b) the Court rules in favor of such party in interest or the Committee in any such timely and properly filed adversary proceeding, then, without further order of the Court, (i) the claims, liens and security interests of First Midwest shall be deemed to be allowed for all purposes in the Cases and shall not be subject to challenge by any party in interest as to extent, validity, priority or otherwise, and (ii) the Debtors and their estates shall be deemed to have waived, released and discharged First Midwest and its officers, directors, principals, attorneys, consultants, predecessors in interest, and successors and assigns of and from any and all claims and causes of action, indebtedness, and obligations, of every type, which occurred on or prior to the date of

Redline proposed Final DIP Order v Second Interim Order

entry of ~~the First Interim~~this Final Order with respect to or in connection with the Prepetition Debt, the Prepetition Liens, the Prepetition Documents~~; provided, however, that~~ or otherwise, and (iii) the recitals in Paragraphs D through J of this Final Order shall be binding on all parties in interest, including, without limitation, the ~~waiver~~Committee.  Notwithstanding anything to the contrary herein, if any such adversary proceeding is timely commenced, the stipulations contained in ~~this paragraph 5 shall not apply  in the event of fraud, gross negligence and/or willful  misconduct.~~Paragraphs D through J hereof shall nonetheless remain binding on the Debtors except to the extent that such stipulations are expressly challenged in such adversary proceeding and the Committee prevails by a final order of this Court.  Notwithstanding the foregoing, nothing in this Final Order shall limit the right of any person claiming a Permitted Priority Lien from asserting that it has priority over First Midwest in property of the Debtors' estates after the expiration of the Challenge Period established by the second sentence in this Section 6, and all rights of a party asserting a Permitted Priority Lien to assert a priority challenge are expressly preserved.

7.    ~~6.~~    Application of Sale Proceeds. All proceeds from sales or other dispositions of all or any portion of the Aggregate Collateral that is not subject to a Permitted Priority Lien shall be remitted to First Midwest for application in accordance with Paragraph 2.  All proceeds from sales or other dispositions of all or any portion of the Aggregate Collateral that is subject to a Permitted Priority Lien shall be remitted:  first, subject to any rights of the Debtors under Code § 506(c), to holders of Permitted Priority Liens in accordance to the portion of the proceeds of sale attributable to the Aggregate Collateral that is subject to such holder's Permitted Priority Lien, for application against the claim of such holder of a Permitted Priority Lien; and, second, to the extent that any proceeds remain after the claim of such holder

16

Redline proposed Final DIP Order v Second Interim Order

of such Permitted Priority Lien has been paid in full, including with respect to any post-petition interest, fees, costs, or other charges to which such holder is entitled under Section 506(b) of the Bankruptcy Code, to First Midwest for application in accordance with Paragraph 2.

8.     Waiver of Right to Return/Consent to Setoff.  The Debtors hereby waive their rights: (a) to return any of the Aggregate Collateral pursuant to § 546(h) of the Code; (b) to consent to any order permitting any claims pursuant to § 503(b)(9) of the Code except to the extent permitted in the Budget as previously disclosed to First Midwest and the Court; and (c) to consent to setoff pursuant to § 553 of the Code or recoupment.

3.9.     Force and Effect of Prepetition Documents.  Except as modified herein and subject to the other provisions of this Second InterimFinal Order and the Code, the Prepetition Documents shall remain in full force and effect with respect to the Prepetition Debt. To the extent there exists any conflict among the terms of the Motion, the Prepetition Documents and this Second InterimFinal Order, this Second InterimFinal Order shall govern and control.

4.10.     7.     Modification of Stay.  TheSubject to Paragraph 5 of this Order, the automatic stay of § 362 of the Code is hereby modified solely with respect to First Midwest to the extent necessary to effectuate the provisions of this Order.

