**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CHELLINO CRANE, INC., *et al.*[1] | § | Case No. 17-14200 (CAD) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**FINAL ORDER AUTHORIZING THE DEBTORS TO: (A) USE CASH COLLATERAL;
(B) INCUR POSTPETITION DEBT; AND (C) GRANT ADEQUATE PROTECTION
AND PROVIDE SECURITY AND OTHER RELIEF TO FIRST MIDWEST BANK**

This matter came before this Court on the motion (the "Motion") of the above-captioned debtors and debtors in possession  (collectively, the "Debtors") requesting that this Court enter an interim order, and later after notice and a hearing, a final order (this "Final Order"), authorizing the Debtors to: (a) use Cash Collateral; (b) incur Postpetition Debt, pursuant to the terms of the Postpetition Loan Documents; and (c) grant adequate protection and provide security and other relief to First Midwest Bank ("First Midwest").  Unless otherwise indicated, all capitalized terms used as defined terms herein have the meanings ascribed in **Exhibit 1** attached hereto and by this reference are made a part hereof.

This Final Order shall constitute findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052 and shall take effect and be fully enforceable as of the Petition Date, and shall supersede the Court's prior orders granting the Motion on an interim basis (Dkts. 84 & 205).

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Chellino Crane, Inc. (6804); Sam J. Chellino Crane Rental, Inc. (0830); G & B Equipment, LLC (0688); Chellino/Industrial Park Family Limited Partnership (1246); and Chellino Industrial Management, Inc. (0691).  The address for all of the Debtors is 915 Rowell Avenue, Joliet, Illinois 60433 (the "Real Property").

Having examined the Motion, being fully advised of the relevant facts and circumstances surrounding the Motion, having entered the *Order Granting the Debtors to: (A) Use Cash Collateral on an Interim Basis Pending a Final Hearing; (B) Incur Postpetition Debt on an Interim Basis Pending a Final Hearing; and (C) Grant Adequate Protection and Provide Security and other Relief to First Midwest Bank* on May 10, 2017 (Dkt. 84) (the "Interim Order"); and, the Court having set an initial date for hearing on entry of the Final Order of June 1, 2017 ("Final Hearing"); and, the Court having entered the *Second Interim Order Authorizing the Debtors to (A) Use Cash Collateral; (B) Incur Postpetition Debt; and (C) Grant Adequate Protection and Provide Security and Other Relief to First Midwest Bank* on June 9, 2017 (dkt 205), which order set the date for a Final Hearing on June 21, 2017; and, having held the Final Hearing on June 21, 2017, pursuant to §§ 363 and 364 of the Code and Fed. R. Bankr. P. 4001(b) and (c); and, objections, if any, having been withdrawn, resolved or overruled by the Court, **THE MOTION IS GRANTED AS SET FORTH BELOW, AND, SUBJECT TO THE RIGHTS SET FORTH IN PARAGRAPH 6(d) BELOW, THE DEBTORS HEREBY ADMIT, STIPULATE AND AGREE THAT:**

A.      On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Code. The Debtors have retained possession of their property and continue to have the rights, powers and duties of debtors-in-possession pursuant to §§ 1107 and 1108 of the Code.

B.      The Court has jurisdiction over the Cases and this proceeding pursuant to 28 U.S.C. § 1334. Determination of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue over this Motion is proper under 28 U.S.C. § 1409(a).

2

C.      On  May 16, 2017, the Office of the United States Trustee (the "UST") appointed the members of the Official Committee of Unsecured Creditors (the "Committee") in these Cases.  On May 17, 2017, the UST filed the *Notice of Appointment of Official Unsecured Creditor's Committee* (Dkt. 113).

D.      The Prepetition Documents evidence and govern the Prepetition Debt, the Prepetition Liens and the prepetition financing relationship between the Debtors and First Midwest.

E.      The Prepetition Debt constitutes the legal, valid and binding obligation of the Debtors, enforceable in accordance with the terms of the Prepetition Documents (other than in respect of the stay of enforcement arising from section 362 of the Code).

F.      As of the Petition Date, the Debtors are liable for payment of the Prepetition Debt, and the Debtors stipulate that the Prepetition Debt is valid, enforceable and unavoidable in an amount not less than $14,442,239.84.

G.      The Debtors do not possess and will not assert any offsets, defenses or counterclaims to the Prepetition Debt, and no portion of the Prepetition Debt is subject to contest, objection, recoupment, defense, counterclaim, offset, avoidance, recharacterization, subordination or other claim, cause of action or challenge of any nature under the Code, under applicable non-bankruptcy law or otherwise by the Debtors, except as set forth herein.

H.      The Prepetition Liens are Priority Liens, subject and subordinate only to the Carveout and Permitted Priority Liens, if any, and the Prepetition Liens secure payment of all of the Prepetition Debt.

I.

J.      Subject solely to the rights set forth in Paragraph 6(d) of this Final Order, the Debtors do not have, and hereby release, any claims, counterclaims, causes of action, defenses or setoff rights relating to the Prepetition Documents, the Prepetition Liens, the Prepetition Debt or otherwise, against First Midwest and its affiliates, subsidiaries, agents, officers, directors, employees, advisors, consultants, predecessors in interest, successors and assigns.

K.      First Midwest has consented to the terms of this Final Order and is entitled to the adequate protection as set forth herein pursuant to §§ 361, 362, 363 and 364 of the Code to the extent of any diminution in the value of its interests in the Prepetition Collateral from and after the Petition Date.

L.      Debtors agree that by reason of taking any actions pursuant to this Final Order, First Midwest is not in control of the operations, management or liquidation of the Debtors or their assets.

M.      The Debtors have an immediate need to use Cash Collateral and incur Postpetition Debt as provided herein, in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs. The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the Debtors as a going concern and enterprise value.

N.      The Debtors are unable to obtain unsecured credit allowable under § 503(b)(1) of the Code sufficient to finance the administration of their estates. Except as provided below, the

Debtors are unable to obtain credit allowable under §§ 364(c)(1), (c)(2) or (c)(3) of the Code on terms more favorable than those offered by First Midwest.

O.   The terms of the Postpetition Debt have been negotiated at arm's length, and the Postpetition Debt is being extended in good faith, as that term is used in § 364(e) of the Code.

P.   The terms and conditions of the Postpetition Debt and the liens and claims granted herein are fair and reasonable, the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.

Q.   The notice provided by the Debtors of the Motion, the entry of the Interim Order, the entry of the Second Interim Order, and the Final Hearing satisfy the requirements of Fed. R. Bankr. P. 2002, 4001(b) and (c) and 9014 and §§ 102(1), 363, 364(c) and (d) of the Code and were otherwise sufficient and appropriate under the circumstances.