5.11.     8.     No Waiver.  First Midwest shall not be deemed to have suspended or waived any of their rights or remedies under this Second Interim Final Order, the Prepetition Documents, the Code, or applicable nonbankruptcy law unless such suspension or waiver is in writing, signed by a duly authorized officer of First Midwest, as applicable, and directed to the Debtors.  No failure of First Midwest to require strict performance by the Debtors, or by any chapter 7 trustee appointed or elected in the CasesTrustee of any provision of this Second InterimFinal Order shall waive, affect or diminish any right of First Midwest thereafter

Redline proposed Final DIP Order v Second Interim Order

to demand strict compliance and performance therewith, and no delay on the part of First Midwest in the exercise of any right or remedy under this ~~Second Interim~~Final Order, the Prepetition Documents, the Code, or applicable nonbankruptcy law shall preclude the exercise of any right or remedy.  Further, this ~~Second Interim~~ Final Order shall not constitute a waiver by First Midwest of any of its rights under the Prepetition Documents, the Code or applicable nonbankruptcy law, including, without limitation~~,~~ its right to later assert~~:(~~: (1) that its interests in the Aggregate Collateral lack adequate protection within the meaning of §§ 362(d) or 363(e) of the Code or any other provision thereof; or (2) a claim under § 507(b) of the Code.

~~6.~~12.    ~~9.~~    Amendments.  The Debtors and First Midwest may enter into amendments or modifications of the Budget and the Maximum DIP Amount without further notice and hearing or order of this Court; provided, that (a) such modifications or amendments do not materially and adversely affect the rights of any creditor or other party-in~~-~~interest, (b) the Committee consents to such modification, and (c) notice of any such amendment or modification is filed with this Court~~; and (c) the Committee consents to such modification.~~.

~~10.    The Debtors agree that no charge under Section 506(c) of the Code shall be sought for the Debtors' Carveout Professionals against First Midwest, without written consent of First Midwest, for any amounts that are not set forth in the Budget. Nothing in this provision shall bind the Committee or any Trustee appointed in these cases under chapter 11 or chapter 7 of the Bankruptcy Code.~~

~~7.~~13.    ~~11.~~    Reporting.  In addition to all reporting requirements under the Prepetition Documents, the Debtors shall timely provide First Midwest with reports on no less than a weekly basis detailing the ~~Debtors'~~Debtors' compliance with the Budget and any changes in its projections including, but not limited to, cash inflows and outflows, weekly borrowing base certificates, accounts receivable aging, accounts payable aging, weekly actual cash flow versus projections, and shall otherwise reasonably cooperate with First Midwest regarding the Budget and the administration of its assets.

18

Redline proposed Final DIP Order v Second Interim Order

8.14.        12.    Binding Effect.  Except as provided in Paragraph 56 herein, this Second InterimFinal Order shall be binding on all parties in interest in the Cases and their respective successors and assigns, but notincluding any chapter 7 trustee who may be appointed in these cases in the future.Trustee.  If, in accordance with § 364(e) of the Code, this Second InterimFinal Order does not become a final nonappealable order, or if any of the provisions of thethis Final Order are hereafter modified, amended, vacated or stayed by subsequent order of this Court or any other court, such termination or subsequent order shall not affect: (a) subject to Paragraph 56 of this Second InterimFinal Order, the stipulations, representations, and findings contained in this Second InterimFinal Order and the relief granted by and the releases contained in this Second InterimFinal Order (including, without limitation, Paragraphs 2(ed), 3(d) and 56); and (b) the priority, validity, enforceability or effectiveness of any lien, security interest or other benefit or claim authorized hereby with respect to Cash Collateral used or Postpetition Debt incurred prior to the effective date of such termination or subsequent order. All such liens, security interests, claims and other benefits shall be governed in all respects by the original provisions of this Second InterimFinal Order, and First Midwest shall be entitled to all the rights, remedies, privileges and benefits granted hereto, including the liens and priorities granted herein, with respect to the Postpetition Debt.  Except as otherwise explicitly set forth in this Second InterimFinal Order, no third party is intended to be, or shall be deemed to be, a third-party beneficiary of this Second InterimFinal Order.

9.15.        13.    Survival.  The provisions of this Second InterimFinal Order, and any actions taken pursuant to or in reliance upon the terms hereof, shall survive entry of, and govern in the event of any conflict with, any order which may be entered in the Cases: (a) confirming any chapter 11 plan, (b) converting the Cases to cases under chapter 7 of the Code,

(c) dismissing the ~~Case,~~ Cases,

(d) withdrawing of the reference of the Cases from this Court, or (e) providing for abstention

from handling or retaining of jurisdiction of the Cases in this Court.  The terms and provisions of

this ~~Second Interim~~Final Order, including, without limitation, the rights granted First Midwest

under §§ 364(c) and (d) of the Code, shall continue in full force and effect until all of the

Aggregate Debt is indefeasibly paid in full in cash and discharged.