R.   Nothing herein constitutes a finding by the Court or an admission by the Debtors that any prepetition lenders, other than First Midwest (subject to the Challenge Period set in paragraph 6 hereof), has a valid, perfected, or otherwise enforceable security interest in any Aggregate Collateral.

**WHEREFORE, IT IS HEREBY ORDERED THAT THE MOTION IS GRANTED AS SET FORTH HEREIN, AND THAT:**

1.   <u>Authorization to Use Cash Collateral</u>.  The Debtors are authorized to use Cash Collateral in accordance and as limited by the Budget (as attached hereto as **Exhibit 2**), subject to the Permitted Variance, and otherwise in accordance with and pursuant to the terms and provisions of this Final Order, including Paragraph 2(d) hereof.  So long as any Prepetition

Debt or Postpetition Debt remains outstanding, the Debtors may not use Cash Collateral other than pursuant to the terms of this Final Order. Notwithstanding any other provision of this Order to the contrary, the Debtors are not authorized to use Third Party Proceeds and no claims shall be paid with Third Party Proceeds other than as set forth in paragraph 7 below or otherwise ordered by this Court.

2.  Procedure for Use of Cash Collateral.

(a)  Delivery of Cash Collateral to First Midwest. The Debtors shall deposit all Cash Collateral now or hereafter in its possession or control into the FMB Account (or otherwise deliver such Cash Collateral to First Midwest in a manner approved in writing by First Midwest) promptly upon receipt thereof.

(b)  Cash Collateral in First Midwest's Possession. First Midwest is authorized to collect upon, convert to cash and enforce checks, drafts, instruments and other forms of payment now or hereafter coming into its possession or control which constitute Aggregate Collateral or proceeds thereof; provided that First Midwest shall segregate and hold separate and in trust any and all Cash Collateral that constitutes Third Party Proceeds.

(c)  Application of Cash Collateral Upon the Termination Date. Upon the Termination Date, except as set forth in Section 2(e), First Midwest is authorized to apply all Cash Collateral other than the Third Party Proceeds now or hereafter in First Midwest's possession or control as follows: (1) first, to payment of Postpetition Debt, and (2) second, after all Postpetition Debt has been paid in full and subject to the rights, if any, of holders of Permitted Priority Liens, to Prepetition Debt.

(d)  Prohibition Against Use of Cash Collateral. Except as provided for in this Final Order, Debtors will not use Cash Collateral unless, in addition to the satisfaction

of all requirements of § 363 of the Code: (1) First Midwest has consented to an order authorizing such use; (2) at the time such an order is entered, the Postpetition Debt has been indefeasibly paid in full, in cash; or (3) this Court orders otherwise. The Debtors are not authorized to use Third Party Proceeds and no claims shall be paid with Third Party Proceeds other than as set forth in paragraph 7 below or as otherwise ordered by this Court.

      (e)     <u>Permitted Priority Liens</u>.  Subject to the rights of First Midwest with respect to Priming Liens set forth in Section 3(c)(iv) herein, the right of First Midwest to receive and apply Cash Collateral shall be subject and subordinate to any Permitted Priority Liens.

      3.     <u>Authorization to Incur Postpetition Debt</u>.

      (a)     <u>Permitted Uses of Postpetition Debt</u>.  The Debtors are authorized and have agreed to incur Postpetition Debt, in accordance with the terms and provisions of this Final Order and the Postpetition Loan Documents which Postpetition Debt shall be used for all purposes permitted under the Postpetition Credit Agreement, including, without limitation, those expenses enumerated in the Budget, including the Carveout, as and when such expenses become due and payable, subject to the Permitted Variance.

      (b)     <u>Additional Terms of Postpetition Debt</u>.

      (i)     <u>Maximum Amount</u>.  The maximum principal amount of Postpetition Debt outstanding shall not at any time exceed the Maximum DIP Amount.

      (ii)     <u>Interest</u>. The Postpetition Debt shall bear interest at a per annum rate equal to Prime plus 3%, payable monthly, and shall require immediate payment to First Midwest of a nonrefundable fee of $138,000, which are hereby found to be fair and reasonable under the circumstances.

7

        (iii)   <u>Maturity</u>. The Postpetition Debt shall mature and be due and payable in full on the Termination Date, as set forth in the Postpetition Credit Agreement.

        (iv)   <u>Control Agreements</u>. All deposit account control agreements or similar control agreements, and all collateral access agreements, in effect as of the Petition Date shall remain in full force and effect notwithstanding the entry of this Final Order and any subsequent orders amending this Final Order.

        (v)   The Postpetition Debt shall be supported by personal guarantees by the Guarantors.

(c)   <u>Superpriority Administrative Expense Status; Postpetition Liens; Priming Liens</u>.

        (i)   The Postpetition Debt is hereby granted superpriority administrative expense status under § 364(c)(1) of the Code, with priority over all costs and expenses of administration of the Cases that are incurred under any provision of the Code; and the Postpetition Debt is entitled to the protections of § 364(e) of the Code.

        (ii)   In addition, First Midwest is hereby granted the Postpetition Liens to secure the Postpetition Debt.  Subject to subparagraph 3(c)(iii) below, the Postpetition Liens: (1) are in addition to the Prepetition Liens; (2) pursuant to §§ 364(c)(2), (c)(3) and 364(d) of the Code, are liens senior in priority to all liens on the Postpetition Collateral other than the Permitted Priority Liens and the junior mortgage lien claimed by SuperG Funding on 915 Rowell Ave., Joliet, Illinois 60433; without any further action by the Debtors or First Midwest and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; (3) shall not be subject to avoidance or subordination including, without limitation, under § 510(c) of the Code; and (4) shall not be subject to any security interest or lien that is avoided and preserved pursuant to § 551 of the Code; and (5) shall remain in full force and effect notwithstanding any subsequent conversion of the Cases to chapter 7 or dismissal of the Cases.

        (iii)   Notwithstanding anything else in this Order to the contrary, the Postpetition Liens are and shall be subject and subordinate to the Carveout and the Permitted Priority Liens.

        (iv)   In addition, First Midwest is hereby granted the Priming Liens in the Primed Collateral to secure the Postpetition Debt. The Priming Liens in the Primed Collateral: (1) are in addition to the Prepetition Liens and the Postpetition Liens; (2) pursuant to

8

§§ 364(c)(2), (c)(3) and 364(d) of the Code, are liens senior in priority to all liens on the Primed Collateral; without any further action by the Debtors or First Midwest and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; (3) shall not be subject to avoidance or subordination including, without limitation, under § 510(c) of the Code; and (4) shall not be subject to any security interest or lien that is avoided and preserved pursuant to § 551 of the Code; and (5) shall remain in full force and effect notwithstanding any subsequent conversion of the Cases to chapter 7 or dismissal of the Cases.