~~14.     Definitions.  Unless otherwise indicated, all capitalized terms used as defined terms herein  have the meanings ascribed thereto in Exhibit A attached hereto and by this reference are made a  part hereof.~~

~~15.     Final Hearing.  The hearing on entry of the Final Order is continued from June  7, 2017, to June 21, 2017, at 11:00 a.m. (Central Time), and may be continued from time to time without further notice other than that given in open court.~~

~~16.     Objections.  The deadline for objections or responses to the proposed Final Order shall be June 14, 2017, 2017 at 5:00 p.m. (Central Time) and served on the following parties:~~

~~(i) the Debtors, Attn: Linda Spadafino, 915 Rowell Ave., Joliet, IL  60433 ();~~

~~(ii) counsel to the Debtors, Jonathan Friedland, Sugar Felsenthal Grais & Hammer, LLP, 30 N. LaSalle St., Suite 3000, Chicago, IL 60602 ();~~

~~(iii) the Office of the United States Trustee for the Northern District of Illinois, 219 S. Dearborn St., Room 873, Chicago, IL 60604 ();~~

~~(iv) proposed counsel to the Committee, Bennett S. Silverberg, Brown Rudnick LLP, Seven Times Square, New York, NY 10036  (bsilverberg@brownrudnick.com);~~

~~(v) counsel to First Midwest, Mark Prager, Foley & Lardner LLP, 321 North Clark St., Ste. 2800, Chicago, IL 60606; and~~

~~(vi) any party that has requested notice pursuant to Bankruptcy Rule 2002. Any timely and properly served objection shall be heard at the Final Hearing.~~

~~17.     Notice of Final Hearing.  Upon entry of this Second Interim Order, the Debtors are directed to promptly docket and serve a notice of rehearing and a copy of this Order by first class mail, postage prepaid, on counsel for First Midwest, the Debtors' other secured creditors, the Debtors' thirty (30) largest unsecured creditors, and the United States Trustee, which service shall constitute adequate and proper notice of the Final Hearing.~~

Dated: _____, 2017
Chicago, Illinois                              UNITED STATES BANKRUPTCY JUDGE

# Exhibit 4

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Chellino Crane, Inc., et al., | ) | Case No. 17-14200 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Hon. Carol A. Doyle |

**SUPPLEMENTAL DECLARATION OF A. JEFFREY ZAPPONE**

I, A. Jeffrey Zappone, do hereby declare under penalty of perjury, that:

1. I am the same Jeffrey Zappone who submitted a declaration in these proceeding in support of Chapter 11 petitions and first day motions on May 5, 2017 (Docket No. 7).

2. I reaffirm the statements I made under oath in my initial declaration and give this supplemental declaration in support of that Final Order authorizing the Debtors to: (A) Use Cash Collateral, (B) Incur Post-petition Debts and (C) Grant Adequate Protection and Provide Security and Other Relief to First Midwest Bank (the "Final DIP Order").

3. The Final DIP Order makes certain changes from the draft which was attached to and made a part of the Debtors Emergency Motion for Interim and Final Orders Authorizing the Debtors to: (A) Use Cash Collateral; (B) Incur Post-Petition Debts; and (C) Grant Adequate Protection and Provide Security and Other Relief to First Midwest Bank filed in these proceedings on May 5, 2017. (Docket No. 11) (the "Initial DIP Motion"). As this Court is aware, the Court entered Interim Orders on May 10, 2017 and on June 9, 2017 allowing the Debtors under certain terms and conditions, to utilize cash collateral and continued a final hearing on the Final DIP Order to June 21, 2017.

4. Many of the original features of the Final DIP Order remain unchanged.  The budget for the next thirteen weeks has changed somewhat.  Assuming this Court approves the Final DIP Order it is currently projected that First Midwest Bank ("FMB") will advance approximately $1.45 M in post-petition debt over a thirteen week period.

5. It is no longer proposed that FMB "roll up" any amount of its pre-petition debt.  See Final DIP Order ¶3(a).

6. However, it is now proposed that a limited priming lien be granted to FMB pursuant to Section 364(d) of the Bankruptcy Code, with priority over all other liens, including purchase money security interest liens of equipment lenders ("PMSI liens"), but based solely on any increase in value in accounts receivable post-petition and limited solely to the amount of any such increase in value in accounts receivable generated post-petition.  See Final DIP Order, ¶3(c)(iv) and Definitions 32 and 33.