(v)   Notwithstanding anything in the Financing Agreement or this Final Order to the contrary, the Postpetition Liens and the Priming Liens shall not attach to and shall not be satisfied from assets of the Debtors' estates that were unencumbered as of the Petition Date, including but not limited to commercial tort claims and actions arising under chapter 5 of the Code (collectively, the "Unencumbered Assets")

(vi)   The Debtors are authorized to and shall execute and deliver to First Midwest such postpetition loan agreements, financing statements, mortgages, instruments and other documents as First Midwest may reasonably request from time to time, and any such documents filed by First Midwest shall be deemed filed as of the Petition Date; provided, to the extent there is any conflict between such documents and this Final Order, this Final Order shall govern and control.

(d)   Prohibition Against Additional Debt.  The Debtors will not incur or seek to incur debt secured by a lien which is equal to or superior to the Prepetition Liens, the Postpetition Liens or the Priming Liens, or which is given superpriority administrative expense status under Code § 364(c)(l), unless, in addition to the satisfaction of all requirements of§ 364 of the Code: (1) First Midwest has consented to such order; or (2) such credit or debt is used to pay the Postpetition Debt and the Prepetition Debt in full, in cash, immediately upon the entry of such order.

4.   Adequate Protection of Interests of First Midwest in the Prepetition Collateral and the Prepetition Liens.  As adequate protection for First Midwest's interest in the

Prepetition Collateral under §§ 361, 362, 363 or 364 of the Code from and after the Petition Date, and to induce First Midwest to provide the Postpetition Debt:

        (a)     <u>Priority of Prepetition Liens/Allowance of First Midwest's Claim</u>. Subject to the rights set forth in Paragraph 6(d) of this Final Order: (1) the Prepetition Liens shall constitute Priority Liens, subject and subordinate only to the Postpetition Liens, the Priming Liens and the Permitted Priority Liens; and (2) the Prepetition Debt shall constitute the legal, valid and binding obligation of each of the Debtors that are obligated on such Prepetition Debt by the terms of the documents governing such debt, by guarantees or otherwise, and their respective estates, enforceable in accordance with the terms of the applicable Prepetition Documents.

        (b)     <u>Replacement Liens</u>.  To the extent of any diminution in value of First Midwest's interest in the Prepetition Collateral from and after the Petition Date and subject to the Carveout, First Midwest is hereby granted the Replacement Liens as security for payment of the Prepetition Debt.  The Replacement Liens: (1) are and shall be in addition to the Prepetition Liens; (2) are and shall be deemed properly perfected, valid and enforceable liens; (3) are and shall be subject and subordinate to the Postpetition Liens, the Priming Liens and the Permitted Priority Liens, without any further action by the Debtors or First Midwest and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; and (4) shall remain in full force and effect notwithstanding any subsequent conversion to chapter 7 or dismissal of the Cases. Notwithstanding the foregoing, the Debtors authorized to and shall execute and deliver to First Midwest such financing statements, mortgages, instruments and other documents as First Midwest may reasonably request from time to time in respect of the Replacement Liens.

(c)    <u>Allowed Code § 507(b) Claim</u>. As additional adequate protection of the interests of First Midwest in the Prepetition Collateral, to the extent of any diminution in value of First Midwest's interest in the Prepetition Collateral from and after the Petition Date, and subject to the Carveout, First Midwest shall have an allowed claim under § 507(b) of the Code, with priority over: (1) all costs and expenses of administration of the Cases (other than First Midwest's claims under § 364 of the Code) that are incurred under any provision of the Code; and (2) the claims of any other party-in-interest under § 507(b) of the Code.

(d)    <u>No Surcharge</u>. No surcharge under Code § 506(c), enhancement of collateral provision of Code § 552 or any other legal or equitable doctrine (including, without limitation, unjust enrichment) of the Bankruptcy Code shall be imposed upon First Midwest or First Midwest's interest in Aggregate Collateral for the benefit of any party in interest, including, without limitation, the Committee, any of the Carveout Professionals, or the Debtors for any amounts that are not set forth in the Budget; *provided, however*, that nothing in this provision shall bind any Trustee appointed in these cases under chapter 11 or chapter 7 of the Bankruptcy Code.

(e)    <u>Right to Credit Bid</u>. In all events, pursuant to § 363(k) of the Code, and subject to the rights, if any, of any holder of a Permitted Priority Lien, First Midwest shall have the right to use the Aggregate Debt or any part thereof to credit bid with respect to any bulk or piecemeal sale of all or any portion of the Aggregate Collateral.

(f)    <u>No Marshaling</u>. Neither First Midwest nor any of the Aggregate Collateral shall be subject to the doctrine of marshaling.

5.    <u>Effect of Termination Date</u>. Unless extended by the Court upon the written agreement of First Midwest, upon the Termination Date, without further notice or order

of Court: (1) the Debtors' authorization to use Cash Collateral and incur Postpetition Debt hereunder will automatically terminate; (2) at First Midwest's election: (i) the Postpetition Debt shall be immediately due and payable, (ii) the Prepetition Debt shall become immediately due and payable to the extent that it is not due and payable already, and (iii) First Midwest shall be entitled to set off any cash in First Midwest's possession or control and apply such cash in accordance with Paragraph 2(c) of this Final Order; and (3) First Midwest shall be entitled to exercise all of its rights and remedies under the Prepetition Documents, the documents executed in connection with the Postpetition Debt, and applicable law. Notwithstanding the foregoing, First Midwest shall not exercise any remedies against Third Party Proceeds or tangible personal property subject to a Permitted Priority Lien without seeking further relief of automatic stay which may be requested on an expedited basis upon 7 days' notice to all parties in interest.

6.    Carveout.

(a)    Carveout Priority. Subject to the terms and conditions of this paragraph 6, the Postpetition Liens, the Priming Liens, the DIP Superpriority Claim, the Prepetition Liens, the Replacement Liens, and the Adequate Protection Superpriority Claims are subordinate to the Carveout.

(b)    Carveout Scope. The Carveout includes all fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a). The Carveout (A) with respect to each Carveout Professional: (1) shall equal an aggregate amount not to exceed the lesser of (i) the aggregate amount provided in the Budget for such Carveout Professional for the period commencing on the Petition Date and ending on the Termination Date; and (ii) the aggregate amount of accrued fees and expenses during the period commencing on the Petition Date and ending on the Termination Date, and allowed by the Court at any time; (2) shall be

reduced dollar-for-dollar by any payments of fees and expenses to such Carveout Professional;
and (3) shall, to the extent cash is available, be paid first out of any prepetition retainer or any
proceeds of unencumbered assets; and (B) from and after the Termination Date with respect to
the Carveout Professionals, shall in the aggregate equal $75,000 for such professionals.  Further,
First Midwest shall have the right to reserve against the Maximum DIP Amount an amount equal
to the sum of the aggregate amount of unpaid fees and expenses consistent with the Budget for
the Carveout Professionals.