7. It is my conclusion, based on my experience with these Debtors, that extension of the proposed final DIP loans will permit the funding of operating expenses for these Debtors, including the expenses applicable to collateral held by PMSI lenders, i.e., maintenance charges for equipment, insurance for equipment and overhead associated with maintaining the value of equipment which provides collateral for the PMSI lenders.

8. Without the proposed Final DIP Order and its advances, there will not be sufficient funds available to continue the operations of the Debtors, maximize the value of all collateral and preserve the value of the PMSI collateral.

9. It is my projection that the additional funds lent by FMB over the next thirteen weeks, pursuant to the budget and the Final DIP Order will generate an increase in post-petition accounts in the approximate amount of $2 M.  Any priming lien granted FMB under the final

2

order will be limited to this amount. To the extent post-petition accounts do not increase from the level at which existed pre-petition, no such priming lien will be granted FMB.

10. This limited priming lien under the terms of Section 364(d) will adequately protect the interest of PMSI lenders (since by definition it will only be imposed upon an increase in value of account receivable post petition) while also permitting the Debtors to continue their operations and maximize the value of collateral for all constituents.

11. I believe that the Final DIP Order as currently structured is in the best interest of the Debtors and all of its creditors and other constituents. Based on my work for the Debtors, despite real efforts to identify alternative DIP lenders to FMB, only FMB has emerged to date as a viable DIP lender. While FMB has now agreed to forego any roll up of its pre-petition debt, it has very clearly told the Debtors it will not make the post-petition loans without the limited priming lien that has been provided for in the Final DIP Order.

12. In conclusion, for the reasons stated herein, and in my original declaration, I respectfully request that the Court enter the Final DIP Order in the form it has been tendered.

I certify under penalty of perjury that, based on my knowledge, information and belief, as set forth in this declaration, the foregoing is true and correct.


Dated: _6/16_____, 2017

A. Jeffrey Zappone
Conway MacKenzie, Inc.
Senior Managing Director

4839-3778-4906.1

# Exhibit 5

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Chellino Crane, Inc., et al., | ) | Case No. 17-14200 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Hon. Carol A. Doyle |

## DECLARATION OF MARY BROWN

I, Mary Brown, hereby declare under penalty of perjury:

1. I am a Vice President of First Midwest Bank ("FMB") and I make this declaration in support of the Final Order authorizing the Debtors in these cases to (A) use cash collateral, (B) incur post-petition debt to be funded by FMB and (C) provide security and other relief to FMB (the "Final DIP Order").

2. I have been with FMB for approximately two years. In connection with my work at the Bank I am an officer in charge of distressed or non-performing assets including the loans made to the various Debtors in this case. Prior to becoming a Vice President at FMB I worked in the restructuring business for a consulting firm located in Chicago called High Ridge Partners, on a variety of other restructuring and receivership matters.

3. FMB merged with Standard Bank and Trust("Standard Bank") in January of 2017. Through that merger FMB acquired certain loans including a number of loans made by Standard Bank to the Debtors in these cases. I am the officer responsible for overseeing these loans. The loans consist of a pre-petition revolving line of credit, four separate equipment loans, a first mortgage on property located at 915 Rowell Ave., Joliet, IL (Debtors' Business location) and a loan made by First Midwest Equipment Finance Company to G&B Equipment LLC. As

security for these loans FMB has a blanket lien on all assets of Chellino Crane, Inc. and Sam J. Chellino Crane Rental, Inc. It has specific liens on certain pieces of equipment and has a first mortgage lien on the Debtors' headquarters property. The liens of FMB are subject only to previously filed and perfected purchase money security interest ("PMSI") liens on specific pieces of equipment by certain other equipment lenders. FMB is not yet certain how many of such liens have been properly perfected, or whether such liens extend beyond the equipment securing them to any proceeds. Those issues are currently under review but have not yet been resolved.

4. The total balance on all the FMB loans as of petition date was approximately $14.4M. On that date the Debtors were in default under their pre-petition loan documents by reason of their failure to remit monthly payments starting in October, 2016. Prior to the petition date FMB took certain steps to collect on its collateral by commencing mortgage foreclosure and replevin actions. FMB also became aware of three or four other replevin type lawsuits which were filed against the Debtors by other equipment lenders.