        (c)    <u>Limitation on Use</u>.  No portion of the Carveout and no Postpetition
Debt or Aggregate Collateral may be used to pay any fees or expenses incurred by any entity,
including the Debtors, the Committee or the Carveout Professionals, in connection with claims
or causes of action adverse to First Midwest's interests in the Aggregate Collateral, including (1)
preventing, hindering or delaying First Midwest's enforcement or realization upon any of the
Aggregate Collateral once an Event of Default has occurred; (2) using or seeking to use Cash
Collateral or incurring indebtedness in violation of the terms hereof, or selling any Aggregate
Collateral without the consent of First Midwest and each holder of a Permitted Priority Lien in
such Aggregate Collateral; or (3) objecting to or contesting in any manner, or in raising any
defenses to, the validity, extent, amount, perfection, priority or enforceability of the Aggregate
Debt or any mortgages, liens or security interests with respect thereto or any other rights or
interests of First Midwest, or in asserting any claims or causes of action, including, without
limitation, any actions under chapter 5 of the Code, against First Midwest; provided, however,
that up to $15,000 of the Carveout may be used by the Committee to investigate the validity,
extent, amount, perfection, priority, or enforceability of the Prepetition Debt and the Prepetition
Collateral; provided, further, however, that the Carveout may be used to pay fees and expenses

incurred by the Carveout Professionals in connection with the negotiation, preparation and entry of this Final Order or any amendment hereto consented to by First Midwest.

(d)     Binding Effect of Stipulations; Challenge Period. The stipulations and admissions contained in this Final Order, exclusive of the recitals in Paragraphs D through J of this Final Order, shall be binding on all parties-in-interest, including, without limitation, the Committee. Further, unless, and solely to the extent that, (a) a party in interest has timely filed an adversary proceeding challenging the amount, validity, or enforceability of the Prepetition Debt, or the perfection or priority of First Midwest's liens on and security interests in the Prepetition Collateral in respect thereof, or otherwise asserting any claims or causes of action on behalf of the Debtors' estates against First Midwest relating to the Prepetition Debt, by no later than (x) with respect to the Committee, the date that is 60 days after the date of its formation, and, with respect to any other party, the date that is 75 days from the entry of the Interim Order, and (b) the Court rules in favor of such party in interest or the Committee in any such timely and properly filed adversary proceeding, then, without further order of the Court, (i) the claims, liens and security interests of First Midwest shall be deemed to be allowed for all purposes in the Cases and shall not be subject to challenge by any party in interest as to extent, validity, priority or otherwise, and (ii) the Debtors and their estates shall be deemed to have waived, released and discharged First Midwest and its officers, directors, principals, attorneys, consultants, predecessors in interest, and successors and assigns of and from any and all claims and causes of action, indebtedness, and obligations, of every type, which occurred on or prior to the date of entry of this Final Order with respect to or in connection with the Prepetition Debt, the Prepetition Liens, the Prepetition Documents or otherwise, and (iii) the recitals in Paragraphs D through J of this Final Order shall be binding on all parties in interest, including, without

14

limitation, the Committee.   Notwithstanding anything to the contrary herein, if any such adversary proceeding is timely commenced, the stipulations contained in Paragraphs D through J hereof shall nonetheless remain binding on the Debtors except to the extent that such stipulations are expressly challenged in such adversary proceeding and the Committee prevails by a final order of this Court.   Notwithstanding the foregoing, nothing in this Final Order shall limit the right of any person claiming a Permitted Priority Lien from asserting that it has priority over First Midwest in property of the Debtors' estates before or after the expiration of the Challenge Period established by the second sentence in this Section 6, and all rights of a party asserting a Permitted Priority Lien to assert a priority challenge are expressly preserved.

    7. <u>Application of Sale Proceeds</u>. All proceeds from sales, losses or other dispositions of all or any portion of the Aggregate Collateral that is not subject to a Permitted Priority Lien shall be remitted to First Midwest for application in accordance with Paragraph 2. All proceeds from sales or other dispositions of all or any portion of the Aggregate Collateral that is subject to a Permitted Priority Lien shall be remitted:   <u>first</u>, subject to any rights of the Debtors under Code § 506(c), to holders of Permitted Priority Liens in accordance to the portion of the proceeds of sale attributable to the Aggregate Collateral that is subject to such holder's Permitted Priority Lien, for application against the claim of such holder of a Permitted Priority Lien; and, <u>second</u>, to the extent that any proceeds remain after the claim of such holder of such Permitted Priority Lien has been paid in full, including with respect to any post-petition interest, fees, costs, or other charges to which such holder is entitled under Section 506(b) of the Bankruptcy Code, to First Midwest for application in accordance with Paragraph 2.

    8. <u>Waiver of Right to Return</u>. The Debtors hereby waive their right to return any of the Aggregate Collateral pursuant to § 546(h) of the Code.

9.    Force and Effect of Prepetition Documents.  Except as modified herein and subject to the other provisions of this Final Order and the Code, the Prepetition Documents shall remain in full force and effect with respect to the Prepetition Debt.  To the extent there exists any conflict among the terms of the Motion, the Prepetition Documents and this Final Order, this Final Order shall govern and control.

10.    Modification of Stay.  Subject to Paragraph 5 of this Order, the automatic stay of § 362 of the Code is hereby modified solely with respect to First Midwest to the extent necessary to effectuate the provisions of this Order.

11.    No Waiver.  First Midwest shall not be deemed to have suspended or waived any of their rights or remedies under this Final Order, the Prepetition Documents, the Code, or applicable nonbankruptcy law unless such suspension or waiver is in writing, signed by a duly authorized officer of First Midwest, as applicable, and directed to the Debtors.  No failure of First Midwest to require strict performance by the Debtors, or by any Trustee of any provision of this Final Order shall waive, affect or diminish any right of First Midwest thereafter to demand strict compliance and performance therewith, and no delay on the part of First Midwest in the exercise of any right or remedy under this Final Order, the Prepetition Documents, the Code, or applicable nonbankruptcy law shall preclude the exercise of any right or remedy. Further, this Final Order shall not constitute a waiver by First Midwest of any of its rights under the Prepetition Documents, the Code or applicable nonbankruptcy law, including, without limitation its right to later assert: (1) that its interests in the Aggregate Collateral lack adequate protection within the meaning of §§ 362(d) or 363(e) of the Code or any other provision thereof; or (2) a claim under § 507(b) of the Code.

16

12.     <u>Amendments</u>.  The Debtors and First Midwest may enter into amendments or modifications of the Budget and the Maximum DIP Amount without further notice and hearing or order of this Court; provided, that (a) such modifications or amendments do not materially and adversely affect the rights of any creditor or other party-in-interest, (b) the Committee consents to such modification, and (c) notice of any such amendment or modification is filed with this Court.