5. I am aware that prior to the filing of the petition, the Debtors engaged in discussions with a lender with the goal of purchasing all of FMB's loans. After a considerable amount of discussion and negotiation that deal fell through in late 2016. I am also aware that in early 2017 the Debtors received a commitment letter from a strategic lender called White Oak for purposes of retiring the existing secured lenders' aggregate debt at a value equal to the net forced liquidation value of the collateral. However, funding under that commitment was contingent upon 90% of the Debtors' secured lenders accepting the terms, and, while FMB accepted the terms, the Debtors were unable to meet the 90% threshold so that deal also fell through.

2

6. Shortly after the financing with White Oak fell through, in mid-April of 2017, the Debtors' advisor, Jeffrey Zappone at Conway MacKenzie, Inc., reached out to FMB to determine its level of interest and willingness to participate in funding the needs of the Debtors through their pre and post filing period.

7. At first FMB was uninterested in making any sort of DIP loan to the Debtors. However, Mr. Zappone convinced the Bank that the value of Debtors from a going concern sale or series of sales exceeded the liquidation value of FMB's collateral.

8. Ultimately there were a series of negotiations between FMB and the Debtors, primarily through their advisors, which led to a proposal incorporated in that Emergency Motion for (A) Interim and Final Orders Authorizing the Debtors to Use Cash Collateral, (B) Incur Post-petition Debt and (C) Grant Adequate Protection and Provide Security and Other Relief to FMB which was filed in this case on May 5, 2017. (Docket No. 11) (the "Initial DIP Motion"). I was involved in the negotiation process which led to the terms of the initial proposed DIP order attached to the Initial DIP Motion. I also participated in the process of seeking appropriate approvals for such debtor in possession loan. In order for FMB to convince its loan committee to approve the post-petition financing for the Debtors and provide them with sufficient working capital to operate during the bankruptcy, at the outset the Bank conditioned any such financing on a roll up of the revolving line of credit, as described in the Initial DIP Motion. Two interim orders have been entered without that feature, due to objections by some of the parties in interest.

9. I have reviewed and am familiar with the draft Final Order which has been tendered to the Court. FMB is willing to proceed with financing based upon a post-petition credit agreement, on the terms set forth in the Final DIP Order. The Final DIP Order and the

3

4822-3968-1610.1

related credit agreement will not provide any roll up as was previously proposed in Paragraph

3(a) of the original proposed Final DIP Order.

10. Instead, FMB has agreed to proceed with DIP financing, providing approximately $1.450M

in post-petition financing over the next thirteen weeks, without any roll up of its pre-petition

debt. Those funds will be disbursed in accordance with the budget which is attached to the

Final DIP Order and made part of that order and which has been provided to the Court.

11. In return for dropping any roll up, FMB has agreed to make the DIP loan with an extremely

limited priming lien under Section 364(d) of the Code, over all others' interests, including the

interests of any PMSI equipment lenders, but with such priming lien limited solely to any

increase in value of accounts receivable post-petition, and which will have been made

possible by FMB's DIP loan. In other words, we seek to prime other PMSI equipment

lenders only with respect to post-petition DIP funds advanced, only to the extent of accounts

receivable, and only to the extent of any increase post-petition in the value of accounts

receivable. FMB will not receive a priming lien to the extent the value of accounts

receivable do not increase post-petition.

12. FMB is willing to allow the use of its cash collateral and extend the additional post-petition

DIP financing but only based upon the terms of the proposed Final DIP Order. Should the

Court refuse to permit the limited priming feature which FMB has negotiated, in lieu of any

roll up, FMB is not prepared to advance the additional funding.

13. FMB believes that its post-petition funding under the Final DIP Order will allow these

Debtors to improve their financial position and generate additional receivables. In the

process, FMB's DIP lending will pay the expenses, including maintenance and insurance on

all of the Debtors' equipment, including the equipment alleged to be the subject of the PMSI

4822-3968-1610.1

liens which may be prior to First Midwest's liens on particular pieces of equipment. Without these post-petition loans, FMB believes these Debtors could not survive based on existing receivables. A liquidation would result. No other lender has stepped up and taken the risk of this DIP loan.

14. FMB believes that it has not been oppressive, nor has it tried to unreasonably prejudice the rights of any other constituents in this case. FMB has proposed to provide a DIP loan that will provide support to the company and its employees, that will not "roll up" any of its pre-petition indebtedness, but will only provide it with the specified limited priming liens over the liens of existing PMSI lenders.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: _JUNE 16_, 2017       _Mary Brown_
                                   Mary Brown

5