13.     <u>Reporting</u>.  In addition to all reporting requirements under the Prepetition Documents, the Debtors shall timely provide First Midwest with reports on no less than a weekly basis detailing the Debtors' compliance with the Budget and any changes in its projections including, but not limited to, cash inflows and outflows, weekly borrowing base certificates, accounts receivable aging, accounts payable aging, weekly actual cash flow versus projections, and shall otherwise reasonably cooperate with First Midwest regarding the Budget and the administration of its assets.

14.     <u>Binding Effect</u>.  Except as provided in Paragraph 6 herein, this Final Order shall be binding on all parties in interest in the Cases and their respective successors and assigns, including any Trustee.  If, in accordance with § 364(e) of the Code, this Final Order does not become a final nonappealable order, or if any of the provisions of this Final Order are hereafter modified, amended, vacated or stayed by subsequent order of this Court or any other court, such termination or subsequent order shall not affect: (a) subject to Paragraph 6 of this Final Order, the stipulations, representations, and findings contained in this Final Order and the relief granted by and the releases contained in this Final Order (including, without limitation, Paragraphs 2(d), 3(d) and 6); and (b) the priority, validity, enforceability or effectiveness of any lien, security interest or other benefit or claim authorized hereby with respect to Cash Collateral used or

Postpetition Debt incurred prior to the effective date of such termination or subsequent order. All such liens, security interests, claims and other benefits shall be governed in all respects by this Final Order, and First Midwest shall be entitled to all the rights, remedies, privileges and benefits granted hereto, including the liens and priorities granted herein, with respect to the Postpetition Debt. Except as otherwise explicitly set forth in this Final Order, no third party is intended to be, or shall be deemed to be, a third-party beneficiary of this Final Order.

15.   <u>Survival</u>.   The provisions of this Final Order, and any actions taken pursuant to or in reliance upon the terms hereof, shall survive entry of, and govern in the event of any conflict with, any order which may be entered in the Cases: (a) confirming any chapter 11 plan, (b) converting the Cases to cases under chapter 7 of the Code, (c) dismissing the Cases, (d) withdrawing of the reference of the Cases from this Court, or (e) providing for abstention from handling or retaining of jurisdiction of the Cases in this Court. The terms and provisions of this Final Order, including, without limitation, the rights granted First Midwest under §§ 364(c) and (d) of the Code, shall continue in full force and effect until all of the Aggregate Debt is indefeasibly paid in full in cash and discharged.

Dated: June 22, 2017
Chicago, Illinois

_____
UNITED STATES BANKRUPTCY JUDGE

4822-3098-9898, v. 2

18

## EXHIBIT A

## DEFINED TERMS

1.    *Aggregate Collateral*.  Collectively, the Prepetition Collateral and the Postpetition Collateral.

2.    *Aggregate Debt*.  Collectively, the Prepetition Debt and the Postpetition Debt.

3.    *Budget*.  The budget attached to this Final Order as Exhibit 2, as amended, modified or supplemented from time to time, as may be agreed to in writing by First Midwest.

4.    *Carveout*.  Collectively, (a) all fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), and (b) the allowed fees and disbursements as may be awarded by the Court to a Carveout Professional from time to time pursuant to § 330 of the Code, in the aggregate amount set forth in paragraph 4(b) of the Final Order.

5.    *Carveout Professionals*.  Sugar Felsenthal Grais & Hammer LLP, Conway MacKenzie, Inc., Brown Rudnick LLP, Freeborn & Peters LLP, Emerald Capital Partners, and FocalPoint Partners LLC.

6.    *Cases*.  The Debtors' chapter 11 cases or any superseding chapter 7 cases of the Debtors.

7.    *Cash Collateral*.  All "cash collateral," as that term is defined in § 363(a) of the Code, in which First Midwest has an interest, all deposits subject to setoff rights in favor of First Midwest, and all cash arising from the collection or other conversion to cash of the Aggregate Collateral, including from the sale of inventory and the collection of accounts receivable.

8.    *Code*.  The United States Bankruptcy Code (11 U.S.C. §§ 101 et seq.), as amended, and any successor statute. Unless otherwise indicated, all statutory section references in this Final Order are to the Code.

9.    *Committee*.  The official committee of unsecured creditors appointed on May 16, 2017, and identified in the notice of appointment filed by the Office of the United States Trustee on May 17, 2017, to represent unsecured creditors in these Cases pursuant to § 1102 of the Code.

10.    *Debtors*.  Chellino Crane Inc.; Sam J. Chellino Crane Rental, Inc.; G & B Equipment, LLC; Chellino/Industrial Park Family Limited Partnership; and Chellino Industrial Management, Inc.

11.    *Event(s) of Default*.  An Event of Default includes any of the following: (a) the Company shall fail to pay (i) any interest due on the Note (as defined in the Postpetition Credit Agreement) by three (3) days after the same becomes due; (ii) any other amount due and payable under the Postpetition Credit Agreement (other than a principal payment on any Note) by three (3) days after Company receives written demand from First Midwest therefor; or (iii) any principal amount due on the Note when due; (b) the Company shall default in the performance or observance of any agreement, covenant, condition, provision or term contained in Article V or section 6.01 of the Postpetition Credit Agreement; (c) the Company or any Guarantor shall default in the performance or observance of any of the other agreements, covenants, conditions, provisions or terms in the Postpetition Credit Agreement or any of the Postpetition Collateral Documents (as defined in the Postpetition Credit Agreement) continuing for a period of thirty days after written notice thereof is given to the Company by First Midwest; (d) any representation or warranty made by the Company in the Postpetition Credit Agreement or any certificate delivered pursuant to the Postpetition Credit Agreement, or any financial statement delivered to the First Midwest under the Postpetition Credit Agreement, by the Company or any Guarantor shall prove to have been false in any material respect as of the time when made or given; (e) [OMITTED]; (f) any lien purported to be created by any Postpetition Loan Document or the Interim Order or Final Order in any of the collateral secured by the Postpetition Collateral Documents purported to be covered thereby shall, for any reason, cease to be valid except collateral released as permitted by any Postpetition Loan Document or Interim Order or Final Order; (g) entry of an order of the Bankruptcy Court converting the chapter 11 case of the Company to a case under chapter 7 of the Bankruptcy Code and such order is not reversed or vacated within thirty (30) days; (h) entry of an order of the Bankruptcy Court

2

dismissing or suspending the chapter 11 case of the Company; (i) entry of an order of the Bankruptcy Court in the Company's chapter 11 case appointing a trustee under Section 1104 of the Bankruptcy Code which First Midwest reasonably determines may result in events which are materially injurious to the interests of First Midwest and such order is not reversed or vacated within thirty (30) days; (j) entry of an order of the Bankruptcy Court granting relief from the automatic stay to the holder of a lien on, or security interest in, any other asset the removal of which from the Company's bankruptcy estate that has a material adverse effect on the value or operation of the Company's business, as determined by the Bankruptcy Court; (k) the Interim Order or Final Order shall terminate by its terms, shall not remain in full force and effect or shall have been stayed, vacated, reversed, modified, supplemented or amended in a manner which First Midwest reasonably believes is materially injurious to its interests, or, in the event that any such order is the subject of any pending motion or appeal, any performance of any obligation of any party hereto shall have been stayed pending such motion or appeal; (l) the Final Order shall not have been issued within two (2) Business Days after the date the Final Hearing is concluded; (m) the sum of the amounts outstanding under the Loans, the $370,000 Note and the Postpetition Credit Agreement (but expressly subject to the Permitted Overadvances set forth in the Postpetition Credit Agreement) exceed the Borrowing Base from time to time in effect, and in either case, the Company fails to repay the amount of such excess within 5 Business Days after notice from First Midwest; or (n) the Postpetition Credit Agreement, the Note or any Postpetition Collateral Document shall, at any time after their respective execution and delivery, and for any reason, cease to be in full force and effect or be declared null and void, or be revoked or terminated (other than by First Midwest), or the validity or enforceability thereof or hereof shall be contested in writing by the Company or any Guarantor, or the Company or any Guarantor shall deny in writing that it has any or further liability or obligation thereunder or under the Postpetition Credit Agreement, as the case may be.

    12.    ***Final Hearing***.  The final hearing on the Motion conducted in accordance with Fed R. Bankr. P. 4001.

    13.    ***FMB Account***.  A collection account in the name of Chellino Crane, Inc. at First Midwest.

3

14.   **_Guaranties._**   Collectively, (a) Commercial Guaranty for Loan No. 2014001300, dated as of July 5, 2016, executed by Sam J. Chellino Crane Rental, Inc.; (b) Commercial Guaranty for Loan No. 2014001300, dated as of July 5, 2016, executed by Frank J. Chellino; (c) Commercial Guaranty for Loan No. 2014001300, dated as of July 5, 2016, executed by Gregory Chellino; (d) Commercial Guaranty for Loan No. 2014001467, dated as of December 29, 2014, executed by Sam J. Chellino Crane Rental, Inc.; (e) Commercial Guaranty for Loan No. 2014001467, dated as of December 29, 2014, executed by Frank J. Chellino; (f) Commercial Guaranty for Loan No. 2014001467, dated as of December 29, 2014, executed by Gregory Chellino; (g) Commercial Guaranty for Loan No. 2014001468, dated as of December 29, 2014, executed by Sam J. Chellino Crane Rental, Inc.; (h) Commercial Guaranty for Loan No. 2014001468, dated as of December 29, 2014, executed by Frank J. Chellino; (i) Commercial Guaranty for Loan No. 2014001468, dated as of December 29, 2014, executed by Gregory Chellino; (j) Commercial Guaranty for Loan No. 2014001469, dated as of December 29, 2014, executed by Sam J. Chellino Crane Rental, Inc.; (k) Commercial Guaranty for Loan No. 2014001469, dated as of December 29, 2014, executed by Frank J. Chellino; (l) Commercial Guaranty for Loan No. 2014001469, dated as of December 29, 2014, executed by Gregory Chellino; (m) Commercial Guaranty for Loan No. 2014001470, dated as of December 30, 2014, executed by Sam J. Chellino Crane Rental, Inc.; (n) Commercial Guaranty for Loan No. 2014001470, dated as of December 30, 2014, executed by Frank J. Chellino; (o) Commercial Guaranty for Loan No. 2014001470, dated as of December 30, 2014, executed by Gregory Chellino; (p) Commercial Guaranty for Loan No. 2014001751, dated as of January 15, 2015, executed by Sam J. Chellino Crane Rental, Inc.; (q) Commercial Guaranty for Loan No. 2014001751, dated as of January 15, 2015, executed by Frank J. Chellino; and (r) Commercial Guaranty for Loan No. 2014001751, dated as of January 15, 2015, executed by Gregory Chellino (each a "Guaranty," collectively the "Guaranties").

15.   **_Guarantors._**   Collectively, (a) Sam J. Chellino Crane Rental, Inc., (b) Frank J. Chellino, and (c) Gregory Chellino (each a "Guarantor," collectively the "Guarantors").

16.   **_Maximum DIP Amount._**   $1,450,000.

17.    *Permitted Priority Liens*. The liens in favor of third parties upon assets of the Debtors' estates, which third-party liens, as of the Petition Date: (1) had priority under applicable law or by agreement over the Prepetition Liens, (2) were not subordinated by agreement or applicable law, and (3) were non-avoidable, valid, properly perfected and enforceable as of the Petition Date. Those lenders listed on page 5 of the Motion claim to be holders of Permitted Priority Liens, and actions in derogation of that claimed status cannot be taken without further order of the Court.

18.    *Permitted Variance*. An amount equal to 10% of the cumulative amount set forth in the Budget.

19.    *Petition Date*. May 5, 2017.

20.    *Postpetition Collateral*. (a) All of the real and personal property of the Debtors that have granted a mortgage or security interest to First Midwest, or any of its subsidiaries, to secure Prepetition Debt, and their respective estates, of any description whatsoever, wherever located and whenever arising or acquired, including, without limitation all cash, accounts, receivables, inventory, equipment, fixtures, chattel paper, general intangibles all leaseholds, all commercial torts, all interests in any joint venture, all licenses and permits, all other Prepetition Collateral, and all proceeds, rents, issues, profits and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any of the foregoing; provided, however, that the Postpetition Collateral shall not include property to the extent that such property is subject to a valid and enforceable agreement with the Small Business Administration which prohibits the granting of a lien in favor of First Midwest.

(b)    A mortgage on the real estate and personal property owned by Chellino/ Industrial Park Family Limited Partnership and now or hereafter located at 915 Rowell Avenue, Joliet, Illinois.

(c)    A pledge of notes owed by Chellino Crane, Inc. to the individual Guarantors.

21.   ***Postpetition Debt***.  All indebtedness or obligations of the Debtors to First Midwest incurred on or after the Petition Date pursuant to this Interim Order or otherwise, including all advances made by First Midwest to pay the Carveout.

22.   ***Postpetition Liens***.  Priority Liens in the Aggregate Collateral, subject only to Permitted Priority Liens.

23.   ***Postpetition Credit Agreement***.  The postpetition loan agreement to be entered into between Chellino Crane, Inc. (the "Company") and First Midwest, substantially similar to that draft Credit Agreement previously agreed upon, tracking the provisions of this Final Order and funded in accordance with the attached Budget.

24.   ***Postpetition Loan Documents***.  Collectively, the Postpetition Credit Agreement, the Note (as defined in the Postpetition Credit Agreement) and the Postpetition Collateral Documents (as defined in the Postpetition Credit Agreement).

25.   ***Prepetition Collateral***.  All of the "Collateral" (as that term is defined in the Prepetition Documents) of First Midwest existing as of the Petition Date, and all proceeds, rents, issues, profits and products thereof.

26.   ***Prepetition Credit Agreement***.  That certain Business Loan Agreement (Asset Based) dated as of December 5, 2014 by and between the Chellino Crane, Inc. and Standard Bank and Trust Company ("Standard Bank"), as predecessor in interest to First Midwest, as amended, modified and supplemented from time to time.

27.   ***Prepetition Debt***.  All indebtedness or obligations of the Debtors under the Prepetition Documents as of the Petition Date, including fees, costs, interest, and expenses as and when due and payable pursuant to the Prepetition Documents.

28.   ***Prepetition Documents***.  The Prepetition Credit Agreement and all security agreements, pledge agreements, promissory notes and other documents, entered into by any of the Debtors and First Midwest, or any of its subsidiaries, including, without limitation, the following documents, among others, each as amended: Commercial Security Agreement, dated as of December 5, 2014, among Chellino Crane, Inc. and Standard Bank; Certain Promissory

Notes numbered 2014001751, 2014001300, 2014001467, 2014001468, 2014001469, and 2014001470 (the "Notes"); Separate Business Loan Agreements (the "Business Loan Agreements"); Separate Security Agreements (the "Security Agreements") between the Guarantors and Standard Bank; the Guaranties; and the Prepetition Third Party Documents.

29.    ***Prepetition Liens***. First Midwest's security interests in the Prepetition Collateral under the Prepetition Documents, subject only to Permitted Priority Liens and Postpetition Liens.

30.    ***Prepetition Revolving Line of Credit.*** Pursuant to that certain Business Loan Agreement dated as of December 29, 2014, Standard Bank and Trust Company, as predecessor in interest to First Midwest, provided a credit facility to Chellino Crane, Inc., the outstanding principal balance of which, as of the Petition Date, was approximately $5,217,903.06.

31.    ***Prepetition Third Party Documents***. Collectively, the Debtors' deposit account control agreements, leases, licenses, collateral access agreements, landlord agreements, warehouse agreements bailment agreements, insurance policies, contracts or other similar agreements in which First Midwest has an interest.

32.    ***Primed Collateral.*** Accounts receivable of the Debtors that (a) are part of the Aggregate Collateral or (b) existed on or after the Petition Date, but (c) do not constitute Third Party Proceeds.

33.    ***Priming Liens.*** Priority Liens in Primed Collateral, senior in priority to all liens on such collateral, but junior to any Permitted Priority Liens, and solely to the extent that of the lesser of (a) the outstanding amount of Postpetition Debt as of the Termination Date (subject to the Maximum DIP Amount) and (b) the amount by which the fair value of the Primed Collateral as of the Termination Date determined by the Court exceeds $3,380,562.

34.    ***Priority Liens***. Liens that are first priority, properly perfected, valid and enforceable security interests, and that are not subject to any claims, counterclaims, defenses, setoff, recoupment or deduction, and which are otherwise unavoidable and not subject to

7

recharacterization or subordination pursuant to any provision of the Code, any agreement, or applicable nonbankruptcy law.

35. **Replacement Liens**. Priority Liens in the Postpetition Collateral granted to First Midwest pursuant to this Final Order, subject only to the Postpetition Liens and the Permitted Priority Liens.

36. **Specified Bare Rental Proceeds**. Rent and other amounts receivable from the bare rental of the following units:

    (a)    MANITEX VIN# 1NKZL40X4GJ492327;

    (b)    MANITEX VIN# 1NKZL40X2GJ492326;

    (c)    2016 MANITOWOC SN# 605801; and

    (d)    2016 MANITOWOC SN# 604717.

37. **Termination Date**. At First Midwest's election, the earlier to occur of: (a) the date on which First Midwest provides, via facsimile or overnight mail, written notice to counsel for the Debtors and counsel for the Committee of the occurrence and continuance of an Event of Default; and (b) the Final Order shall not have been issued within two (2) Business Days after the date the Final Hearing is concluded.

38. **Third Party Proceeds**. Proceeds of the sale, or proceeds of the disposition out of the Debtors' ordinary course of business, of property subject to a Permitted Priority Lien, or insurance proceeds of property subject to a Permitted Priority Lien, or Specified Bare Rental Proceeds of property subject to a Permitted Priority Lien.

39. **Trustee**. Any chapter 11 or chapter 7 trustee appointed or elected in the Cases.

40.

41.

42.    4815-0989-7290, v. 2

# **Exhibit B**

Chellino Crane, Inc. — Working Draft
DIP Cash Flow Analysis — Confidential
Monthly Cash Flow

| Month Ending | Pre-Filing May-17 | (5/1 - 5/5) May-17 | (5/5 - 5/31) May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Exit | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | |
| Rental/Labor Revenue | | 390,332 | 1,989,287 | 1,621,028 | 2,450,492 | 2,795,224 | 3,403,165 | | 12,649,528 |
| Other Revenue | | | | | | | | | |
| **Total Cash Receipts** | - | 390,332 | 1,989,287 | 1,621,028 | 2,450,492 | 2,795,224 | 3,403,165 | | 12,649,528 |
| | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | |
| Compensation & Benefits | | 283,248 | 1,432,874 | 1,642,920 | 1,742,931 | 2,149,847 | 2,671,255 | | 9,923,074 |
| Rental Related Costs | | 7,000 | 35,463 | 74,799 | 81,584 | 116,797 | 73,024 | | 388,666 |
| Operating Expenses | | 20,337 | 57,967 | 100,700 | 100,700 | 100,700 | 111,200 | | 491,604 |
| Insurance/Other | | 95,147 | | 324,711 | 112,807 | 163,654 | 87,807 | | 784,125 |
| **Total Operating Disbursements** | - | 405,732 | 1,526,303 | 2,143,129 | 2,038,022 | 2,530,997 | 2,943,285 | | 11,587,469 |
| | | | | | | | | | |
| **Extraordinary Professionals** | | | | | | | | | |
| Conway MacKenzie - Financial Advisory Fees | 70,325 | 24,690 | - | 96,317 | 95,680 | 95,680 | 95,680 | 140,439 | 618,812 |
| Conway MacKenzie - Financial Advisory Fees (Retainer) | 50,000 | | | | | | | | 50,000 |
| SFGH - Legal Counsel | | | 172,000 | 104,000 | 104,000 | 84,000 | 196,000 | | 660,000 |
| SFGH - Legal Counsel (Retainer) | 150,000 | | | | | | | | 150,000 |
| Epiq | - | | | 40,000 | 25,000 | 25,000 | 25,000 | | 115,000 |
| UCC (1) | - | | | 95,000 | 95,000 | 95,000 | 95,000 | 95,000 | 475,000 |
| Trustee/Administrative Fees | - | | | - | 13,000 | - | 8,667 | | 21,667 |
| Other (FMB & Other Legal) | - | | | 30,000 | 20,000 | 30,000 | 20,000 | 20,000 | 120,000 |
| Investment Banking Fees (2) | - | | | 25,000 | 25,000 | 25,000 | 25,000 | - | 100,000 |
| **Total Extraordinary Professional Fees** | 270,325 | 24,690 | - | 458,317 | 377,680 | 374,680 | 353,347 | 451,439 | 2,310,478 |
| | | | | | | | | | |
| **Notes Payable** | | | | | | | | | |
| Interest Payments | | | - | - | - | - | - | | |
| DIP Interest (3) | | | - | - | 4,375 | 4,375 | 5,542 | 5,542 | 19,833 |
| DIP Fees (4) | | | | 138,000 | | | | | 138,000 |
| Tail Expenses | | | | | | | | 250,000 | 250,000 |
| Note Payments | | | | | | | | | |
| **Total Notes Payable Disbursements** | - | - | - | 138,000 | 4,375 | 4,375 | 5,542 | 255,542 | 407,833 |
| | | | | | | | | | |
| **Operating Leases** | | | | | | | | | |
| Nations Equipment Finance | | | - | - | - | - | - | | |
| Mardian | | | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | | |
| Continental | | | - | | | | | | |
| Other | | | - | | | | | | |
| **Total Operating Lease Disbursements** | - | - | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | | 85,000 |
| | | | | | | | | | |
| **Past Due / Critical Payments** | | | | | | | | | |
| Union Dues | 100,000 | | - | 100,000 | - | - | - | | 200,000 |
| Payroll Taxes | | | | | | | | | |
| **Total Past Due/Critical Payments** | 100,000 | - | - | 100,000 | - | - | - | | 200,000 |
| | | | | | | | | | |
| **Beginning Cash Balance** | 174,633 | 174,308 | 134,218 | 580,202 | 94,784 | 108,199 | 176,371 | 260,362 | 174,633 |
| Plus: Cash Receipts | | 390,332 | 1,989,287 | 1,621,028 | 2,450,492 | 2,795,224 | 3,403,165 | | 12,649,528 |
| Less: Cash Disbursements | (370,325) | (430,422) | (1,543,303) | (2,856,446) | (2,437,077) | (2,927,052) | (3,319,173) | (706,981) | (14,590,780) |
| Net Cash Flow | (370,325) | (40,090) | 445,984 | (1,235,418) | 13,415 | (131,828) | 83,991 | (706,981) | (1,941,252) |
| Other Borrowings | 370,000 | | | | | | | | 370,000 |
| DIP Borrowings/(Repayment) | | | | 750,000 | | 200,000 | | 500,000 | 1,450,000 |
| **Ending Cash Balance** | $174,308 | $134,218 | $580,202 | $94,784 | $108,199 | $176,371 | $260,362 | $53,381 | $53,381 |
| September Cash Flow | | | | | | | | | |
| Ending Cash Flow | | | | | | | | | |
| | | | | | | | | | |
| DIP - Beginning Balance | - | - | - | - | 750,000 | 750,000 | 950,000 | 950,000 | 950,000 |
| Borrowing/Repayment | - | - | - | 750,000 | - | 200,000 | - | 500,000 | 500,000 |
| DIP - Ending Balance | - | - | - | 750,000 | 750,000 | 950,000 | 950,000 | 1,450,000 | 1,450,000 |
| | | | | | | | | | |
| **Total Borrowings (Pre-Petition & DIP)** | 370,000 | 370,000 | 370,000 | 1,120,000 | 1,120,000 | 1,320,000 | 1,320,000 | 1,820,000 | 1,820,000 |
| Line of Credit | 5,217,903 | 5,587,903 | 5,217,903 | 5,217,903 | 5,217,903 | 5,217,903 | 5,217,903 | 5,217,903 | 5,217,903 |
| **Total Borrowings** | 5,587,903 | 5,587,903 | 5,587,903 | 6,337,903 | 6,337,903 | 6,537,903 | 6,537,903 | 7,037,903 | 7,037,903 |
| | | | | | | | | | |
| **AR - Ending Balance** | 3,381,562 | 3,530,897 | 3,301,690 | 4,404,534 | 4,823,622 | 5,602,228 | 6,669,687 | 6,669,687 | |
| AR - Ineligible | 541,050 | (325,416) | (325,416) | (325,416) | (325,416) | (325,416) | (325,416) | (325,416) | |
| **AR - Net Available BB** | 2,840,512 | 3,205,481 | 2,976,274 | 4,079,118 | 4,498,206 | 5,276,812 | 6,344,271 | 6,344,271 | |
| | | | | | | | | | |
| Borrowing Availability (80%) | 2,272,410 | 2,564,385 | 2,381,019 | 3,263,295 | 3,598,565 | 4,221,450 | 5,075,417 | 5,075,417 | |
| Total Borrowing | 5,587,903 | 5,587,903 | 5,587,903 | 6,337,903 | 6,337,903 | 6,537,903 | 6,537,903 | 7,037,903 | |
| **Excess (Deficit) Availability** | (3,315,494) | (3,023,518) | (3,206,884) | (3,074,609) | (2,739,339) | (2,316,454) | (1,462,486) | (1,962,486) | |
| | | | | | | | | | |
| AR - Ending Balance | 3,381,562 | 3,530,897 | 3,301,690 | 4,404,534 | 4,823,622 | 5,602,228 | 6,669,687 | 6,669,687 | |
| Total Borrowing | 5,587,903 | 5,587,903 | 5,587,903 | 6,337,903 | 6,337,903 | 6,537,903 | 6,537,903 | 7,037,903 | |
| **Variance** | (2,206,342) | (2,057,006) | (2,286,214) | (1,933,369) | (1,514,281) | (935,675) | 131,784 | (368,216) | |

Notes:
(1) UCC Professionals (Legal & Financial Advisor) will be paid at an assumed combined run-rate of $95,000 per month
(2) Investment banking success fee is assumed to be paid as a deduct from sale proceeds and will not be paid out of the DIP provided by First Midwest Bank
(3) DIP Interest will be paid on the incremental new money that is borrowed by the debtor during the post-petition period; this will be paid monthly in arrears
(4) DIP Fees will be paid out in two installments: one payment of $50,000 to occur during the interim DIP period and one payment of $83,000 to be paid once the final order is signed